# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Loan Agreement") is made and entered into as of the ____ day of October, 2008, by and between **Warehouse 86, LLC**, an Arizona limited liability company ("Borrower"),  5 River Bend Place, Flowood, MS 39232, and **Kenneth A. May** ("Lender"), 5139 Palomar Lane, Dallas, Texas 75229.

IN CONSIDERATION OF the Lender's commitment to make loans and advances to Borrower in an amount not to exceed FIVE HUNDRED THOUSAND AND/100ths DOLLARS ($500,000.00) (the "Loan") and the mutual agreements herein contained, the parties agree as follows:

## SECTION 1. DEFINITIONS AND ACCOUNTING TERMS

**1.1** **Certain Defined Terms.**  For purposes of this Loan Agreement, the following terms shall have the following meanings:

"Advances," collectively, or "Advance," singularly, means an advance of principal on the Loan by the Lender under the terms of this Loan Agreement to the Borrower during the term of the Loan.

"Environmental Laws" means all local, state or federal laws, rules or regulations pertaining to environmental regulation, contamination or cleanup, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976 or any state lien or superlien or environmental cleanup statutes.

"Event of Default" has the meaning assigned to that phrase in Section 6.

"Hazardous Substances" shall mean and include all hazardous and toxic substances, wastes or materials, any pollutants or contaminants (including, without limitation, asbestos and raw materials which include hazardous constituents), or any other similar substances or materials which are included under or regulated by any Environmental Laws.

"Loan" means Borrower's indebtedness, hereinabove mentioned, to the Lender under this Loan Agreement.

"Note" means the line of credit note evidencing the Loan in the principal amount hereinabove set out executed by the Borrower to the Lender, as such note may be modified, renewed or extended from time to time; and any other note or notes executed at any time to evidence the indebtedness under this Loan Agreement, in whole or in part, and any renewals, modifications and extensions thereof, in whole or in part.

"Security Agreement" means the Security Agreement pursuant to which Borrower has granted to Lender a security interest in certain personal property.



EXHIBIT
"B"

"Termination Date of Loan" shall mean the Maturity Date (as defined in the Note).

**1.2    Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles.

**SECTION 2. CONDITIONS    OF    LENDING;    COMMITMENT;    REQUIRED REPAYMENTS**

**2.1    The Commitment.**  Subject to the terms and conditions herein set out, Lender agrees and commits to make Advances to the Borrower from time to time, from the date hereof until the Termination Date of Loan, in an aggregate principal amount not to exceed, at any one time outstanding, Five Hundred Thousand and No/100ths Dollars ($500,000.00).  Each Advance hereunder shall be made upon the written request of the Borrower to the Lender and shall be made by Lender by either, at Lender's sole election, (a) depositing such Advance to an authorized depository account of the Borrower or (b) making a direct payment of the invoices submitted by Borrower in support of the request for an Advance; additionally, Advances made be made in such other manner as Borrower and Lender may agree.  The Borrower may use the Advances only for the purposes set forth in Section 2.4 below.  The Loan shall be evidenced by the Note, shall bear interest at the rate therein provided and shall be payable as therein set out, with the entire unpaid principal amount being due and payable on the Termination Date of Loan.

**2.2    Conditions Precedent to Funding.**  The obligation of the Lender to fund the Loan hereunder is subject to the condition precedent that the Lender shall have received all of the following in form and substance satisfactory to the Lender:

(a)    This Loan Agreement.

(b)    The Note.

(c)    The Security Agreement, together with such financing statements as the Lender may require to perfect its security interest therein.

(d)    The entry of an Order by the Bankruptcy Court approving this transaction and granting Lender a first and prior lien and security interest in all of the Collateral.

(e)    Current signed bankruptcy schedules of the Borrower.

(f)    Copies of Borrower's articles of organization and operating agreement and any amendments thereto, a certificate of existence or good standing from the Arizona Secretary of State's Office, and resolutions of the Borrower authorizing the transaction.

(g)    Such other information and documentation that is reasonably necessary for funding of the Loan.

**2.3    Conditions Precedent to All Advances.**  The obligation of the Lender to make Advances pursuant hereto (including the initial advance at the closing date) shall be subject to the following additional conditions precedent:

(a)    The Borrower shall have furnished to the Lender each of the items referred to in Section 2.2 hereof, all of which shall remain in full force and effect as of the date of such Advance (notwithstanding that the Lender may not have required any such item to be furnished prior to the closing date).

(b)    The Borrower shall not be in default of any of the terms and provisions hereof or of any instrument or document now or at any time hereafter evidencing or securing all or any part of the Loan indebtedness, including, but not limited to the Note and the Security Agreement. Each of the Representations and Warranties of the Borrower, as set out in Section 3 hereof, shall remain true and correct in all material respects as of the date of such Advance.

(c)    A certificate of insurance from an insurance broker, satisfactory to Lender setting forth the information concerning insurance which is required by the Security Agreement, and, if the Lender shall so require, the original insurance policies evidencing such insurance.

(d)    Any subsequent Advance will be either in accordance with the terms of the operating budget submitted by Borrower or will be supported by documentary evidence in form and substance acceptable to Lender.

**2.4    Use of Loan Proceeds.**  Borrower agrees to use the proceeds of the Loan solely for the payment of: (a) trade payables, (b) preapproved salaries of employees, (c) sourcing and listing of goods, (d) day-to-day operational expenses incurred in the ordinary course of its business, and (e) such other items as are approved from time to time by Lender or its designated agent.

**2.5    Commitment Fee.**  Intentionally omitted.

**2.6    Required Repayments.**  Intentionally omitted.


**SECTION 3.  REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants that:

**3.1    Accuracy of Submissions.**  All documents and information submitted by Borrower to Lender was, as of the date of submission, and now remains true, complete and correct in all material respects. All financial statements submitted to the Lender in connection with the Loan are correct and complete and fairly present the financial condition of the Borrower as of the date or for the period therein stated; and there are no material contingent liabilities or obligations which are not duly noted therein.

**3.2**     **No Material Change.**   There has occurred no material adverse change in the business, properties or condition, financial or otherwise, of Borrower since the date of its bankruptcy schedules submitted to Lender.

**3.3**     **Title to Assets Pledged.**   Borrower has good and marketable title to all properties and assets pledged to the Lender as security for the Loan.

**3.4**     **Hazardous Substances.**   No Hazardous Substances are located on or have been stored, processed or disposed of on or released or discharged (including ground water contamination) from any property owned by Borrower and no above or underground storage tanks exist on such property.   No private or governmental lien or judicial or administrative notice or action related to Hazardous Substances or other environmental matters has been filed against any property owned by Borrower or otherwise issued to or received by Borrower.

## SECTION 4.  FINANCIAL COVENANTS OF BORROWER.

INTENTIONALLY OMITTED.

## SECTION 5.  OTHER COVENANTS OF BORROWER

Borrower covenants and agrees that at all times, unless the Lender shall otherwise consent in writing, such consent to be at the sole discretion of the Lender:

**5.1**     **Financial Reports and Other Data.**   Borrower will furnish to the Lender a copy of the Monthly Operating Report filed with the United States Trustee, as well as such other financial reports reasonably requested by Lender.

**5.2**     **Additional Information.**   Borrower will furnish such other information regarding the operations, business affairs and financial condition of the Borrower as Lender may reasonably request, including, but not limited to, copies of its books of account and tax returns, and all information furnished to any governmental authority, will permit the copying of the same, and will permit any person designated by the Lender to visit and inspect any of the properties, books and financial reports of the Borrower and to discuss its affairs, finances and accounts with its principal officers, at all such reasonable times and as often as a Lender may reasonably request.

**5.3**     **Right of Inspection.**   Borrower will permit any person designated by the Lender, at the Lender's expense, to visit and inspect any of the properties, books and financial reports of the Borrower and to discuss its affairs, finances and accounts with its principal officers, at all such reasonable times and as often as a Lender may reasonably request.

**5.4**     **Borrowing Base Certificate.**   Intentionally omitted.

**5.5**     **Environmental Laws.**   Borrower will maintain at all times all of Borrower's property in compliance with all Environmental Laws, and immediately notify the Lender of any

notice, action, lien or other similar action alleging either the location of any Hazardous Substances or the violation of any Environmental Laws with respect to any of such property or Borrower's operations.

**5.6    Consolidation or Merger; Sale or Acquisition of Assets.** Except as may be approved by the Bankruptcy Court, after notice and a hearing, Borrower will not enter into any transaction of merger or consolidation, acquire any other business or corporation, acquire all or substantially all of the property or assets of any other individual, partnership, corporation, trust, association or other form of organization, or sell, lease, transfer or dispose of all or a substantial part of its assets out of the ordinary course of its business.

**5.7    Notice of Default.** At the time of Borrower's first knowledge or notice, Borrower will furnish the Lender with written notice of the occurrence of any event or the existence of any condition which constitutes or upon written notice or lapse of time or both would constitute an Event of Default under the terms of this Loan Agreement.

**5.8    Legal Expenses.** Borrower shall pay all legal fees and expenses incurred by Lender in the preparation, execution, amendment, recording, administration or enforcement of this Agreement or any instrument or document executed in connection herewith, subject to the approval by the Bankruptcy Court of the amount of any such legal fees and expenses.

## SECTION 6. EVENTS OF DEFAULT

An "Event of Default" shall exist if any of the following shall occur:

**6.1    Payment or Performance of Obligations.** The Borrower defaults in the prompt payment or performance of any obligations under the Note, this Loan Agreement or any instrument or document securing the Loan; or in the prompt payment when due of any other indebtednesses, liabilities, or obligations to the Lender, whether now existing or hereafter created or arising, direct or indirect, absolute or contingent; or there shall occur an event which, under the terms of the Note or any instrument or document securing the Loan, would permit the Lender to accelerate the maturity of the Loan; or

**6.2    Representation or Warranty.** Any representation or warranty made by the Borrower herein, or in any report, certificate, financial statement or other writing furnished in connection with or pursuant to this Loan Agreement shall prove to be false, misleading or incomplete in any material respect on the date as of which made; or

## SECTION 7. REMEDIES.

**7.1    Remedies.** Upon the occurrence of any Event of Default, as specified herein, which is not cured by the fifth Business Day after the Lender's giving of written notice of such failure or default to the Debtor and its counsel with a copy to the United States Trustee, the Lender, at its option, shall be relieved of any obligation to make further Advances hereunder; and the Lender may, at its option, declare the entire unpaid principal balance of the Note, all

interest accrued and unpaid thereon and all other amounts payable under this Loan Agreement or any of the Loan Documents to be immediately due and payable for all purposes, and may exercise all rights and remedies available to it under any instrument or document securing the Loan, or available at law or in equity.  All such rights and remedies are cumulative and nonexclusive, and may be exercised by the Lender concurrently or sequentially, in such order as the Lender may choose.

## SECTION 8.  MISCELLANEOUS

**8.1**     **Amendments**.  The provisions of this loan agreement, the note or any instrument or document executed pursuant hereto or securing the indebtednesses may be amended or modified only by an instrument in writing signed by the parties hereto.

**8.2**     **No Waiver, Cumulative Remedies**.  No failure to exercise and no delay in exercising, on the part of the Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Waiver of any right, power, or privilege is a waiver only as to the specified item.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

**8.3**     **Indemnification.**  Borrower agrees to indemnify Lender from and against any and all claims, losses and liabilities, including, without limitation, reasonable attorneys' fees, growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from Lender's gross negligence or willful misconduct.  The indemnification provided for in this Section shall survive the payment in full of the Loan.

**8.4**     **Successors.**  This Loan Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest therein.

**8.5**     **Liens; Setoff by Lender.**  Borrower hereby grants to the Lender a continuing lien, as security for the Loan and all other indebtednesses of the Borrower to the Lender, upon any and all of its moneys, securities and other property and the proceeds thereof, now or hereafter held or received by or in transit to, the Lender from or for Borrower, and also upon any and all deposits (general or special, matured or unmatured) and credits of the Borrower against the Lender, at any time existing.  Upon the occurrence of any Event of Default as specified above, the Lender is hereby authorized at any time and from time to time, without notice to Borrower to set off, appropriate, and apply any and all items hereinabove referred to against any or all indebtednesses of the Borrower to the Lender.

**8.6**     **Governing Law.**  This Loan Agreement shall be governed and construed in accordance with the laws of the State of Tennessee; except (a) that the provisions hereof which relate to the payment of interest shall be governed by (i) the laws of the United States or, (ii) the laws of the State of Tennessee, whichever permits the Lender to charge the higher rate, and (b) to

the extent that the liens in favor of the Lender, the perfection thereof, and the rights and remedies of the Lender with respect thereto, shall, under mandatory provisions of law, be governed by the laws of a state other than Tennessee.

**8.7** **Terminology; Section Headings.** All personal pronouns used in this Loan Agreement whether used in the masculine, feminine, or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. Section headings are for convenience only and neither limit nor amplify the provisions of this Loan Agreement.

**8.8** **Severability.** Should any one or more of the provisions of this Loan Agreement be determined to be illegal or unenforceable, all other provisions, nevertheless, shall remain effective and binding on the parties hereto.

**8.9** **Interest Limitations.** The Loan and the Note evidencing the Loan, including any renewals or extensions thereof, may provide for the payment of any interest rate (i) permissible at the time the contract to make the Loan is executed, (ii) permissible at the time the Loan is made or any advance thereunder is made, or (iii) permissible at the time of any renewal or extension of the Loan. It is the intention of the Lender and the Borrower to comply strictly with applicable usury laws; and, accordingly, in no event and upon no contingency shall the Lender ever be entitled to receive, collect, or apply as interest any interest, fees, charges or other payments equivalent to interest, in excess of the maximum rate which the Lender may lawfully charge under applicable statutes and laws from time to time in effect; and in the event that the holder of the Note ever receives, collects, or applies as interest any such excess, such amount which, but for this provision, would be excessive interest, shall be applied to the reduction of the principal amount of the indebtedness thereby evidenced; and if the principal amount of the indebtedness evidenced thereby, and all lawful interest thereon, is paid in full, any remaining excess shall forthwith be paid to the Borrower, or other party lawfully entitled thereto. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the highest rate which Lender may lawfully charge under applicable law from time to time in effect, the Borrower and the Lender shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as a reasonable loan charge, rather than as interest. Any provision hereof, or of any other agreement between the Lender and the Borrower, that operates to bind, obligate, or compel the Borrower to pay interest in excess of such maximum rate shall be construed to require the payment of the maximum rate only. The provisions of this paragraph shall be given precedence over any other provision contained herein or in any other agreement between the Lender and the Borrower that is in conflict with the provisions of this paragraph.

**8.10** **Fees and Expenses.** The Borrower agrees to pay, or reimburse the Lender for, the actual out-of-pocket expenses, including counsel fees and fees of any accountants, inspectors or other similar experts, as deemed necessary by the Lender, incurred by the Lender in connection with the development, preparation, execution, amendment, recording, administration (excluding the salary of Lender's employees and Lender's normal and usual overhead expenses) or enforcement of, or the preservation of any rights under this Loan Agreement, the Note, and any instrument or document now or hereafter securing the Loan.

**8.11    Waiver of Right to Trial By Jury.** EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

IN WITNESS WHEREOF, the Borrower and the Lender have caused this Agreement to be executed by their duly authorized officers, all as of the day and year first above written.

**Warehouse 86, LLC,**
an Arizona limited liability company

By:_____
Title:_____

_____
**Kenneth A. May**

Jackson 3414779v.1

**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT ("Security Agreement") is made and entered into as of the _____ day of October, 2008, by and between **WAREHOUSE 86, LLC**, an Arizona limited liability company ("Debtor"), 5 River Bend Place, Flowood, MS 39232, and **KENNETH A. MAY** ("Secured Party") 5139 Palomar Lane, Dallas, Texas 75229.

This Security Agreement is entered into with respect to a loan in the amount of $500,000.00 ("Loan") made by Secured Party to Debtor, evidenced by a Line of Credit Note dated October _____, 2008 (the "Note").

1.    **Definitions**.

    1.1    *Generally.* All terms used in the UCC (hereafter defined) and not specifically defined herein shall have the meanings ascribed to them in the UCC.

    1.2    *Collateral.* The Collateral shall consist of all of the personal property of Debtor, wherever located, and whether now owned or hereafter acquired, including:

        (i)    Accounts, including health-care-insurance receivables;

        (ii)    As-extracted collateral;

        (iii)    Chattel paper, including tangible, intangible and electronic chattel paper;

        (iv)    Deposit accounts;

        (vi)    Documents;

        (vii)    Equipment;

        (viii)    Fixtures;

        (x)    General intangibles;

        (xi)    Goods;

        (xii)    Instruments;

        (xiii)    Inventory;

        (xiv)    Investment property;

(xv)   Letter of credit rights, and

(xvi)   Intellectual property of all types and kinds, including (a) all intangible proprietary rights and interests, however denominated, throughout the world, whether express or implied, whether or not registered or recorded, including all patents, all inventions, technology, processes, algorithms and formulae (whether patentable or not) and trademarks, all proprietary data, databases, research and development data and customer data, all domain names, rights of privacy and publicity, moral rights, shop rights, all trade secrets and know-how, all published and unpublished works of authorship (whether copyrightable or not) and any copyrights therein and thereto, all computer software (including process control software), source code and object code, and all documentation related thereto, and licenses received from manufacturers and sellers of any equipment; (b) all filings, recordings and governmental awards or registrations pertaining to the foregoing, including patents and applications therefor, trademark registrations and applications therefor, service mark registrations and applications therefor (including the service mark "BARGAINLAND" registered with the United States Patent and Trademark Office on October 17, 2006 under registration number 3157341), copyright registrations and applications therefor, domain name registrations and applications therefor, and all licenses and contracts relating to any and all of the foregoing, including employee or consultant agreements or other agreements to transfer rights in intellectual property to Debtor; (c) all choses in action and other rights arising from or relating to the foregoing, including maintenance rights or rights to upgrades, rights to sue and collect remedies against past, present and future infringements or misappropriations thereof, and rights of priority and protection of interests therein under the laws of any jurisdiction worldwide, including rights to obtain renewals, continuations, division or other extensions of legal protections pertaining thereto; (d) to the extent permitted by applicable law, all rights under section 365(n) of the United States Bankruptcy Code arising from or relating to the above; and (e) all tangible embodiments of the above, including, without limitation, all filings and correspondence with governmental authorities, all original governmental certificates for such patents and trademark and copyright registrations, and all files and filings pertaining to any litigation, opposition proceeding, cancellation proceeding, arbitration, mediation, or negotiation arising from or relating to the foregoing.

Each item described above shall have the meaning ascribed to it in the UCC. As provided in the UCC, the Collateral shall include the supporting obligations, proceeds and products of each item listed. Also included in the definition are all accessions, attachments, accessories, tools, parts, supplies, replacements and additions to any of

2

the items listed above, whether added now or later, and all records and data relating to any item described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any such record or data on electronic media.

1.3   *Environmental Laws.*   The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Hazardous Waste Management Substances Act of 1998, Tenn. Code Ann. 68-212-201, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

1.4   *Hazardous Substances.*   The words "Hazardous Substances" shall mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include any an all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes petroleum and petroleum by-products or any fraction thereof and asbestos.

1.5   *Loan Documents.*   The words "Loan Documents" shall mean this Security Agreement, the Note, the Loan Agreement by and between Debtor and Secured Party of even date herewith and any and all other agreements, instruments or documents executed in connection with the Loan or guaranteeing, securing or in any other manner relating to any of the Obligations.

1.6   *Obligations.*   This Security Agreement secures the following Obligations:

   (i)    the obligations of Debtor under the Loan Documents;

   (ii)   all other present and future liabilities and obligations of Debtor to Secured Party, whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related or unrelated to this Security Agreement and whether or not now contemplated;

3

(iii)    the repayment of (a) any amounts that Secured Party may advance or spend for the maintenance or preservation of the Collateral, including reasonable attorney's fees and expenses, and (b) any other expenditures that Secured Party may make under the provisions of this Security Agreement or for the benefit of Debtor;

(iv)    all amounts owed under any modifications, renewals or extensions of any of the foregoing obligations; and

(v)    any of the foregoing that arises after the filing of a petition by or against Debtor under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise.

1.7    *UCC.* The term "UCC" shall mean the Tennessee Uniform Commercial Code codified at § 47-9-101 et seq. of the Tennessee Code Annotated.

**2.    Grant of Security Interest.**

2.1    As security for the payment and performance of all of the Obligations, Debtor hereby assigns, pledges and grants a continuing security interest in the Collateral to Secured Party, which security interest shall continuously exist even though all or any part of the Obligations is paid in full and even though for a period of time Debtor may not be indebted to Secured Party. Debtor agrees that Secured Party shall have all rights stated in this Security Agreement with respect to the Collateral, in addition to all other rights which Secured Party may have by law or in equity. This Security Agreement shall also secure future advances pursuant to the Loan Documents.

**3.    Perfection of Security Interest.**

3.1    *Filing of Financing Statement.*

(i)    Debtor authorizes Secured Party to prepare a financing statement(s) (the "Financing Statement") describing the Collateral and to file the Financing Statement(s) with the appropriate governmental authority to perfect and continue the Secured Party's security interest in the Collateral, except for UCC financing statement of record in the Arizona Secretary of State's Office at Instrument Nos. 200614332004.

(ii)    Debtor authorizes Secured Party to prepare and file a Financing Statement describing any agricultural liens or other statutory liens held by Secured Party.

4

> (iii)   Secured Party shall receive prior to the Closing an official report from the Secretary of State of the Debtor State (the "SOS Report") indicating that Secured Party's security interest is prior to all other security interests or other interests reflected in the report.

3.2   *Possession*.

> (i)   Debtor shall have possession of the Collateral, except where expressly otherwise provided in this Security Agreement or where Secured Party chooses to perfect its security interest by possession in addition to the filing of a financing statement.

> (ii)   Where Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying the third party of Secured Party's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Secured Party.

3.3   *Control*.  Debtor will cooperate with Secured Party in obtaining control with respect to Collateral consisting of:

> (i)   Deposit Accounts;

> (ii)   Investment Property;

> (iii)   Letter-of-credit rights; and

> (iv)   Electronic chattel paper.

3.4   *Marking of Chattel Paper*.  Debtor will not create any Chattel Paper without placing a legend on the Chattel Paper acceptable to Secured Party indicating that Secured Party has a security interest in the Chattel Paper.

3.5   *Other Actions*. Debtor shall take such further actions, and shall execute, acknowledge, deliver and record such other documents and instruments, as may be reasonably necessary from time to time, as determined by Secured Party, to perfect and continue the Secured Party's security interest in the Collateral.

3.6   *Costs*. Debtor shall pay all costs, taxes and fees, including reasonable attorney's fees and expenses, incurred by Secured Party in connection with the perfection of the security interests granted herein.

**4.    Debtor's Representations and Warranties.**

Debtor warrants and represents that:

4.1   *Title to and Transfer of Collateral.* Debtor has ownership of, rights in or the power to transfer the Collateral.

4.2   *First Priority Lien.* Prior to any disbursements under the Loan Agreement and the Note, Debtor shall obtain the entry of an order in the United States Bankruptcy Court, finding that the security interest of Secured Party has priority over any and all administrative expenses, diminution claims and all other claims against Debtor, now existing or hereafter arising, of any kind whatsoever, and that the Secured Party holds a valid, binding and enforceable security interest in and superpriority lien in favor of Lender in all property of Debtor's estate of any and every nature, characterization or description whatsoever, including without limitation, all inventory, equipment, accounts, and general intangibles of the bankruptcy estate of Debtor (collectively, the "Lender DIP Collateral"), which security interests and liens shall be senior and prior to all other liens, security interests and claims (including the lien and security interest of Stuart M. Irby in the Collateral).

4.3   *Use of Loan Proceeds.* Borrower agrees to use the proceeds of the Loan solely for the payment of: (a) trade payables, (b) preapproved salaries of employees, (c) sourcing and listing of goods, (d) day-to-day operational expenses incurred in the ordinary course of its business, and (e) such other items as are approved from time to time by Lender or its designated agent.

4.4   *Enforceability of Collateral.* To the extent the Collateral consists of Accounts, Chattel Paper or General Intangibles, the Collateral is enforceable in accordance with its terms, is genuine and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any Account becomes subject to a security interest in favor of Secured Party, the Account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Debtor with or for the account debtor. So long as this Security Agreement remains in effect, Debtor shall not, without Secured Party's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Account. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral. Debtor shall be permitted to use

6

the proceeds as cash collateral in the ordinary course of business subject to the requirements of Section 4.3 above.

4.5    *Formation and Good Standing*.  Debtor is limited liability company duly formed, legally existing and in good standing under the laws of the state of Arizona, has the power to own its property and to carry on its business and is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned by it therein or in which the transaction of its business makes such qualification necessary.

4.6    *Location of Debtor*.  Debtor's state of formation is the State of Arizona.

4.7    *Name of Debtor*.  Debtor's exact legal name is as set forth in the first paragraph of this Security Agreement.

4.8    *Power and Authority*.  Debtor has the full authority (including full entity power, authority and capacity, as applicable) to execute and deliver this Security Agreement, to incur the obligations hereunder and to carry out and perform the terms hereof. Without limiting the generality of the foregoing, the members of Debtor have duly authorized the execution, delivery and performance of this Security Agreement by Debtor. This Security Agreement constitutes the valid and legally binding obligation of Debtor, enforceable in accordance with its terms and conditions (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditor's rights generally or by the principles governing the availability of any equitable remedy).

4.9    *Financial Condition*. The financial statements of Debtor heretofore delivered to Secured Party are true and complete, fairly present the financial condition of Debtor at such dates and the results of its operations for the period then ended. No material adverse change in Debtor's financial condition has occurred since the date of such statements.

4.10   *Financial Information*. All financial statements, schedules, reports and other information supplied to Secured Party by or on behalf of Debtor heretofore and hereafter are and will be true and complete.

4.11   *No Violations*. The execution, delivery and performance by Debtor of this Security Agreement will not (a) violate (i) any provision of law or any order, rule or regulation of any court or agency of government, (ii) any award of any arbitrator, (iii) the organizational documents of Debtor, including the Articles of Organization and the Operating Agreement of Debtor, or (iv) any indenture, contract, agreement, mortgage, deed of trust or other instrument to which Debtor is a party or by which

7

Debtor or any of its property is bound, or (b) be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a material default under, any such award, indenture, contract, agreement, mortgage, deed of trust or other instrument, or result in the creation or imposition of any lien upon any of the property or assets of Debtor.

4.12    *Licenses and Permits.* Debtor has duly obtained and now holds all licenses, permits, certifications, approvals and the like required by federal, state and local laws of the jurisdictions in which Debtor conducts its business, and each remains valid and in full force and effect.

4.13    *Patents, Trademarks, etc.* Debtor owns, possesses or has the right to use all necessary patents, patent rights, licenses, trademarks, trade names, trade name rights, copyrights and franchises to conduct its business as now conducted, without any known conflict with any patent, patent right, license, trademark, trademark rights, trade name right, trade name, copyright or franchise right of any other person.

4.14    *Presence of Hazardous Materials or Hazardous Materials Contamination.* To the best of Debtor's knowledge and belief, and except as permitted by applicable Environmental Laws, no Hazardous Substances are located on any real property owned, leased, operated or controlled by Debtor or for which Debtor is responsible and for which remedial or corrective action would be required under applicable Environmental Laws. To the best of Debtor's knowledge and belief, and except as permitted by applicable Environmental Laws, no property owned, leased, operated or controlled by Debtor has ever been used as a manufacturing, storage, or dump site for Hazardous Substances.

4.15    *Litigation.* Except as disclosed to Secured Party in writing prior to the date hereof, there are no judgments, injunctions or similar orders or decrees, claims, actions, suits or proceedings pending or, to the knowledge of Debtor, threatened against or affecting Debtor or any property of Debtor, at law or in equity, by or before any court or any federal, state, county, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which could result in any material adverse change in the business, operations, prospects, properties or in the condition, financial or otherwise, of Debtor, and Debtor is not, to Debtor's knowledge, in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court or any federal, State, county, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which could have a material adverse effect on Debtor or the Collateral.

8

4.16   *Taxes*. Debtor has paid or caused to be paid all federal, state and local taxes to the extent that such taxes have become due and has filed or caused to be filed all federal, state and local tax returns which are required to be filed by Debtor.

4.17   *Certain Indebtedness*. Except as disclosed to Secured Party in writing prior to the date hereof, there is no indebtedness of Debtor owing to any employee, officer, stockholder or director of Debtor other than accrued salaries, commissions and the like.

4.18   *Outstanding Indebtedness*. Except as disclosed to Secured Party in writing prior to the date hereof through its draft bankruptcy schedules or otherwise, Debtor has no outstanding indebtedness and there exists no default under the provisions of any instrument evidencing such indebtedness or under the provisions of any agreement relating thereto.

4.19   *Government Contracts*. Debtor is not now, and has not been within the past three (3) years, in receipt of any communication from any officer or employee of the United States Government regarding Debtor's actual or possible disqualification, suspension or debarment from contracting with the United States Government. Further, Debtor has no information, in relation to the obtaining, formation, pricing, performance, billing or administration of any one of its contracts with the United States Government of: (a) a violation of law, regulation or contract provision, or any such fact(s) or circumstance(s) reasonably indicating any such violation; (b) a pending or threatened investigation; (c) an existing or threatened adverse audit finding, whether draft or final; (d) an existing or threatened cost disallowance or finding of defective pricing; (e) a pending or threatened claim or action seeking a fine, penalty or damages; (f) a communication regarding, or actual initiation of, payment withholding or suspension, setoff, recoupment or debt collection; or (g) a contract termination or a communication reasonably indicating the potential for such a termination.

4.20   *Commercial Purpose*. The Loan is not a 'consumer transaction' as defined in the UCC, and none of the Collateral was or will be purchased or held primarily for personal family or household purposes.

5.   **Debtor's Covenants.**

5.1   *Personal Property*. The Collateral shall remain personal property at all times. Debtor shall not affix any of the Collateral to any real property in any manner which would change its nature from that of personal property to real property or to a fixture.

5.2   *Location of Collateral*. Debtor shall maintain its Collateral at its normal locations and, upon request, to provide Secured Party with a schedule of such locations of the Collateral.

5.3   *Repairs and Maintenance.*  Debtor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Security Agreement remains in effect.  Debtor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with, the Collateral so that no lien or encumbrances with priority over the lien of Secured Party ever attaches to or is filed against the Collateral.

5.4   *No Disposition of Collateral.*  Except as may occur in the ordinary course of its business, or as permitted by the Bankruptcy Court after notice and a hearing, Debtor agrees not to, without the Secured Party's prior written consent, and Secured Party does not authorize, the Debtor to:

    (i)   sell, lease or otherwise transfer or dispose of any of the Collateral;

    (ii)   license any of the Collateral;

    (iii)   pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge with priority over the security interest of Secured Party; or

    (iv)   remove the Collateral from its existing location.

5.5   *No Change in Existence, Formation and Name of Debtor.*  Until the Obligations are paid in full, Debtor agrees that without the consent to Secured Party it shall:

    (i)   preserve its entity existence and not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets;

    (ii)   not change the state of its formation; and

    (iii)   not change its name.

5.6   *Notice to Secured Party.*  Debtor agrees that it shall notify Secured Party in writing of any change concerning the following:

    (i)   A substantial change in the nature of Collateral or a diminution in amount or value of Collateral,

    (ii)   Debtor's existence or structure,

10

     (iii)    Debtor's formation, and

     (iv)    Debtor's name.

Nothing contained herein shall be construed as Secured Party's consent or authorization for Debtor to change any of the above-listed items. Changes in same are specifically prohibited hereunder. Additionally, Debtor shall notify Secured Party of any of the following occurrences:

     (i)    Threatened or pending litigation concerning or affecting Debtor or the Collateral,

     (ii)    Any event causing extraordinary loss or depreciation of the value of Debtor's assets or the Collateral, and

     (iii)    An Event of Default (hereafter defined) or any event or existing condition which, with the giving of notice and/or the lapse of time, or both, could constitute an Event of Default or which might materially and adversely affect the financial conditions or operations of Debtor.

5.7    *Defense of Secured Party's Rights in Collateral.* Debtor shall defend Secured Party's rights in the Collateral against the claims and demands of all other persons.

5.8    *Compliance with Governmental Requirements.* Debtor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Debtor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Secured Party's interest in the Collateral, in Secured Party's opinion, is not jeopardized.

5.9    *Hazardous Substances.* Debtor agrees to (a) give notice to Secured Party immediately upon Debtor's acquiring knowledge of the presence of any Hazardous Substances (other than those stored in compliance with applicable Environmental Laws and are in Debtor's possession in the ordinary course of business) on any property owned, leased or controlled by Debtor or for which Debtor is responsible or of any Hazardous Substances contamination with a full description thereof for which remedial or corrective action is required; (b) promptly take action to comply with any Environmental Laws requiring the removal, treatment or disposal of Hazardous Substances or Hazardous Substances contamination and provide Secured Party with satisfactory evidence of such action, which action must be in all respects sufficient to avoid any penalty, assessment or notice of non-compliance with any required remedial

11

or corrective action on the part of any governmental authority; (c) provide Secured Party, within thirty (30) days after a demand by Secured Party, with a bond, letter-of-credit or similar financial assurance evidencing to Secured Party's reasonable satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of Hazardous Substances described in item (b) or Hazardous Substances contamination and discharging any lien which may be established as a result thereof on any property owned or controlled by Debtor or for which Debtor is responsible; and (d) defend, indemnify and hold harmless Secured Party and its employees, trustees, successors and assigns from any and all claims which may now or in the future (whether before or after the termination of this Security Agreement) be asserted as a result of the presence of any Hazardous Substances on any property owned, leased or controlled by Debtor for which Debtor is responsible for any Hazardous Substances contamination.

5.10   *Patents, Franchises, etc.* Debtor shall maintain, preserve and protect all licenses, patents, franchises, trademarks and trade names of Debtor or licensed by Debtor which are necessary to the conduct of the business of Debtor as now conducted, free of any conflict with the rights of any other person.

5.11   *Taxes, Assessments and Liens.* Debtor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Security Agreement, upon any promissory note or notes evidencing the Obligations, or upon the other documents related to or executed in connection with the Loan. Debtor may withhold any such payment or may elect to contest any lien if Debtor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Secured Party's interest in the Collateral is not jeopardized in Secured Party's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Debtor shall deposit with Secured Party cash, a sufficient corporate surety bond or other security satisfactory to Secured Party in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorney's fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Debtor shall defend itself and Secured Party and shall satisfy any final adverse judgment before enforcement against the Collateral. Debtor shall name Secured Party as an additional obligee under any surety bond furnished in the contest proceedings. Debtor further agrees to furnish Secured Party with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Debtor may withhold any such payment or may elect to contest any lien if Debtor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Secured Party's interest in the Collateral is not jeopardized.

12

5.12    *Maintenance of Casualty Insurance.* Debtor shall procure and maintain all risks insurance, including fire, theft and liability coverage together with such other insurance as Secured Party may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party. Debtor hereby assigns and grants to Secured Party a security interest in the proceeds of such insurance policy(ies). Debtor, upon request of Secured Party, will deliver to Secured Party from time to time the policies or certificates of insurance in form satisfactory to Secured Party, including stipulations that coverages will not be canceled or diminished without at least thirty (30) days' prior written notice to Secured Party and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Secured Party will not be impaired in any way by any act, omission or default of Debtor or any other person. In connection with all policies covering assets in which Secured Party holds or is offered a security interest, Debtor will provide Secured Party with such loss payable or other endorsements as Secured Party may require. If Debtor at any time fails to obtain or maintain any insurance as required under this Security Agreement, Secured Party may (but shall not be obligated to) obtain such insurance as Secured Party deems appropriate, including if Secured Party so chooses "single interest insurance," which will cover only Secured Party's interest in the Collateral.

5.13    *Application of Insurance Proceeds.* Debtor shall promptly notify Secured Party of any loss or damage to the Collateral. Secured Party may make proof of loss if Debtor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds therein, shall be held by Secured Party as part of the Collateral. If Secured Party consents to repair or replacement of the damaged or destroyed Collateral, Secured Party shall, upon satisfactory proof of expenditure, pay or reimburse Debtor from the proceeds for the reasonable cost of repair or restoration. If Secured Party does not consent to repair or replacement of the Collateral, Secured Party shall retain a sufficient amount of the proceeds to pay all of the Obligations, and shall pay the balance to Debtor. Any proceeds which have not been disbursed with six (6) months after their receipt and which Debtor has not committed to the repair or restoration of the Collateral shall be used to prepay the Obligations.

5.14    *Insurance Reserves.* Secured Party may require Debtor to maintain with Secured Party reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Debtor of a sum estimated by Secured Party to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Debtor shall on demand pay any deficiency to

13

Secured Party. The reserve funds shall be held by Secured Party as a general deposit and shall constitute a non-interest-bearing account which Secured Party may satisfy by payment of the insurance premiums required to be paid by Debtor as they become due. Secured Party does not hold the reserve funds in trust for Debtor, and Secured Party is not the agent of Debtor for payment of the insurance premiums required to be paid by Debtor. The responsibility for the payment of premiums shall remain Debtor's sole responsibility.

5.15   *Insurance Reports*. Debtor, upon request of Secured Party, shall furnish to Secured Party reports on each existing policy of insurance showing such information as Secured Party may reasonably request, including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Debtor shall upon request by Secured Party (however not more often than annually) have an independent appraiser satisfactory to Secured Party determine, as applicable, the cash value or replacement cost of the Collateral.

5.16   *Financial Reports*. Debtor shall furnish to Secured Party financial statements, tax returns, financial reports and such other information concerning the operations, business affairs and financial condition of Debtor and any guarantor of the Loan as may reasonably be requested by Secured Party from time to time.

## 6.   Rights of the Parties Concerning the Collateral.

6.1   *Inspection*. Secured Party, or its designated representatives or agents, shall have the right to inspect any of the Collateral, and all of the books and records pertaining to same, at any time wherever it is located. Debtor shall pay all costs and expenses of Secured Party in connection with same.

6.2   *Secured Party's Collection Rights*. Upon the occurrence of an Event of Default, which Event of Default is not cured by the fifth Business Day after the giving of written notice of such failure or default by Lender to the Debtors and its counsel with a copy to the United States Trustee of the occurrence of such Event of Default, Secured Party shall have the right collect the Accounts and to enforce Debtor's rights against the account debtors and obligors. Debtor shall cooperate fully with Secured Party in this regard and shall take all actions reasonably requested by Secured Party to assist or enable Secured Party to exercise these rights.

6.3   *Limitations on Obligations Concerning Maintenance of Collateral*.

14

     (i)     *Risk of Loss.* Debtor has the risk of loss of the Collateral.

     (ii)    *No Obligation on Secured Party.* Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral. While Secured Party shall not be required to take any action concerning the Collateral, Secured Party may, in its sole discretion, take action to preserve and maintain the Collateral. If Secured Party has possession of any Collateral at any time, Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral.

6.4    *Purchase Money Security Interest.* To the extent Debtor uses the Loan to purchase Collateral, Debtor's repayment of the Loan shall apply on a "first-in-first-out" basis so that the portion of the Loan used to purchase a particular item of Collateral shall be paid in the chronological order the Debtor purchased the Collateral.

**7.    Events of Default.**

The occurrence of any of the following shall, at the option of Secured Party, be an event of default ("Event of Default") if such failure to comply with default under any terms or condition of this Security Agreement is not cured by the fifth Business Day after the giving of written notice of such failure or default by Lender to the Debtor and its counsel with a copy to the United States Trustee:

7.1    Debtor fails to make any payment on the Obligations when due;

7.2    Debtor fails to comply with any of the provisions of, or the incorrectness of any representation or warranty contained in, the Loan Documents or any other agreement between the Secured Party and the Debtor;

7.3    Default by Debtor under any of the Loan Documents or any other agreement, instrument or document between the Debtor and the Secured Party;

7.4    The attachment, execution or levy on or foreclosure or forfeiture proceedings instituted against any of the Collateral;

7.5    The injunction or restraint of Debtor in any manner from conducting its business in whole or in part;

7.6    The dissolution or other termination of Debtor's existence, or the death, dissolution, incompetence or withdrawal of any member;

15

7.7     Debtor shall fail to comply with, or become subject to any administrative or judicial proceeding (except a bankruptcy case) under any federal, state or local (a) hazardous waste or environmental law, (b) asset forfeiture or similar law which can result in the forfeiture of property, or (c) other law, where noncompliance may have any significant effect on the Collateral;

7.8     Debtor defaults under any loan, extension of credit, security agreement, purchase or sales agreement or any other agreement, in favor of any other creditor or person that may materially affect Debtor's ability to repay the Obligations under this Security Agreement or any of the Loan Documents; or

**8.     Default Costs.**

8.1     Should an Event of Default occur and not be timely cured as provided in Section 7 above, Debtor shall pay to Secured Party all costs reasonably incurred by the Secured Party for the purpose of enforcing its rights hereunder, including:

(i)     costs to cure the default, which Secured Party shall have the option, but not the obligation, of curing;

(ii)    costs of foreclosure or other public or private sale of the Collateral;

(iii)   costs of obtaining money damages; and

(iv)    a reasonable fee for the services of attorneys and others employed by Secured Party for any purpose related to this Security Agreement or the Obligations, including consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or arbitration.

All such costs shall become a part of the Obligations secured by this Security Agreement and shall be payable on demand, with interest at the rate set forth in the Note from the date of expenditure until repaid.

**9.     Remedies Upon Default.**

9.1     *General*.  Upon any Event of Default, Secured Party may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce or satisfy any Obligations then owing, whether by acceleration or otherwise.

9.2     *Concurrent Remedies*.  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or simultaneously;

16

(i)     Accelerate the Obligations and declare the same immediately due and payable without presentment, demand for payment, protest or notice of any kind to Debtor, all of which are hereby expressly waived.

(ii)    Take possession of any Collateral, if not already in its possession without demand and without legal process. Upon Secured Party's demand, Debtor will assemble and make the Collateral available to Secured Party as it directs. Debtor grants to Secured Party the right, for this purpose to enter into or on any premises where Collateral may be located.

(iii)   With or without taking possession, sell, lease, license or otherwise dispose of the Collateral at public or private sale in accordance with the UCC.

(iv)    Secured Party shall have the right to make application to a court of competent jurisdiction to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral prior to foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Secured Party's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Secured Party shall not disqualify a person from serving as a receiver.

(v)     Secured Party, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Secured Party may at any time in Secured Party's discretion transfer any Collateral into Secured Party's own name or that of Secured Party's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Secured Party may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Secured Party may determine, whether or not the Obligations or Collateral is then due. For these purposes, Secured Party may, on behalf of and in the name of Debtor, receive, open and dispose of mail addressed to Debtor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To

17

facilitate collection, Secured Party may notify account debtors and obligors on any Collateral to make payments directly to Secured Party.

(vi)   File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law, including levy of attachment and garnishment. If Secured Party chooses to sell any or all of the Collateral, Secured Party may obtain a judgment against Debtor for any deficiency remaining on the Obligations due to Secured Party after application of all amounts received from the exercise of the rights provided in this Security Agreement. Debtor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

9.3   *No waiver*. No delay or omission by Secured Party to exercise any right or remedy accruing upon any Event of Default shall: (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature.

## 10.   Foreclosure Procedures.

10.1   *Notices*. Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtor reasonable notice of the time after which any private sale of any other intended disposition of the Collateral is to be made. The requirements of reasonable notice shall be met if such notice is given at least fifteen (15) days before the time of the sale or disposition.

10.2   *Condition of Collateral*. Secured Party has no obligation to clean-up or otherwise prepare the Collateral for sale.

10.3   *No Obligation to Pursue Others*. Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

10.4   *Compliance with Other laws*. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

18

10.5    *Warranties.*  Secured Party may sell the Collateral without giving any warranties as to the Collateral.  Secured Party may specifically disclaim any warranties of title or the like.  This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.6    *Sales of Credit.* If Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchase.  In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

10.7    *Purchases by Secured Party.*  In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting some or all of the Obligations of the Debtor.

10.8    *No Marshaling.*  Secured Party has no obligations to marshal any assets in favor of Debtor, or against or in payment of:

    (i)    the Notes;

    (ii)   any of the other Obligations; or

    (iii)  any other obligations owed to Secured Party to Debtor or any other person.

## 11.    Indemnity and Expenses.

11.1    The Debtor agrees to indemnify Secured Party from and against any and all claims, losses, and liabilities growing out of or resulting from this Security Agreement (including, without limitation, enforcement of this Security Agreement), except claims, losses, or liabilities resulting solely and directly from Secured Party's gross negligence or willful misconduct.

11.2    The Debtor will upon demand pay to Secured Party the amount of any and all costs and expenses, including the fees and disbursements of the Secured Party's counsel and of any experts and agents, which Secured Party may incur in connection with (i) the administration of this Security Agreement (excluding the salary of Secured Party's employees and Secured Party's normal and usual overhead expenses); (ii) the custody, preservation, use, or operation of, or the sale of, collection from, or other realization upon, any Collateral; (iii) the exercise or enforcement of any of the rights of Secured Party hereunder; or (iv) the failure by the Debtor to perform or observe any of the provisions hereof, except expenses resulting solely and directly from Secured Party's gross negligence or willful misconduct.

12.    **Miscellaneous.**

12.1   *Notices.* Any notices required by this Security Agreement shall be deemed to be delivered when a record has been (a) deposited in any United States postal box as first class, certified or registered mail with postage prepaid, and the notice properly addressed to the intended recipient, (b) deposited with a nationally recognized overnight courier, (c) received by telecopy, or (d) personally delivered. Any party may change its address for notices under this Security Agreement by giving formal written notice or the other parties, specifying the purpose of the notice is to change the party's address. Debtor agrees to keep Secured Party informed at all times of Debtor's Current address.

12.2   *No Waiver.* Secured Party shall not be deemed to have waived any rights under this Security Agreement unless such waiver is given in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver by Secured Party of a provision of this Security Agreement shall not prejudice or constitute a waiver of Secured Party's right otherwise to demand strict compliance with that provision or any other provision of this Security Agreement. No prior waiver by Secured Party, nor any course of dealing between Secured Party and Debtor, shall constitute a wavier of any of Secured Party's rights or of any of Debtor's obligations as to any future transactions. Whenever the consent of Secured Party is required under this Security Agreement, the granting of such consent by Secured Party in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Secured Party.

12.3   *Power of Attorney.* Debtor hereby appoints Secured Party as Debtor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Security Agreement. Secured Party may at any time, and without further authorization from Debtor, file a carbon, photographic or other reproduction of any financing statement or of this Security Agreement for use as a financing statement. Debtor will reimburse Secured Party for all expenses for the perfection and the continuation of the perfection of Secured Party's security interest in the Collateral.

12.4   *Further Assurances.* Debtor agrees to execute any further documents, and to take any further actions, reasonably required by Secured Party to evidence or perfect the security interest granted herein, to maintain the first priority of the security interests, or to effectuate the rights granted to Secured Party herein.

12.5   *Assignment.*

20

(i)    *Binds Assignees.*  This Security Agreement shall bind and shall inure to the benefit of the heirs, legatees, executors, administrators, successors and assigns of Secured Party and shall bind all persons who become bound as a debtor to this Security Agreement.

(ii)    *No Assignment by Debtor.*  Secured Party does not consent to any assignment by Debtor except as expressly provided in this Security Agreement.

21

       (iii)   *Secured Party Assignments.* Secured Party may assign its rights and interests under this Security Agreement. If an assignment is made, Debtor shall render performance under this Security Agreement to the assignee. Debtor waives and will not assert against any assignee any claims, defenses or set-offs which Debtor could assert against Secured Party except defenses which can not be waived.

12.6   *Severability.* Should any provision of this Security Agreement be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction, that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provisions of this Security Agreement.

12.7   *Integration and Modifications.*

       (i)   This Security Agreement is the entire agreement of the Debtor and Secured Party concerning its subject matter.

       (ii)   Any modification to this Security Agreement must be made in writing and signed by the party adversely affected.

12.8   *Survival of Representations and Warranties.* All representations, warranties, and agreements made by Debtor in this Security Agreement shall survive the execution and delivery of this Security Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Debtor's Obligations shall be paid in full.

12.9   *Governing Law.* This Security Agreement is being executed and delivered and is intended to be performed in the State of Tennessee and shall be construed and enforced in accordance with federal law and the laws of the State of Tennessee.

12.10   *Choice of Venue.* If there is a lawsuit arising out of this Security Agreement or the Loan, Debtor agrees upon Secured Party's request to submit to the jurisdiction of the courts of Shelby County, State of Tennessee.

12.11   *Waive Jury.* All parties to this Security Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

12.12   *Attorneys' Fees; Expenses.* Debtor agrees to pay upon demand all of Secured Party's costs and expenses, including Secured Party's attorneys' fees and expenses incurred in connection with the enforcement of this Security Agreement. Secured Party may hire or pay someone else to help enforce this Security Agreement, and Debtor shall pay

22

the costs and expenses of such enforcement.  Costs and expenses include Secured Party's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Debtor also shall pay all court costs and such additional fees as may be directed by the court.

12.13   *Rules of Construction.*

     (i)     No reference to 'proceeds' in this Security Agreement authorizes any sale, transfer, or other disposition of the Collateral by the Debtor.

     (ii)    "Includes" and "including" are not limiting.

     (iii)   "Or" is not exclusive.

     (iv)   "All" includes "any" and "any" includes "all."

12.14   *Headings.*  Section headings used in this Security Agreement are for convenience only.  They are not a part of this Security Agreement and shall not be used in construing it.

12.15   *Time is of the Essence.*  Time is of the essence in the performance of this Security Agreement.

    IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers, all as of the day and year first above written.

**WAREHOUSE 86, LLC,**
an Arizona limited liability company


By:_____
Its:_____




_____
**KENNETH A. MAY**


Jackson 3414926v.1

## TRADEMARK SECURITY AGREEMENT

This Trademark Security Agreement ("Agreement"), dated as of October ____, 2008 is made by and between **WAREHOUSE 86, LLC**, an Arizona limited liability company, having a mailing address at 5 River Bend Place, Flowood, MS 39232 (the "Debtor"), and **KENNETH A. MAY**, having a mailing address at 5139 Palomar Lane, Dallas, Texas 75229 (the "Secured Party").

<u>Recitals</u>

WHEREAS, the Debtor and the Secured Party are parties to that certain Loan Agreement of even date herewith (as the same may hereafter be amended, supplemented or restated from time to time, the "Loan Agreement") setting forth the terms on which the Secured Party may now or hereafter extend credit to or for the account of the Debtor;

WHEREAS, as a condition to extending credit to or for the account of the Debtor, the Secured Party has required the execution and delivery of this Agreement by the Debtor; and

ACCORDINGLY, in consideration of the mutual covenants contained in the Loan Documents and herein, the parties hereby agree as follows:

1.    <u>Definitions</u>. All terms defined in the Recitals hereto or in the Loan Agreement that are not otherwise defined herein shall have the meanings given to them therein. In addition, the following terms have the meanings set forth below:

"Obligations" means each and every debt, liability and obligation of every type and description arising under or in connection with the Loan Agreement or any other Loan Document (as defined in the Loan Agreement) which the Debtor may now or at any time hereafter owe to the Secured Party, whether such debt, liability or obligation now exists or is hereafter created or incurred and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, independent, joint, several or joint and several.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or otherwise), preference, priority or charge of any kind (including, but not limited to, any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code as adopted and in effect in the relevant jurisdiction or other similar recording or notice statute, and any lease in the nature thereof).

"Permitted Liens" means (i) any Lien securing obligations of Debtor to Secured Party, (ii) any Lien for taxes not yet due or any Lien for taxes being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established (and as to which the property subject to any such Lien

is not yet subject to foreclosures, sale or loss on account thereof), and (iii) any other Lien to which Secured Party has consented in writing.

"Security Interest" has the meaning given in Section 2.

"Trademarks" means all of the Debtor's right, title and interest in and to: (i) all business names, trade names, images and likenesses (and any derivation thereof), trade dress, logos, slogan, registered and unregistered trademarks (including common law marks), service marks, internet domain names, rights in telephone numbers, collective membership marks, registrations and applications for registration for each, and the respective goodwill associated with each, (ii) all translations, adaptations, derivations and combinations thereof (iii) licenses, fees or royalties with respect to each, (iv) the right to sue for past, present and future infringement, dilution and damages therefor, (v) and licenses thereunder, all as presently existing or hereafter arising or acquired, including, but not limited to, the marks listed on Exhibit "A."

2.    Security Interest. The Debtor hereby irrevocably pledges and assigns to, and grants the Secured Party a security interest (the "Security Interest"), with power of sale to the extent permitted by law, in the Patents and in the Trademarks to secure payment of the Obligations. As set forth in the Loan Agreement, the Security Interest is coupled with a security interest in substantially all of the personal property of the Debtor.

3.    Representations, Warranties and Agreements. The Debtor represents, warrants and agrees as follows:

(a)    *Existence; Authority.* The Debtor is a limited liability company duly organized, validly existing and in good standing under the laws of its state of incorporation, and this Agreement has been duly and validly authorized by all necessary corporate action on the part of the Debtor.

(b)    *Trademarks.* Exhibit "A" accurately lists all Trademarks owned or controlled by the Debtor as of the date hereof and accurately reflects the existence and status of Trademarks and all applications and registrations pertaining thereto as of the date hereof; provided, however, that Exhibit "A" need not list common law marks (i.e., Trademarks for which there are no applications or registrations) which are not material to the Debtor's or any affiliate's business(es). If after the date hereof, the Debtor owns or controls any Trademarks not listed on Exhibit "A" (other than common law marks which are not material to the Debtor's or any affiliate's business(es)), or if Exhibit "A" ceases to accurately reflect the existence and status of applications and registrations pertaining to the Trademarks, then the Debtor shall promptly provide written notice to the Secured Party with a replacement Exhibit "A," which upon acceptance by the Secured Party shall become part of this Agreement.

(d)    *Affiliates.* As of the date hereof, no affiliate of Debtor owns, controls, or has a right to have assigned to it any items that would, if such item were owned by the Debtor, constitute Trademarks. If after the date hereof any affiliate owns, controls, or has

a right to have assigned to it any such items, then the Debtor shall promptly either: (i) cause such affiliate to assign all of its rights in such item(s) to the Debtor; or (ii) notify the Secured Party of such item(s) and cause such affiliate to execute and deliver to the Secured Party a Trademark security agreement substantially in the form of this Agreement.

(e) *Title.* The Debtor has absolute title to each Trademark listed on Exhibit "A," free and clear of all Liens except Permitted Liens. The Debtor (i) will have, at the time the Debtor acquires any rights in Trademarks hereafter arising, absolute title to each such Trademark free and clear of all Liens except Permitted Liens, and (ii) will keep all Trademarks free and clear of all Liens except Permitted Liens.

(f) *No Sale.* Except as permitted in the Loan Agreement, the Debtor will not assign, transfer, encumber or otherwise dispose of the Trademarks, or any interest therein, without the Secured Party's prior written consent.

(g) *Defense.* The Debtor will at its own expense and using commercially reasonable efforts, protect and defend the Trademarks against all claims or demands of all Persons other than those holding Permitted Liens.

(h) *Maintenance.* The Debtor will at its own expense maintain the Trademarks to the extent reasonably advisable in its business including, but not limited to, filing all applications to obtain trademark registrations and all affidavits, maintenance fees, annuities, and renewals possible with respect to letters patent, trademark registrations and applications therefor. The Debtor covenants that it will not abandon nor fail to pay any maintenance fee or annuity due and payable on any Trademark, nor fail to file any required affidavit or renewal in support thereof, without first providing the Secured Party: (i) sufficient written notice, of at least 30 days, to allow the Secured Party to timely pay any such maintenance fees or annuities which may become due on any Trademarks, or to file any affidavit or renewal with respect thereto, and (ii) a separate written power of attorney or other authorization to pay such maintenance fees or annuities, or to file such affidavit or renewal, should such be necessary or desirable.

(i) *Secured Party's Right to Take Action.* If the Debtor fails to perform or observe any of its covenants or agreements set forth in this Section 3, and if such failure continues for a period of ten (10) calendar days after the Secured Party gives the Debtor written notice thereof (or, in the case of the agreements contained in subsection (h), immediately upon the occurrence of such failure, without notice or lapse of time), or if the Debtor notifies the Secured Party that it intends to abandon a Trademark, the Secured Party may (but need not) perform or observe such covenant or agreement or take steps to prevent such intended abandonment on behalf and in the name, place and stead of the Debtor (or, at the Secured Party's option, in the Secured Party's own name) and may (but need not) take any and all other actions which the Secured Party may reasonably deem necessary to cure or correct such failure or prevent such intended abandonment.

(j)      ***Costs and Expenses.*** Except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, the Debtor shall pay the Secured Party on demand the amount of all moneys expended and all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Secured Party in connection with or as a result of the Secured Party's taking action under subsection (i) or exercising its rights under Section 6, together with interest thereon from the date expended or incurred by the Secured Party at the default rate provided in the Note.

(k)      ***Power of Attorney.*** To facilitate the Secured Party's taking action under subsection (i) and exercising its rights under Section 6, the Debtor hereby irrevocably appoints (which appointment is coupled with an interest) the Secured Party, or its delegate, as the attorney-in-fact of the Debtor with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file, in the name and on behalf of the Debtor, any and all instruments, documents, applications, financing statements, and other agreements and writings required to be obtained, executed, delivered or endorsed by the Debtor under this Section 3, or, necessary for the Secured Party, after an Event of Default, to enforce or use the Trademarks or to grant or issue any exclusive or non-exclusive license under the Trademarks to any third party, or to sell, assign, transfer, pledge, encumber or otherwise transfer title in or dispose of the Trademarks to any third party. The Debtor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof other than acts or omissions constituting gross negligence or willful misconduct.   The power of attorney granted herein shall terminate upon the termination of the Loan Agreement as provided therein and the payment and performance of all Obligations.

4.      Satisfaction.  Upon full payment or satisfaction of the Obligations and termination of any credit facilities extended to the Debtor by the Secured Party, this Agreement and the rights granted hereunder to the Secured Party, shall be terminated upon demand by a written termination statement or release of lien to the effect that the Secured Party no longer claims a security interest under this Agreement suitable for filing wherever notices of such security interest have been filed.

5.      Debtor's Use of the Trademarks. The Debtor shall be permitted to control and manage the Trademarks, including the right to exclude others from making, using or selling items covered by the Trademarks and any licenses thereunder, in the same manner and with the same effect as if this Agreement had not been entered into, so long as no Event of Default occurs and remains uncured.

6.      Events of Default. Each of the following occurrences shall constitute an event of default under this Agreement (herein called "Event of Default"), unless the Debtor cures such Event of Default by the fifth Business Day after the giving of written notice of such failure or default by Lender to the Debtors and its counsel with a copy to the United States Trustee: (a) an Event of Default, as defined in the Loan Agreement, which definition is incorporated herein by reference as though copied herein verbatim, shall occur; or (b) the Debtor shall fail promptly to observe or perform any covenant or agreement herein binding on it; or (c) any of the

representations or warranties contained in Section 3 shall prove to have been incorrect in any material respect when made.

      7.   <u>Remedies</u>. Following an Event of Default that is not cured within any applicable cure period, the Secured Party may, at its option, take any or all of the following actions:

      (a)   The Secured Party may exercise any or all remedies available under the Loan Agreement.

      (b)   The Secured Party may sell, assign, transfer, pledge, encumber or otherwise dispose of the Trademarks.

      (c)   The Secured Party may enforce the Trademarks and any licenses thereunder, and if Secured Party shall commence any suit for such enforcement, the Debtor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents required by Secured Party in aid of such enforcement.

      8.   <u>Miscellaneous</u>. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the Secured Party. A waiver signed by the Secured Party shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any of the Secured Party's rights or remedies. All rights and remedies of the Secured Party shall be cumulative and may be exercised singularly or concurrently, at the Secured Party's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other. All notices to be given to Debtor under this Agreement shall be given in the manner and with the effect provided in the Loan Agreement. The Secured Party shall not be obligated to preserve any rights the Debtor may have against prior parties, to realize on the Trademarks at all or in any particular manner or order, or to apply any cash proceeds of Trademarks in any particular order of application. This Agreement shall be binding upon and inure to the benefit of the Debtor and the Secured Party and their respective participants, successors and assigns and shall take effect when signed by the Debtor and delivered to the Secured Party, and the Debtor waives notice of the Secured Party's acceptance hereof. The Secured Party may execute this Agreement if appropriate for the purpose of filing, but the failure of the Secured Party to execute this Agreement shall not affect or impair the validity or effectiveness of this Agreement. A carbon, photographic or other reproduction of this Agreement or of any financing statement signed by the Debtor shall have the same force and effect as the original for all purposes of a financing statement. This Agreement shall be governed by the internal law of Tennessee without regard to conflicts of law provisions. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations.

**THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT.**

IN WITNESS WHEREOF, the parties have have caused this Agreement to be executed by their duly authorized officers, all as of the day and year first above written.


**WAREHOUSE 86, LLC,**
an Arizona limited liability company


By:_____

Its:_____


_____

**KENNETH A. MAY**


STATE OF _____
COUNTY OF _____

Personally appeared before me, a Notary Public in and for said State and County, _____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged himself to be a member-manager of WAREHOUSE 86, LLC, the within named bargainor, an Arizona limited liability company, and that he as such _____, executed the foregoing instrument for the purpose therein contained, by signing the name of the limited liability company by himself as a member manager.

WITNESS my hand and seal this _____ day of October, 2008.


_____
Notary Public

My Commission Expires:_____

STATE OF TENNESSEE
COUNTY OF SHELBY

Personally appeared before me, a Notary Public in and for said State and County, KENNETH A. MAY, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

WITNESS my hand and seal this _____ day of October, 2008.

_____
Notary Public

My Commission Expires:_____

EXHIBIT "A"

UNITED STATES ISSUED TRADEMARKS, SERVICE MARKS

AND COLLECTIVE MEMBERSHIP MARKS

REGISTRATIONS

| Mark | Registration Number | Registration Date |
|---|---|---|
| BARGAINLAND | 3157341 | October 17, 2006 |

APPLICATIONS

NONE

COLLECTIVE MEMBERSHIP MARKS

NONE

UNREGISTERED MARKS

WAREHOUSE86
BIDTOPIA

STATE ISSUED TRADEMARKS

| Mark | Serial Number | Registration Date | State |
|---|---|---|---|
| NONE | | | |