ASSET PURCHASE AGREEMENT

dated as of October 31, 2008

between

Warehouse86 Ventures, LLC

(as "Buyer")

and

Warehouse 86, LLC;

(as "Seller")

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

## TABLE OF CONTENTS

Page

ARTICLE 1  DEFINITIONS
- Section 1.1  Defined Terms ..................................................................................1
- Section 1.2  Other Definitional Provisions ...........................................................10

ARTICLE 2  TRANSFER OF ASSETS AND LIABILITIES
- Section 2.1  Assets to be Acquired ........................................................................10
- Section 2.2  Excluded Assets .................................................................................12
- Section 2.3  Liabilities to be Assumed by Buyer ..................................................13
- Section 2.4  Excluded Liabilities ...........................................................................14
- Section 2.5  Changes in Lists of Assumed Real Property Leases, Assumed Equipment Leases, Assumed Contracts, Acquired Intellectual Property and Acquired Software/Hardware..........16

ARTICLE 3  CLOSING AND PURCHASE PRICE
- Section 3.1  Closing; Transfer of Possession; Certain Deliveries .........................16
- Section 3.2  Purchase Price ....................................................................................18
- Section 3.3  Allocation of Purchase Price ..............................................................19

ARTICLE 4  REPRESENTATIONS AND WARRANTIES OF SELLER
- Section 4.1  Organization and Good Standing .......................................................19
- Section 4.2  Execution and Effect of Agreement ...................................................19
- Section 4.3  No Contravention ...............................................................................20
- Section 4.4  Third Party Approvals ........................................................................20
- Section 4.5  Title to Purchased Assets ...................................................................20
- Section 4.6  Inventory ............................................................................................20
- Section 4.7  Compliance with Law ........................................................................20
- Section 4.8  Governmental Permits ........................................................................20
- Section 4.9  Litigation ............................................................................................21
- Section 4.10 Real Estate; Real Property Leases .....................................................21
- Section 4.11 Contracts ............................................................................................21
- Section 4.12 Intellectual Property ..........................................................................21
- Section 4.13 Labor Matters ....................................................................................22
- Section 4.14 Brokers and Finders ..........................................................................23
- Section 4.15 Financial Statements .........................................................................23
- Section 4.16 Health and Safety Matters .................................................................23

ARTICLE 4A  REPRESENTATIONS AND WARRANTIES OF SELLER AS THE SOLE MEMBER OF BIDTOPIA, LLC
- Section 4A.1 Organization and Good Standing .....................................................23
- Section 4A.2 No Contravention ..............................................................................24
- Section 4A.3 Compliance with Law .......................................................................24
- Section 4A.4 Litigation ...........................................................................................24
- Section 4A.5 Real Estate; Real Property Leases ....................................................24
- Section 4A.6 Unexpected Leases and Executory Contracts ...................................24
- Section 4A.7 Intellectual Property ..........................................................................24
- Section 4A.8 Financing Statements ........................................................................25

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

-i-

ARTICLE 5  REPRESENTATIONS AND WARRANTIES OF BUYER
- Section 5.1  Organization and Good Standing .......................................................25
- Section 5.2  Execution and Effect of Agreement ...................................................25
- Section 5.3  No Contravention ...............................................................................26
- Section 5.4  Third Party Approvals ........................................................................26
- Section 5.5  Brokers and Finders ............................................................................26

ARTICLE 6  COVENANTS OF THE PARTIES
- Section 6.1  Conduct of Business Pending the Closing .........................................26
- Section 6.2  Bankruptcy Court Order .....................................................................28
- Section 6.3  Notification of Certain Matters ..........................................................29
- Section 6.4  Access ................................................................................................29
- Section 6.5  Confidentiality; Privacy .....................................................................30
- Section 6.6  Public Announcements ......................................................................30
- Section 6.7  Cure of Defaults; Adequate Assurance ..............................................30
- Section 6.8  Employment Matters ..........................................................................30
- Section 6.9  Further Agreements ............................................................................31
- Section 6.10 Payment of Transfer Taxes and Tax Filings ......................................31
- Section 6.11 Utilities ..............................................................................................32
- Section 6.12 Proration of Taxes and Certain Charges ...........................................32
- Section 6.13 Reasonable Efforts; Notification .......................................................32
- Section 6.14 Rejected Contracts .............................................................................33
- Section 6.15 Adequate Assurances .........................................................................33
- Section 6.16 Further Assurances ............................................................................33
- Section 6.17 Post-Closing Reconciliation ..............................................................34
- Section 6.18 Assignment Assistance ......................................................................34
- Section 6.19 Change of Name ................................................................................34

ARTICLE 7  CONDITIONS TO OBLIGATIONS OF THE BUYER
- Section 7.1  Conditions Precedent to Obligations of Buyer ..................................34

ARTICLE 8  CONDITIONS TO OBLIGATIONS OF THE SELLER
- Section 8.1  Conditions Precedent to the Obligations of Seller .............................36

ARTICLE 9  TERMINATION
- Section 9.1  Termination of Agreement .................................................................37
- Section 9.2  Consequences of Termination ............................................................38

ARTICLE 10  MISCELLANEOUS
- Section 10.1  Expenses ...........................................................................................39
- Section 10.2  Assignment .......................................................................................39
- Section 10.3  Parties in Interest ..............................................................................39
- Section 10.4  Risk of Loss ......................................................................................39
- Section 10.5  Notices ..............................................................................................40
- Section 10.6  Choice of Law ..................................................................................41
- Section 10.7  Entire Agreement; Amendments and Waivers .................................41
- Section 10.8  Acknowledgment and Release .........................................................42
- Section 10.9  Counterparts ......................................................................................42
- Section 10.10 Invalidity ..........................................................................................42

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

-ii-

- Section 10.11 Headings ..........................................................................................42
- Section 10.12 Exclusive Jurisdiction ......................................................................42
- Section 10.13 WAIVER OF RIGHT TO TRIAL BY JURY ..................................42
- Section 10.14 Beneficiaries ....................................................................................43
- Section 10.15 Counting ..........................................................................................43
- Section 10.16 Construction ....................................................................................43

Exhibits:

A - Bill of Sale and Assignment
B - Real Property Lease Assumption and Assignment Agreements
C - Assumption and Assignment Agreement
D - Trademark Assignment
E – Promissory Note to Stuart Irby

F - Approval Order

Schedules:

I - Owned Software
II - Key Employees

2.2(a) - Excluded Assets
4.3 - Contravention
4.4 - Required Third-Party Approvals
4.9 - Pending or Threatened Proceedings and Cases
4.10(a) - Interests in Property Leases
4.12(b) - Intellectual Property
4.12(c) - Transfers of Intellectual Property
4.12(e) - Infringement of Intellectual Property
4.13 – Labor Matters
4.15 - Financial Statements
4.16 - Health and Safety Matters
4A.7 – Bidtopia Intellectual Property
6.1(l) – Allowable Contract Amendments

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

-iii-

Exhibit "A"

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 31st day of October, 2008, by and between Warehouse86 Ventures, LLC, a Delaware limited liability company (the "Buyer"), and Warehouse 86, LLC, an Arizona limited liability company, (the "Company" and the "Seller").

WITNESSETH:

WHEREAS, Seller is in the business of online or internet auctions (the "Business");

WHEREAS, Seller intends to commence a case (the "Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") on or about October 30, 2008 by filing a voluntary petition with the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court");

WHEREAS, Seller wishes to sell to Buyer all of the assets of the Business as specified herein unless expressly excluded as an "Excluded Asset" as defined herein, and Buyer wishes to purchase such assets and will assume only those liabilities relating to the Business expressly specified herein as an "Assumed Liability" as defined herein, all on and subject to the terms and conditions set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, Seller and Buyer have determined that it is in their respective best interests to consummate the foregoing transaction, and in furtherance thereof, have approved this Agreement and the transactions contemplated hereby, subject to approval of same by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.1   Defined Terms. As used herein, the terms below shall have the following respective meanings:

"Accounts Receivable" shall mean any and all accounts receivable due and owing from any of the Seller's customers relating to the Business, and all other accounts receivable related to the Business.

"Acquired Intellectual Property" shall have the meaning ascribed to such term in Section 2.1(d).

"Acquired Permits" shall have the meaning ascribed to such term in Section 2.1(e).

"Acquired Software/Hardware" shall have the meaning ascribed to such term in Section 2.1(d).

"Affiliate" shall mean, with respect to a Person, all Persons controlling, controlled by, or under common control with, such Person.

"Agreement" shall mean this Agreement (together with all schedules and exhibits referenced herein).

"Allocation Schedule" shall have the meaning ascribed to such term in Section 3.3.

"Approval Order" shall have the meaning ascribed to such term in Section 7.1(d).

"Assumed Contracts" shall have the meaning ascribed to such term in Section 2.1(f), but not including those Contracts removed from the list of Assumed Contracts pursuant to Section 2.5.

"Assumed Agreements" shall have the meaning ascribed to such term in Section 6.17.

"Assumed Equipment Leases" shall have the meaning ascribed to such term in Section 2.1(b), including those Equipment Leases added to or removed from the list of Assumed Equipment Leases pursuant to Section 2.5.

"Assumed Liabilities" shall have the meaning ascribed to such term in Section 2.3.

"Assumed Real Property Leases" shall have the meaning ascribed to such term in Section 2.1(a), including those Property Leases added to or removed from the list of Assumed Real Property Leases pursuant to Section 2.5.

"Assumed Supplemental Items" shall have the meaning ascribed to such term in Section 2.5(b).

"Assumption and Assignment Agreement" shall mean the Assumption and Assignment Agreement entered into by and between Buyer and Seller, substantially in the form of Exhibit C.

"Avoidance Actions" shall have the meaning ascribed to such term in Section 2.2(c).

"Bankruptcy Code" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Court" shall have the meaning ascribed to such term in the Recitals.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA),

-2-

and all severance, employment, change in control, fringe benefit, bonus, incentive, deferred compensation, and all other employee benefit plans, programs, policies, agreements and other arrangements, whether or not subject to ERISA, including any funding vehicle therefor now in effect or required in the future to be established as a result of the transactions contemplated by this Agreement, whether formal or informal, written or oral, binding or not, under which any present or former employee of Seller or any beneficiary or dependent of such employee, has any present or future right to benefits, contingent or otherwise.

"Bill of Sale and Assignment" shall mean the Bill of Sale and Assignment from Seller for the benefit of Buyer, substantially in the form of Exhibit A.

"Business" shall have the meaning ascribed to such term in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the state of New York are authorized or obligated by law or executive order to close.

"Buyer" shall have the meaning ascribed to such term in the preamble.

"Case" shall have the meaning ascribed to such term in the Recitals.

"Cash and Cash Equivalents" shall mean cash, third-party checks, wire transfers and any other funds of Seller, and commercial paper, marketable securities, certificates of deposit and other bank deposits, treasury bills and other cash equivalents of Seller calculated in accordance with GAAP.

"Claims" shall have the meaning ascribed to such term in Section 2.2(c).

"Closing" shall have the meaning ascribed to such term in Section 3.1(a).

"Closing Date" shall have the meaning ascribed to such term in Section 3.1(a).

"Closing Time" shall have the meaning ascribed to such term in Section 3.1(a).

"COBRA" shall mean Section 4980B of the Code and Part 6 of Title I of ERISA, together in each case, with applicable regulations, in each case, as amended and in effect from time to time.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Company" shall have the meaning ascribed to such term in the preamble.

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including, without limitation, financial information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and

-3-

arrangements with, customers and suppliers, software and data bases, but shall not include any information that (i) is generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), (ii) is already in the recipient's possession or comes into recipient's possession on a non-confidential basis (other than as a result of disclosure in violation of this Agreement), or (iii) is independently developed by the receiving party without reliance in any way on any Confidential Information.

"Content" shall mean any literary, audio, video, and other information, including editorial content, data, animation, graphics, photographs and artwork, and combinations of any or all of the foregoing, in any tangible or digital formats.

"Contract" shall mean, with respect to the Business, any lease, license, agreement, contract, contract right, purchase order, obligation, trust, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property.

"Copyright Assignment" shall mean the Copyright Assignment entered into by and between Buyer and Seller, substantially in the form of Exhibit E.

"Cure Amounts" shall mean all amounts payable by Seller or Buyer, as applicable pursuant to the Agreement, pursuant to Section 365(b)(1)(A) or (B) of the Bankruptcy Code.

"Database Assets" shall mean the computer databases related to the Business and related storage units necessary to transfer such computer databases to Buyer's possession or control.

"Debtor-in-Possession Financing" shall mean that loan to be advanced by Kenneth A. May to Seller upon the filing of its Chapter 11 petition upon approval of the Bankruptcy Court to fund the operations of Seller business pending the approval of sale and Closing up to a maximum amount of $500,000.00

"Eligible Inventory" shall mean (i) all saleable finished Inventory of a type for which Seller has filled outstanding purchase orders in the normal course of business, within 90 days prior to the Closing Date, and (ii) all supplies, including wrap and pack supplies; provided, however, that Eligible Inventory shall exclude the Excluded Inventory.

"Employee Obligations" shall mean salary, wages, sick pay, accrued bonuses, severance, deferred compensation, Liabilities relating to any Benefit Plan, Liabilities of Seller arising under COBRA, and all other Liabilities of Seller to its present or former employees (including any such employees who become employees of Buyer) or retirees or spouses, dependents or other beneficiaries of such present or former employees or retirees, whether pursuant to agreements, plans or otherwise.

"Environmental Laws" shall mean all Laws relating to protection of human health and the environment, including the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. (S)(S) 9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. (S)(S) 6901 et seq., (the "Resource Conservation and Recovery Act", the Toxic Substances Control Act, 15 U.S.C. (S)(S) 2601, et seq., the Clean Water Act, 33 U.S.C. (S)(S) 51

-4-

et seq., the Oil Pollution Act, 33 U.S.C. (S)(S) 2701 et seq., the Clean Air Act, 42 U.S.C. (S)(S) 7401 et seq. and the Occupational Safety and Health Act, 29 U.S.C. (S)(S) 651 et seq., and state and local equivalents of all of the foregoing.

"Equipment" shall have the meaning ascribed to such term in Section 2.1(c).

"Equipment Leases" shall mean all equipment leases used in the Business, or for Equipment located at the Acquired Leased Facilities.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Estimated Closing Adjustment" shall have the meaning ascribed to such term in Section 3.3(b).

"Excluded Accounts Receivable" shall have the meaning ascribed to such term in Section 2.2(n).

"Excluded Assets" shall have the meaning ascribed to such term in Section 2.2.

"Excluded Intellectual Property" shall have the meaning ascribed to such term in Section 2.2(j).

"Excluded Inventory" shall have the meaning ascribed to such term in Section 2.2(o).

"Excluded Permits" shall have the meaning ascribed to such term in Section 2.2(p).

"Final Order" shall mean an Order of the Bankruptcy Court or other court of competent jurisdiction (i) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or other proceeding for review, rehearing or reargument, (ii) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (iii) respecting which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure and other applicable Laws.

"Financial Statements" shall have the meaning ascribed to such term in Section 4.16.

"GAAP" shall mean United States generally accepted accounting principles.

"Governmental Directive" shall have the meaning set forth in Section 4.7.

"Governmental Entity" shall mean any (i) federal, state, local, municipal, foreign or other government; (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal); or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

-5-

"Hired Employees" shall have the meaning ascribed to such term in Section 6.9.

"Identified Employees" shall mean all of Seller's employees as of the Closing Time.

"Intellectual Property" shall mean, as related to the Business and the operation thereof, to the extent of Seller's interest therein: (i) all intangible proprietary rights and interests, however denominated, throughout the world, whether express or implied, whether or not registered or recorded, including all inventions, technology, processes, algorithms and formulae (whether patentable or not) and Trademarks, all proprietary data, databases, research and development data and customer data, all domain names, rights of privacy and publicity, moral rights, shop rights, all trade secrets and know-how, all published and unpublished works of authorship (whether copyrightable or not) and any copyrights therein and thereto, all computer software (including process control software), source code and object code, and all documentation related thereto, and licenses received from manufacturers and sellers of the Equipment; (ii) all filings, recordations and governmental awards or registrations pertaining to the above, including patents and applications therefor, trademark registrations and applications therefor, copyright registrations and applications therefor, domain name registrations and applications therefor, and all licenses and Contracts relating to any and all of the above, including employee or consultant agreements or other agreements to transfer rights in Intellectual Property to Seller; (iii) all choses in action and other rights arising from or relating to the above, including maintenance rights or rights to upgrades, rights to sue and collect remedies against past, present and future infringements or misappropriations thereof, and rights of priority and protection of interests therein under the laws of any jurisdiction worldwide, including rights to obtain renewals, continuations, divisions or other extensions of legal protections pertaining thereto; (iv) to the extent permitted by applicable law, all rights under section 365(n) of the Bankruptcy Code arising from or relating to the above; and (v) all tangible embodiments of the above, including, without limitation, all filings and correspondence with governmental authorities, all original governmental certificates for such patents and trademark and copyright registrations, and all files and filings pertaining to any litigation, opposition proceeding, cancellation proceeding, arbitration, mediation, or negotiation arising from or relating to the above.

"Inventory" shall mean all merchandise or other goods sold, or intended to be sold at the Acquired Leased Facilities and related to the Business, all raw materials purchased by Seller or located in the Acquired Leased Facilities or elsewhere that is necessary to, or purchased in connection with, the Business and the operation thereof, all supplies, including wrap and pack supplies, and all merchandise or other goods produced by the Acquired Leased Facilities for the Business, the production of which has not been completed as of the Closing Date, and shall not include Equipment or any parts.

"IP Contracts" shall have the meaning ascribed to such term in Section 2.1(d).

"Key Employees" shall mean those employees identified in Schedule II hereto.

"Knowledge" with respect to any individual, shall mean the actual, current knowledge of

-6-

such individual. The "Knowledge of Seller" shall mean the Knowledge of the following persons: Paul St. James, Joy St. James, Ernie Strahan.

"Law" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, principle of common law, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, security interest, mortgage, deed of trust or other monetary encumbrance.

"Material Adverse Effect" shall mean: any event, change, condition or effect which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or is reasonably likely to be, materially adverse to the Purchased Assets or the Business taken as a whole; provided, however, for purposes of this Agreement, neither (xx) the commencement of the Case and the restrictions on Seller's activities and operations resulting therefrom, and the reasonably anticipated consequences thereof; nor (yy) the loss of goodwill or customers of the Business (including, without limitation, any loss of goodwill or customers resulting from the winding down and closing of other facilities and operations of Sellers not included among the Purchased Assets) shall be deemed a "Material Adverse Effect".

"Notice" shall have the meaning ascribed to such term in Section 10.5.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation or award of any Governmental Entity or private arbitration tribunal.

"OSHA" shall have the meaning ascribed to such term in Section 4.17.

"Owned Software" shall mean that software which is listed on Schedule I hereto.

"Permits" shall have the meaning ascribed to such term in Section 2.1(e).

"Permitted Access Parties" shall have the meaning ascribed to such term in Section 6.5(c).

"Permitted Rejection Contracts" shall have the meaning ascribed to such term in Section 6.1(a).

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, joint stock company, labor union, estate, Governmental Entity or other entity.

-7-

"Petition Date" shall mean the date on which Seller files its voluntary petition for relief under the Bankruptcy Code.

"Post-Closing Cooperation Period" shall have the meaning ascribed to such term in Section 6.5(c).

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Professional Expenses" shall mean the legal and other professional fees of Seller's estate in connection with the Case (including professionals for Seller and for the committee of unsecured creditors).

"Property Leases" shall have the meaning ascribed to such term in Section 2.1(a).

"Purchase Price" shall have the meaning ascribed to such term in Section 3.2.

"Purchased Assets" shall have the meaning ascribed to such term in Section 2.1. Notwithstanding anything to the contrary in any other provision of this Agreement, any equipment, goods, articles, assets, or other property of any kind or nature held, used or controlled by Seller pursuant to a contract shall only be included in the transaction contemplated herein to the extent that the associated contract is assumed and assigned to Buyer pursuant to the Approval Order entered by the Bankruptcy Court and then, only to the extent of Seller's interest therein.

"Real Property Lease Assumption and Assignment Agreements" shall have the meaning ascribed to such term in Section 3.1(b)(ii).

"Representative" shall mean, with respect to any Person, such Person's officers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Resource Conservation and Recovery Act" shall have the meaning ascribed to such term in the definition of Environmental Laws.

"Sale Hearing" shall mean the hearing to consider the entry of the Approved Order.

"Sale Motion" shall have the meaning ascribed to such term in Section 6.2(c).

"Seller" shall have the meaning ascribed to such term in the preamble.

"Seller's Adjustment Certificate" shall have the meaning ascribed to such term in Section 3.3(b).

"Seller's Disclosure Schedule" shall have the meaning ascribed to such term in the opening paragraph of ARTICLE IV.

-8-

"Seller's Schedule Delivery Date" shall mean December 18, 2008.

"Tax" or "Taxes" shall mean any current, deferred, federal, state, county, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, without limitation, income, profits, gains, net worth, sales and use, ad valorem, gross receipts, business and occupation, license, minimum, alternative minimum, environmental, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition to tax or interest on the foregoing.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Trademark Assignment" shall mean the Trademark Assignment by and between Buyer and Seller, substantially in the form of Exhibit D.

"Trademarks" shall mean, to the extent of Seller's interest therein, all foreign and domestic trademarks, service marks, trade names (including the name "Western Nonwovens"), trade dress, logomarks, domain names, and other brand identifiers or indicia of origin, along with all goodwill associated therewith and symbolized thereby, and all registrations, applications to register, recordations and governmental filings, arising therefrom or pertaining thereto, in all territories throughout the world and arising under any applicable legal regime, whether common law, statutory, administrative, or other applicable regulation, grant, or order. Without limitation, such "Trademarks" include all trademarks, service marks and trade names and the registrations and applications therefor listed on Schedule 2.1(d).

"Transfer Tax" or "Transfer Taxes" shall mean any federal, state, county, local, foreign and other sales, excise, use, transfer, conveyance, documentary transfer, recording or other similar Tax, fee or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable law under the laws of any state.

"Website" shall mean (i) the website currently located at the URL http://www.bidtopia.com, http://www.bargainland.net and http://www.warehouse86.com, (ii) all other websites owned or controlled by Seller, and all Content and pages contained within each of those websites, hosted anywhere in the world, and (iii) all website user information and data collected by Seller, including email addresses, website logs, clickstream data and cookies, but, in each case, excluding freely available graphic or text content, such as clip art or graphic images licensed from commercial media vendors. For each Website, the Content and pages shall include all computer files and documentation for the current version of the Website and all archived

-9-

Content and pages in Seller's possession or control. Notwithstanding the foregoing, for purposes of this Agreement, the terms "Website" and "Content" shall specifically exclude any attorney-client privileged data and information, records, content, images or the like contained or reflected therein or thereon that are unrelated to the Business.

Section 1.2   Other Definitional Provisions.

(a)   The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)   The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)   Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)   Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)   A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(f)   A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)   All references to "$" and dollars shall be deemed to refer to the United States currency.

(h)   All references to any financial or accounting terms shall be defined in accordance with GAAP except as otherwise specifically defined herein.

## ARTICLE 2

### TRANSFER OF ASSETS AND LIABILITIES

Section 2.1   Assets to be Acquired. At the Closing, and upon the terms and conditions set forth herein and subject to the approval of the Bankruptcy Court pursuant to the Approval Order, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept, all of the right, title and interest of Seller, free and clear of all Liens (other than Permitted Liens), claims and interests, in, to and under each and all of the assets of Seller. "Purchased Assets" shall include, but not be limited to, all right, title and interest of Seller in, to and under the following assets at the Closing Time, but shall exclude the Excluded Assets as set

-10-

forth in Section 2.2:

(a)   All real property leases ("Property Leases" or "Assumed Real Property Leases") subject to the terms and conditions set forth herein;

(b)   All Equipment Leases (the "Assumed Equipment Leases");

(c)   All leasehold improvements, furniture, fixtures, equipment, machinery, parts and spare parts of such machinery, supplies and other tangible personal property owned by Seller that is located at or relates to the Acquired Leased Facilities and, to the extent transferable, and all warranties, licenses, releases, service agreements and contractual commitments, if any, express or implied, existing for the benefit of Seller in connection therewith, (collectively, the "Equipment" or the "Acquired Equipment");

(d)   To the extent transferable, all of Seller's right, title and interest in or to all Intellectual Property owned by Seller, or licensed to Seller, or otherwise controlled by Seller, and used in and for the operation of the Business, or otherwise used or held for use in the Business, including all computer hardware and other software that is necessary or desirable for the operation of the Business (the "Acquired Software/Hardware") and all (i) registered Trademarks, including applications therefor; (ii) unregistered Trademarks; (iii) registered copyrights, including applications therefor; (vi) unregistered copyrights or works of authorship; (vii) software; (viii) material data; (ix) Contracts concerning Intellectual Property (the "IP Contracts"); (x) the Owned Software; (xi) all phone numbers and phone and other telecommunication lines; (xi) the Website; (xii) the Content, in each of the above cases, used or held for use in the Business, and (xiii) the name, "Warehouse 86" (the "Acquired Intellectual Property");

(e)   All licenses, permits, franchises and other authorizations of any Governmental Entity relating to all other Purchased Assets and to the operation of the Business, and all pending applications therefor, (collectively, the "Permits") or (the "Acquired Permits"), to the full extent, if any, such Acquired Permits are transferable or assignable;

(f)   All Contracts and rights thereunder of Seller that are necessary for the operation of the Business (the "Assumed Contracts");

(g)   All Inventory of Seller as of the Closing Date or in transit to or from the Seller as of the Closing Date and, to the extent transferable and assignable, all warranties, licenses, releases and agreements, if any, express or implied, existing for the benefit of Seller in connection therewith;

(h)   Copies or originals of all books, samples, records, files or papers of Seller, whether in hard copy or electronic format, relating to the Purchased Assets and/or the on-going operation of the Business, including, without limitation, sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists, vendor lists, mailing lists, catalogues, research material, URLs, know-how, specifications, designs, drawings, or any intangible property and applications for the same, plans, personnel and employment records

-11-

(other than records with respect to former employees or employees who do not become employees of Buyer as of or after the Closing Time), operating and production records, safety and environmental reports, data, studies and documents, fixed asset ledgers, Tax Returns (other than income Tax Returns) regarding real property, personal property and ad valorem taxes with respect to the Purchased Assets, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns; provided, however, the Purchased Assets shall specifically exclude any of the foregoing to the extent the same is (i) subject to any applicable attorney-client privilege, and/or (ii) not transferable under applicable law.

(i)   Any Prepaid Amounts;

(j)   To the extent transferable, all rights of Seller under all warranties (expressed or implied), representations, indemnities, or guaranties made by third parties to or for the benefit of Seller with respect to the Purchased Assets;

(k)   Other than Excluded Assets, all other properties, assets and rights held for use or utilized in the Business and that are not expressly excluded herein of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, owned by Seller or used or held by Seller for use exclusively in the Business, or as may be necessary to conduct the Business, whether or not reflected on the books or financial statements of the Seller, as the same shall exist at the Closing Time;

(l)   To the extent transferable and assignable, all of Seller's customer relationships with customers of the Business;

(m)   The Database Assets; and

(n)   All goodwill related to the foregoing.

(o)   All Cash and Cash Equivalents as of the Closing Time; and all "PayPal Accounts," merchant accounts and similar accounts, and Seller's bank accounts;

(p)   The membership interest of Seller in Bidtopia, LLC; and

(q)   All accounts receivable including, but not limited to, any intercompany receivables.

Section 2.2   Excluded Assets. Seller shall retain, and Buyer shall not purchase, or seek Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of Seller's right, title and interest in or to any of the following assets and properties of Seller (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of Seller, free and clear of any Claim of Buyer:

(a)   Any Contracts listed on Schedule 2.2(a);

-12-

(b) All rights, demands, claims, actions and causes of action (collectively, the "Claims") that Seller or any of its Affiliates may have against any third party, including any Governmental Entity, under Chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions") or otherwise;

(c) All Claims that Seller or any of its Affiliates may have against any Person (including Governmental Entities) for refund or credit of any type with respect to Taxes accrued with respect to periods ending on or prior to the Closing Time;

(d) All insurance policies, insurance claims and proceeds of insurance policies owned by Seller;

(e) All rights of Seller under this Agreement and the agreements and instruments delivered to Seller by Buyer pursuant to this Agreement or the transactions contemplated hereby;

(f) The company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller;

(g) Seller's directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other Benefit Plan;

(h) Assets owned or used by Seller not related to the Business;

(i) Any other assets that Buyer elects in writing in accordance with Section 2.5 by the Closing Time, which election shall be made in accordance with Section 2.5 in the case of Property Leases, Equipment Leases, Contracts and Intellectual Property, to exclude from Purchased Assets (it being understood that there will be no adjustment to the Purchase Price with respect thereto);

(j) All capital stock of Seller, including any options, warrants or other securities exchangeable or convertible into capital stock of Seller;

(k) Any Inventory that is specifically identified on Schedule 2.2(a) (the "Excluded Inventory");

(l) Any Permit other than the Acquired Permits (the "Excluded Permits"); and

(m) The "Porsche" lease.

Section 2.3  Liabilities to be Assumed by Buyer. At the Closing, Buyer will assume only the following Liabilities of Seller (the "Assumed Liabilities") and no others:

-13-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

(a) all Liabilities expressly assumed by Buyer pursuant to any other provision of this Agreement; and

(b) all Liabilities of Seller which arise after the Closing Time to the counter-parties under the Assumed Contracts, the Assumed Real Property Leases, the Assumed Equipment Leases and the Acquired Intellectual Property; provided, however, that Buyer does not assume and does not agree to pay, discharge or perform any Excluded Liabilities as described in Section 2.4 below;

(c) any Liabilities for Transfer Taxes to the extent provided in Section 6.12 below;

(d) those obligations of Seller to fulfill delivery obligations under purchase orders issued to vendors and suppliers by Seller in the ordinary course of business as to which (i) Seller is not in default of its obligations thereunder, (ii) such purchase orders have not been performed, and (iii) delivery pursuant to the terms of such purchase orders is within the thirty (30) days following the Closing Date (the "Pending Purchase Orders").

Section 2.4  Excluded Liabilities. Other than the Assumed Liabilities, Buyer shall not and does not assume any other Liability whatsoever (including Liabilities relating to the conduct of the Business or to the Purchased Assets (and the use thereof) at any time on or prior to the Closing Time), whether relating to or arising out of the Business or Purchased Assets or otherwise, fixed or contingent, disclosed, or undisclosed (collectively, the "Excluded Liabilities"). Without limiting the foregoing, Buyer shall not and does not assume any of the following (each of which shall be included within the definition of "Excluded Liability"):

(a) Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities of Seller which are based on any Liabilities arising out of any breach by Seller of any provision of any Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases, obligations pertaining to Acquired Intellectual Property, purchase orders or sales orders including any Liabilities for non-payment, non-delivery, breach of warranty or other breach of contract, or failure to deliver specified product.

(b) All Liabilities relating to or arising, whether before, on or after the Closing, out of or in connection with, any of the Excluded Assets, including all Liabilities relating to or arising out of any Contract that is not an Assumed Contract, Assumed Equipment Lease, Assumed Real Property Lease or Acquired Intellectual Property;

(c) Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities, other than the Assumed Liabilities, that arise (whether under the Assumed Contracts, the Assumed Real Property Leases, the Assumed Equipment Leases, the Acquired Intellectual Property or otherwise) with respect to the Purchased Assets or the use thereof on or prior to the Closing Time or relate to periods ending on or prior to the Closing Time or are to be observed, paid, discharged or performed on or prior to the Closing Time (in each case, including any Liabilities that result from, relate to or arise out of tort or other product liability claim);

-14-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

(d) Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all litigation and related claims and Liabilities or any other claims against Seller of any kind or nature whatsoever, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to Seller's conduct, performance or non-performance, failure to deliver specified product, or product delivered with quality issues);

(e) All Employee Obligations;

(f) All Liabilities relating to any environmental, health or safety matter (including any Liability or obligation arising under any Environmental Law) arising out of or relating to Seller's operation of the Business or other of the Seller's respective businesses or Seller's leasing, ownership or operation of real property, including the Acquired Leased Facilities;

(g) All Liabilities for damages to persons or property arising out of alleged defects in products sold by Seller, or arising under warranties, express or implied, issued by Seller;

(h) All Liabilities of Seller under any collective bargaining agreement, including, without limitation, any agreement with any labor union, any employment agreement or any severance agreement;

(i) All Liabilities of Seller attributable to, incurred in connection with, arising from, or relating to, a violation of any Laws governing employee relations, including anti-discrimination Laws, wage and hour Laws, labor relations Laws and occupational safety and health Laws and the WARN Act;

(j) All Liabilities of Seller related to the termination by Seller of employment of any employees of Seller, including, except as provided in Section 6.10 below, all Liabilities for severance or arising under the WARN Act;

(k) All Liabilities for any and all Transfer Taxes due as a result of the transactions contemplated by this Agreement;

(l) Subject to Section 6.12, all Liabilities for any and all Taxes of Seller for any period, including deferred Taxes and any other Taxes relating to the operation of the Business or the ownership of the Purchased Assets on or before the Closing Time, whether assessed prior to, or following, the Closing, and whether the amount is determined by audit, reassessment or otherwise;

(m) Except for those Liabilities specifically assumed by Buyer pursuant to this Agreement, all Liabilities of Seller that were incurred or accrued prior to the Petition Date, including, without limitation, all notes, bonds or other evidences of indebtedness;

(n) All Liabilities of Seller in respect of any indebtedness for borrowed money, intercompany indebtedness or any notes made by Seller in favor of Seller's members,

-15-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

affiliates or any third party;

(o) All Liabilities of Seller arising out of guarantees or indemnities by Seller or any Affiliates of Seller;

(p) All Professional Expenses; and

(q) Except for those Liabilities specifically assumed by Buyer pursuant this Agreement, all Liabilities for fraud, breach, misfeasance, negligence, strict liability in tort, injury to persons or property or under any other theory relating to the Business, the Purchased Assets or the conduct, performance or non-performance of Seller.

Section 2.5  Changes in Lists of Assumed Real Property Leases, Assumed Equipment Leases, Assumed Contracts, Acquired Intellectual Property and Acquired Software/Hardware.

(a) From time to time after the date hereof and until three (3) Business Days prior to the Closing Date, Buyer may by Notice to Seller add assets, including but not limited to, any executory contract or unexpired lease originally selected for Purchase to the schedule of Excluded Assets (Schedule 2.2(a)).

(b) As provided in Section 2.1(a), Buyer may from time to time after the date hereof and until three (3) Business Days, prior to the Closing Date, provide Notice to Seller to take action to reject any non-assumed executory contract or unexpired lease.

ARTICLE 3

CLOSING AND PURCHASE PRICE

Section 3.1  Closing; Transfer of Possession; Certain Deliveries.

(a) Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to Article IX hereof, the closing of the transactions contemplated herein (the "Closing") shall take place at 12:01 a.m. (eastern standard time) on a date mutually acceptable to Buyer and Seller (the "Closing Date") to be mutually agreed upon by the parties, which date shall be two (2) Business Days after all the conditions set forth in Articles VII and VIII hereof (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing) shall have been satisfied or waived), but in any event no later than December 29, 2008, unless another time or date is agreed to in writing by the parties. The Closing shall be held at the offices of Seller's counsel or at such place as is mutually agreed to by the parties. The Closing shall be effective as of 12:01 a.m. (New York time) on the Closing Date (the "Closing Time"). If the Seller is unable to satisfy the conditions of Closing by the Closing Date, upon agreement of Buyer, the Closing Date may be extended for a period of thirty (30) days such that Closing must occur on or before January 28, 2009 ("Extended Closing Date") with the agreed upon reduction in Purchase Price as set forth in Section 3.2.

-16-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

(b) At the Closing, the Seller shall deliver, or shall cause to be delivered, to Buyer the following:

(i) a duly executed Bill of Sale and Assignment, substantially in the form of Exhibit A attached hereto, transferring the Purchased Assets to Buyer;

(ii) duly executed lease assumption and assignment agreements in recordable form, substantially in the form of Exhibit B hereto (the "Real Property Lease Assumption and Assignment Agreements"), separately for each Assumed Real Property Lease;

(iii) an Assumption and Assignment Agreement, substantially in the form of Exhibit C hereto with respect to all Assumed Contracts (other than Assumed Real Property Leases) and Supplemental Assigned Contracts, duly executed by Seller;

(iv) a Trademark Assignment, substantially in the form of Exhibit D hereto, duly executed by the Seller, including a separate Trademark Assignment suitable for recording with regard to each jurisdiction and each recordable right or interest, such as each Trademark registration, each application to register a Trademark, or each recorded or recordable license interest;

(v) an incumbency and specimen signature certificate, dated as of the Closing Date, from Seller with respect to the officer or officers of Seller executing this Agreement and any other documents delivered hereunder by or on behalf of Seller;

(vi) a certificate of Seller, dated as of the Closing Date, signed by an authorized officer of Seller, certifying that conditions specified in Section 7.1(a) and Section 7.1(b) hereof have been fulfilled;

(vii) a copy of the resolutions adopted by the Members of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by an authorized officer of Seller as of the Closing Date in a manner appropriate under the Seller's organizational documents;

(viii) all other instruments reasonably requested by Buyer of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as are desirable or necessary to convey the Purchased Assets to Buyer;

(ix) an Employment Agreement between Buyer and Paul St. James, in a form satisfactory to Buyer and executed by Paul St. James; and

(x) such other closing instruments and certificates as may be reasonably requested by Buyer.

-17-

(xi) At the Closing, Buyer shall deliver, or shall cause to be delivered to Seller or as stated below, the following:

(xii) a wire transfer of federal funds to the account or accounts designated by Seller (which account or accounts shall be designated at least two (2) Business Days prior to the Closing Date) of the cash portion of the Purchase Price;

(xiii) delivery to Seller's secured lender, Stuart Irby, a promissory note in the face amount of $750,000 in the form attached hereto as Exhibit E and accompanying Security Agreement and Guaranty;

(xiv) the Assumption and Assignment Agreement, duly executed by Buyer;

(xv) the Real Property Lease Assumption and Assignment Agreement, duly executed by Buyer;

(xvi) an incumbency and specimen signature certificate, dated as of the Closing Date, from Buyer with respect to the officer or officers of Buyer executing this Agreement and any other documents delivered hereunder by or on behalf of Buyer;

(xvii) a certificate of Buyer, dated as of the Closing Date, signed by the President or Chief Financial Officer of Buyer, certifying that conditions specified in Section 8.1(a) and Section 8.1(b) hereof have been fulfilled;

(xviii) a copy of the resolutions adopted by the Management Committee of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, certified by the Secretary or an Assistant Secretary of Buyer as of the Closing Date; and

(xix) such other closing instruments and certificates as may be reasonably requested by Seller.

Section 3.2  Purchase Price. The purchase price hereunder (the "Purchase Price") shall be a maximum amount of One Million Three Hundred Fifty Thousand Dollars ($1,350,000) including assumption of the Assumed Liabilities, plus any additional sums necessary to satisfy the Debtor-in-Possession Financing. The Purchase Price shall be payable as set forth in Section 3.1(c) and is composed of a cash payment to Seller of $100,000, satisfaction of all obligations of the Debtor-in-Possession Financing (i.e., principal, interest, attorneys fees and expenses), and execution of a promissory note in the face amount of $750,000 in favor of Stuart Irby. In the event that the Closing is extended to the Extended Closing Date, the Purchase Price shall be reduced to a maximum of One Million Three Hundred Twenty Five Thousand Dollars ($1,325,000) by a reduction of $25,000 in the cash to be paid to Seller at Closing. Upon execution of the Agreement, Buyer shall deliver to Seller funds in the amount of Fifty Thousand

-18-

Dollars ($50,000.00) as a deposit (the "Deposit") to be credited at Closing toward satisfaction of the Purchase Price.

Section 3.3  Allocation of Purchase Price. Buyer shall prepare and deliver to Seller a schedule (the "Allocation Schedule") allocating the Purchase Price and the Assumed Liabilities (and all other capitalized costs) among the Purchased Assets in accordance with Section 1060 of the Code and any corresponding requirements of any state or local Tax Laws as soon as practicable after the Closing Time, and in no case later than forty-five (45) days before the due date, including available extensions, for filing any Tax Returns with respect to the Allocation Schedule. Seller will have the right to raise reasonable objections to the Allocation Schedule within ten (10) Business Days after their receipt thereof, in which event Buyer and Seller will negotiate in good faith to resolve such objections. If Buyer and Seller cannot mutually resolve Seller's reasonable objections to the Allocation Schedule within ten (10) Business Days after Buyer's receipt of such objections, such dispute with respect to the Allocation Schedule shall be presented to an independent accounting firm, on the next day for a decision that shall be rendered by such independent accounting firm within thirty (30) days thereafter and shall be final and binding upon each of the parties. The fees, costs and expenses incurred in connection therewith shall be shared in equal amounts by Buyer, on the one hand, and Seller, on the other. Buyer and Seller each shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594) consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or any other proceedings).

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in Seller's disclosure schedule delivered to Buyer concurrently herewith ("Seller's Disclosure Schedule"), Seller hereby represents and warrants to Buyer as follows Seller's Disclosure Schedule shall be arranged in paragraphs corresponding to the section numbers contained in this Article IV, and the disclosure in any paragraph shall qualify only the corresponding section of this Article IV, unless the disclosure contained in such paragraph contains such information so as to enable a reasonable person to determine that such disclosure qualifies or otherwise applies to other sections of this Article IV:

Section 4.1  Organization and Good Standing. Other than as a result of the Case of Seller, Seller (a) is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and (b) subject to any necessary authorizations from the Bankruptcy Court, has full power and authority to own, lease and operate its properties, to perform all of its obligations under the Assumed Contracts, and carry on the Business as it is now being conducted.

Section 4.2  Execution and Effect of Agreement. Subject to obtaining Bankruptcy

-19-

Court approval pursuant to the Approval Order or Procedures Order, as applicable, Seller has the requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by Seller and the consummation by Seller of the transactions contemplated hereby and the performance of Seller's obligations hereunder have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto), following the approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Approval Order, will constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

Section 4.3  No Contravention. Except as set forth on Schedule 4.3, subject to obtaining the approval of the Bankruptcy Court pursuant to the Approval Order, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) violate or conflict with any provision of Seller's certificate of formation or operating agreement, (b) violate or conflict with any Order of any court, Governmental Entity or arbitrator, or any Law applicable to Seller, or (c) result in the creation of any Lien upon any of the Purchased Assets that will not be removed pursuant to the Approval Order at the Closing.

Section 4.4  Third Party Approvals. Except for (a) the Approval Order, (b) obtaining the approval of the Bankruptcy Court pursuant to the Approval Order, and (c) any other third-party approvals as are reflected on Schedule 4.4 hereto, the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which will not be obtained by Seller prior to Closing.

Section 4.5  Title to Purchased Assets. Seller has, and at Closing will have, good title to each of the Purchased Assets, except for those Purchased Assets leased, consigned or licensed by Seller, as to which, to the Knowledge of Seller, Seller has, and, subject to the terms of the Approval Order, at the Closing will have, valid and unencumbered licensed, consignment or leasehold interests.

Section 4.6  Inventory. The Eligible Inventory is merchantable and fit for sale in the ordinary course of business, and may be used and sold without infringement of proprietary interest or violation of applicable law or regulation.

Section 4.7  Compliance with Law. Seller (a) has complied with all Laws applicable to the Business and/or the Purchased Assets, except where the failure to comply has not had and will not have a Material Adverse Effect and (b) is not subject to any Order by, and has not adopted any board resolutions at the request of, any Governmental Entity (a "Governmental Directive"), except for defaults, Orders or Governmental Directives which, individually or in the aggregate, would not have a Material Adverse Effect.

Section 4.8  Governmental Permits. Schedule 2.1(e) lists each Permit of Seller, except where the failure to have such Permit would not, individually, or in the aggregate, have a Material Adverse Effect.

-20-

Section 4.9   Litigation.  Other than the Case and those Proceedings listed in response to 4.a of the Statement of Financial Affairs of the Debtor, there are no Proceedings by any current or previous customer, supplier, Governmental Entity or other Person that is pending, or to the Knowledge of Seller, threatened in writing, against Seller at law or in equity before any court, arbitrator or other Governmental Entity that would have a Material Adverse Effect.

Section 4.10   Real Estate; Real Property Leases.

(a)   Seller's Bankruptcy Schedule G lists each of the Property Leases in which Seller has an interest as tenant, subtenant, assignee thereof or otherwise for the Acquired Leased Facilities and related to the Business.  True and complete copies of all such Property Leases have been delivered by Seller to Buyer, including all amendments, assignments, subordination, nondisturbance and attornment agreements, estoppel certificates, and notices or memoranda of lease related thereto.  Except for Cure Amounts owing by Seller in connection therewith, none of Seller or the other parties to any such Property Leases is in material default thereunder, and all of such Property Leases have not been terminated and remain in full force and effect.

(b)   In the one (1) year prior to Closing, Seller has not received any written notice of, nor does Seller have Knowledge of, condemnation or eminent domain proceedings pending or threatened that affect the Acquired Leased Facilities.  Except where any such violations would not have a Material Adverse Effect, in the one (1) year prior to Closing, Seller has not received any written notice of, and Seller does not have any Knowledge of, any zoning, ordinance, building, fire, access or health code or other legal violation affecting any such Acquired Leased Facilities.

(c)   As of the Closing no Assumed Real Property Lease shall have been rejected by Seller.

Section 4.11   Unexpired Leases and Executory Contracts.  Seller's Bankruptcy Schedule G sets forth a true and complete list of all unexpired leases and executory contracts and corresponding Cure Amounts (see Bankruptcy Schedules E & F), based on the Seller's books and records.  Copies of all unexpired leases and executory contracts in effect as of the date hereof in Seller's possession have been provided or made available to Buyer, and accurate and reasonably detailed descriptions of any unexpired leases and executory contracts in effect as of the date hereof not in Seller's possession have been provided or made available to Buyer.  All of the unexpired leases and executory contracts are in full force and effect and constitute valid and binding agreements of Seller and the other parties thereto, enforceable in accordance with their respective terms, subject, as to enforceability against each such other party, to bankruptcy, moratorium or other insolvency laws and to equitable principles of general application (regardless if enforcement is sought at law or in equity).

Section 4.12   Intellectual Property.

(a)   Seller is the owner of, or has sufficient right to use, all Intellectual Property used or held for use in the Business.  The Intellectual Property included in the Purchased Assets and transferred to Buyer, together with any Excluded Intellectual Property,

-21-

includes all Intellectual Property used or held for use in the Business and is sufficient to conduct the Business.

(b)   Schedule 4.12 hereto identifies all: (i) registered Trademarks, including applications therefor; (ii) unregistered Trademarks; (iii) registered copyrights, including applications therefor; (iv) unregistered copyrights or works of authorship; (v) software; (vi) material data; and (vii) the IP Contracts; in each of the above cases, used or held for use in the Business.  With respect to each item listed on Schedule 4.12 and except as set forth on Schedule 4.12(e), such item is not subject to any outstanding Governmental Directive, and no Proceeding is pending or threatened arising from or relating to such item.  To the Knowledge of Seller, no IP Contract has been breached.

(c)   With respect to the Intellectual Property set forth on Schedule 4.12: (i) except as would not result in a Material Adverse Effect, and except for prosecuting and/or obtaining state and/or, federal registrations thereof, Seller has taken commercially reasonable actions to establish, defend and maintain their rights therein; and (ii) except as set forth in Schedule 4.12, Seller has not sold or transferred such Intellectual Property material to the business of Seller.

(d)   Except as set forth on Schedule 4.12, no third party has been notified in writing by the Seller that the third party infringes Intellectual Property of the Seller.  Also except as set forth in Schedule 4.12, there are not now, nor have been within the past five (5) years any Proceedings pending or threatened in writing against Seller or an indemnitee of Seller arising from or relating to the Intellectual Property or alleged Intellectual Property of a Third Party, nor are there any settlements, licenses, judgments or orders arising from such above described pending or threatened proceedings.

(e)   Each employee, agent, consultant, contractor, person who has contributed to or participated in the discovery, creation or development of any of the Trademarks or "owned software" listed in Schedule 4.12, has assigned all right, title and interest in and to such item to Seller, or, with regard to work of authorship protected by copyright and created, in whole or in part, by employees of Seller, prepared such items within the scope of their employment by Seller.

Section 4.13   Labor Matters.

(a)   Except as disclosed to Buyer and set forth on Schedule 4.13 hereto, Seller is not a party to any labor or collective bargaining agreement with respect to the employees working at the Acquired Leased Facilities.  Except as disclosed to Buyer and set forth on Schedule 4.13 hereto, none of the Identified Employees is represented by a union or other labor organization and, to the Knowledge of Seller, there is not presently and has not been at any time during the preceding six months any union organizing activity or demand or petition for recognition by or on behalf of any union or other labor organization, with respect to any of the Identified Employees.

(b)   Seller has delivered to Buyer, or on or before the Seller's Schedule

-22-

Delivery Date will provide to Buyer, a true, complete and correct list, as of November 1, 2008, of each employee of Seller, together with each employee's (i) starting date of employment, (ii) job title, (iii) present hourly or, if salaried, annual compensation rate, (iv) location of employment, (v) vacation accrual, (vi) treatment of each employee as exempt or non-exempt, and a true, complete and correct list, as of November 1, 2008 with respect to such employees without reference to compensation rate.

Section 4.14   Brokers and Finders.  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any Seller Entity.

Section 4.15   Financial Statements.  Seller has delivered to Buyer (a) a balance sheet of Seller as of December 31, 2007 (the "Balance Sheet"), and the related statements of income, changes in shareholders' equity and cash flows for the fiscal year then ended; and (b) an unaudited balance sheet of Seller as at September 30, 2008, (the "Interim Balance Sheet") and the related unaudited statement of income, changes in shareholders' equity, and cash flow for the five (5) months then ended, including in each case the notes thereto.  Such financial statements fairly present the financial condition and the results of operations, changes in shareholders' equity and cash flows of Seller as at the respective dates of and for the periods referred to in such financial statements.  The financial statements reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements.  The financial statements have been and will be prepared from and are in accordance with the accounting Records of Seller.

Section 4.16   Health and Safety Matters.  Except as set forth in Schedule 4.16, Seller and the operation of the Business are and have been in compliance with rules and regulations set forth by the Occupational Health and Safety Administration ("OSHA") and are not and have not received state or OSHA citations for health and safety violations.

ARTICLE 4A
REPRESENTATIONS AND WARRANTIES OF SELLER AS THE SOLE MEMBER OF BIDTOPIA, LLC

Seller hereby represents and warrants to Buyer as the sole member of Bidtopia, LLC ("Bidtopia") as follows:

Section 4A.1.   Organization and Good Standing.  Bidtopia (a) is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and (b) has full power and authority to own, lease and operate its properties, and carry on the business as it is now being conducted.

Section 4A.2.   No Contravention.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) violate or conflict with any provision of Bidtopia's certificate of formation or operating agreement, (b) violate or

-23-

conflict with any Order of any court, Governmental Entity or arbitrator, or any Law applicable to Bidtopia, or (c) result in the creation of any Lien upon any of the assets of Bidtopia.

Section 4A.3.   Compliance with Law.  Bidtopia (a) has complied with all Laws applicable to its business and/or its assets, except where the failure to comply has not had and will not have a Material Adverse Effect and (b) is not subject to any Order by, and has not adopted any board resolutions at the request of, any Governmental Entity (a "Governmental Directive"), except for defaults, Orders or Governmental Directives which, individually or in the aggregate, would not have a Material Adverse Effect.

Section 4A.4.   Litigation.  There are no Proceedings by any current or previous customer, supplier, Governmental Entity or other Person that is pending, or to the knowledge of Seller, threatened in writing, against Bidtopia at law or in equity before any court, arbitrator or other Governmental Entity that would have a Material Adverse Effect.

Section 4A.5.   Real Estate; Real Property Leases.  Bidtopia owns no real estate and is not a party to any real estate lease.

Section 4A.6.   Unexpired Leases and Executory Contracts.  Other than sellers on the website and merchant and PayPal accounts, Bidtopia is not a party to any unexpired lease or executory contract of personal property.

Section 4A.7.   Intellectual Property.

(a)   Bidtopia is the owner of, or has sufficient right to use, all Intellectual Property used or held for use in its business.

(b)   Schedule 4.A.7 hereto identifies all: (i) registered Trademarks, including applications therefor; (ii) unregistered Trademarks; (iii) registered copyrights, including applications therefor; (iv) unregistered copyrights or works of authorship; (v) software; (vi) material data; and (vii) the IP Contracts; in each of the above cases, used or held for use in the Business.  With respect to each item listed on Schedule 4A.7 and except as set forth on Schedule 4.12(e), such item is not subject to any outstanding Governmental Directive, and no Proceeding is pending or threatened arising from or relating to such item.

(c)   With respect to the Intellectual Property set forth on Schedule 4A.7: (i) except as would not result in a Material Adverse Effect, and except for prosecuting and/or obtaining state, and/or, federal registrations thereof, Bidtopia has taken commercially reasonable actions to establish, defend and maintain their rights therein; and (ii) except as set forth in Schedule 4.12(e), Bidtopia has not sold or transferred such Intellectual Property.

(d)   Except as set forth on Schedule 4A.7, no third party has been notified in writing by Bidtopia that the third party infringes Intellectual Property of Bidtopia.  Also except as set forth in Schedule 4A.7, there are not now, nor have been within the past five (5) years any Proceedings pending or threatened in writing against Bidtopia or an indemnitee of Bidtopia

-24-

arising from or relating to the Intellectual Property or alleged Intellectual Property of a Third Party, nor are there any settlements, licenses, judgments or orders arising from such above described pending or threatened proceedings.

(e)  Each employee, agent, consultant, contractor, person named as an inventor on Schedule 4A.7, or other third party who has contributed to or participated in the discovery, creation or development of any of the Trademarks, or "Owned Software" listed in Schedule 4A.7, has assigned all right, title and interests in and to such item to Bidtopia, or, with regard to works of authorship protected by copyright and created, in whole or in part, by employees of Bidtopia, prepared such items within the scope of their employment by Bidtopia.

Section 4A.8.  Financial Statements.  Seller has caused to be delivered or has delivered to Buyer (a) a balance sheet of Bidtopia as of December 31, 2007 (the "Balance Sheet"), and the related statements of income, changes in shareholders' equity and cash flows for the fiscal year then ended; and (b) an unaudited balance sheet of Bidtopia as at September 30, 2008, (the "Interim Balance Sheet") and the related unaudited statement of income, changes in shareholders' equity, and cash flow for the five (5) months then ended, including in each case the notes thereto. Such financial statements fairly present the financial condition and the results of operations, changes in shareholders' equity and cash flows of Bidtopia as at the respective dates of and for the periods referred to in such financial statements. The financial statements reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. The financial statements have been and will be prepared from and are in accordance with the accounting Records of Bidtopia.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

Section 5.1  Organization and Good Standing.  Buyer is a limited liability company validly existing and in good standing under the laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

Section 5.2  Execution and Effect of Agreement.  Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and the performance of Buyer's obligations hereunder have been duly authorized by all necessary corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Approval Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its

-25-

terms.

Section 5.3  No Contravention.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate or conflict with any provision of Buyer's certificate of formation, (ii) (with or without the giving of notice or the lapse of time or both) violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any material Contract to which Buyer is a party or by which it is bound, or (iii) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer.

Section 5.4  Third Party Approvals.  The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons which have not been obtained by Buyer.

Section 5.5  Brokers and Finders.  No broker, finder, investment banker, financial advisor, consultant or intermediary is entitled to a broker's, finder's, financial advisor's or similar fee or commission which is payable by Buyer in connection with the transactions contemplated by this Agreement or upon the consummation of the transaction contemplated hereby, or if the Closing does not occur.

## ARTICLE 6

### COVENANTS OF THE PARTIES

Section 6.1  Conduct of Business Pending the Closing.  Except as required pursuant to Order of the Bankruptcy Court or as restricted by virtue of the fact that Seller is a debtor under the Bankruptcy Code or by a budget for Seller's operations and activities hereafter approved by the Bankruptcy Court in the Case, during the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall use all commercially reasonable efforts to carry on the Business in the ordinary course of business and, to the extent consistent therewith, use all commercially reasonable efforts to preserve the Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business, it being expressly understood and agreed that any loss of goodwill or customer relationships resulting from the winding down and closing of other facilities and operations of Sellers not included among the Purchased Assets shall not be deemed a violation of any covenant of Seller set forth herein. Without limiting the generality of the first sentence of this Section 6.1, but subject to any Order of the Bankruptcy Court or any restriction imposed on Seller by virtue of the fact that Seller is a debtor under the Bankruptcy Code or by the budget for Seller's operations and activities and hereafter approved by the Bankruptcy Court in the Case, during the period from the date of this Agreement through the earlier of the Closing Time or any termination of this Agreement, Seller shall not without the prior written consent of Buyer:

(a)  abandon any rights under any of the Contracts, Property Leases,

-26-

Equipment Leases or Intellectual Property necessary for the Business, terminate, reject, amend, modify or supplement the terms of any Contract, Property Leases, Equipment Leases or Intellectual Property necessary for the Business; unless and until such Contract, Property Lease, Equipment Lease, such Intellectual Property shall have been added to the list of Excluded Assets; provided, however, nothing herein shall be deemed to preclude Seller from rejecting, in its sole discretion, severance or other employment related agreements with former executives or employee (collectively, the "Permitted Rejection Contracts");

(b)  other than sales of Inventory in the ordinary course of business or the disposition of obsolete equipment, lease, license, surrender, relinquish, reject, sell, transfer, convey, assign, abandon or otherwise dispose of any Purchased Assets or shut down any of the Acquired Leased Facilities;

(c)  fail to use commercially reasonable efforts to maintain or acquire Inventory of the types and amounts consistent with the ordinary course of the Business;

(d)  institute, settle or agree to settle any material litigation, action or Proceeding before any court or Governmental Entity relating to the Purchased Assets, or modify in any manner that is materially adverse to the Business or the Purchased Assets, rescind or terminate any material Permit, excepting (i) any litigation settlement regarding claims of general unsecured creditors in the Cases which are unrelated to any interest of Seller in any Purchased Assets, and (ii) any monetary claims held by Seller other than the claims being acquired by Buyer under this Agreement;

(e)  transfer or grant any rights under, modify any existing rights under, or enter into any settlement regarding the breach or infringement of, or permit to lapse, provide any notice, make any filing, or, to the extent applicable, subject to the cap on the amount of Seller's Cure Payment, fail to pay any fee necessary to maintain any Acquired Intellectual Property;

(f)  terminate, cancel or amend any insurance coverage maintained with respect to any Purchased Assets;

(g)  with regard to the Seller's employees except as approved by Buyer (which approval shall not be unreasonably withheld or delayed) (i) increase in any manner the compensation or benefits of, or pay any bonus or other supplemental or incentive payment to, any such employee other than any management incentive plan approved by the Bankruptcy Court in the Case, (ii) grant any severance or termination pay (other than pursuant to existing agreements of Seller in effect on the date hereof), to, or enter into any severance agreement with, any such employee, unless such severance is conditioned upon employee's employment having been terminated by Seller and such employee's not being offered employment with Buyer or any other employer, (iii) establish, adopt, enter into or amend any Benefit Plan or other arrangement of Seller, except as may be required to comply with applicable Law, (iv) grant to any such employee any awards under any bonus, incentive, performance or other compensation plan or arrangement or Benefit Plan or other arrangement, (v) hire or discharge any such employee that earns in excess of $30,000 per year, or (vi) terminate any such employee other than for cause;

-27-

(h)  fail to use commercially reasonable efforts to prevent any material change in its relationships with its material suppliers that relates to the Business, other than in the ordinary course of business consistent with past practice;

(i)  fail to use commercially reasonable efforts to maintain in good repair their business premises, fixtures, machinery, furniture and equipment at the Acquired Leased Facilities in a manner consistent with prudent business practice;

(j)  enter into any license, lease, sublease or any other form of occupancy agreement with respect to any Acquired Leased Facilities or any agreement for the disposition, purchase or acquisition of any Acquired Leased Facilities, or cause a lessor or sublessor to accelerate or prepay any rent or any landlord allowances with respect to any Acquired Leased Facilities;

(k)  modify, amend, terminate (other than the Permitted Rejection Contracts), assign, sublet or extend the term of any Property Lease or Equipment Lease related to the Business unless Buyer has provided its written consent to such transaction, which consent shall not be unreasonably withheld; provided, however, that with respect to each such Property Lease and Equipment Lease, Seller shall provide Buyer with at least thirty (30) days' written notice prior to the expiration of any period within which a renewal option for such lease shall expire;

(l)  except as set forth on Schedule 6.1(l), enter into, modify, amend, terminate, assign, extend or permit any renewal notice period or option to lapse with respect to (i) any Contract (or series of related Contracts) related to the Business that contains consideration to be given or performed by Seller of a value exceeding $50,000 or (ii) any Contract (or series of related Contracts) related to the Business that is not terminable by Seller, as is party thereto, on 30 days' or less notice without penalty; or

This Section 6.1 as well as any representation, warranty, covenant, schedule or closing condition contained in this Agreement shall not apply to any Excluded Assets from and after the date that such assets are designated by Buyer as being Excluded Assets, except, however, to the extent a provision of this Section 6.1 or such representation, warranty, covenant, schedule or closing condition makes specific reference to an Excluded Asset (or category of Excluded Assets) or to operations relating to an Excluded Asset (or category of Excluded Assets). Similarly, assets that become Purchased Assets shall be added in writing as appropriate to schedules to this Agreement.

Section 6.2  Bankruptcy Court Order.

(a)  On October 30, 2008, substantially concurrent with the filing of its Bankruptcy Petition, Seller shall file Debtor's Motion for an Order to Sell Assets Free and Clear of all Liens, Claim, Interests and Encumbrances Outside of the Ordinary Course of Business and Assuming and Assigning Certain Unexpired Leases and Executory Contracts pursuant to 11 U.S.C. §§ 105, 363(f) and 365 (the "Sale Motion") to approve the sale of the Purchased Assets in accordance with the Agreement.

-28-

(b) Seller shall use commercially reasonable efforts to obtain, through the filed Sale Motion, entry of an Order granting the Approval Order, on or before December 18, 2008, having provided notice to creditors and parties in interest in accordance with the Bankruptcy Code and Bankruptcy Rules.

Section 6.3   Notification of Certain Matters. Seller shall give Notice to Buyer no later than three (3) Business Days after any of the following are received of (i) any written notice or other communication from any Person alleging that the consent of such Person, which is or may be required in connection with the transactions contemplated of this Agreement, is not likely to be obtained prior to Closing, and (ii) any written objection or Proceeding that challenges the transactions contemplated hereby or the entry of the Approval Order. Seller shall give Notice to Buyer no later than three (3) Business Days following Seller's receipt of written notice of any of the following: (i) any notice of any alleged violation of Law applicable to the Seller of which it has Knowledge; (ii) any written notice of the commencement of any investigation, inquiry or review by any Governmental Entity with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of Seller, is contemplated; (iii) the infringement or unauthorized use by any Person of any material Intellectual Property (of which Seller has Knowledge); (iv) the resignation of any Key Employees or 10% or more of the employees at any Acquired Leased Facility; (v) any destruction or significant damage to the Acquired Leased Facilities and any Equipment contained therein, whether caused by natural disaster or otherwise; and (vi) the execution of any Material Contract (and Seller shall deliver or make available a copy thereof to Buyer). Buyer shall give prompt Notice to Seller, and Seller shall give prompt Notice to Buyer, in the event that either party becomes aware of any event which would reasonably be expected to (i) have a Material Adverse Effect or (ii) provide such party with the ability to terminate the Agreement pursuant to 9.1(b)(iii) or 9.1(c)(iii), as applicable.

Section 6.4   Access.

(a) Subject to applicable Law, from the date hereof until the earlier of the Closing Time and any termination of this Agreement, Seller (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel (other than counsel to Seller in connection with the Cases) and other representatives, books and records of Seller, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such persons reasonably request, and (iii) shall instruct Seller's employees, counsel and financial advisors to cooperate with Buyer in its investigation of the Business. In addition, with Seller's consent, which consent shall not be unreasonably withheld, Buyer shall have the right to contact Seller's landlords, lessors, suppliers and other third parties with respect to any Purchased Assets or Assumed Liabilities.

(b) From and after the Closing Time, Seller shall give Buyer and Buyer's Representatives reasonable access during normal business hours to the offices, facilities, plants, properties, officers, employees, books and records of Seller pertaining to the Business, and Seller shall cause their Representatives to furnish to Buyer such financial, technical, operating and other information pertaining to the Business as Buyer's Representatives shall from time to time

-29-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

reasonably request and to discuss such information with such Representatives.

(c) During the period from the Closing Time until the closing of the Case (the "Post-Closing Cooperation Period"), (i) the Buyer shall permit Seller's counsel and other advisers and any successor to Seller and its professional advisers (collectively, "Permitted Access Parties") access to the financial and other books and records relating to the Business for all periods preceding the Closing Time, to the extent that such books and records are transferred to the Buyer at Closing. Such access shall be provided upon written notice from Seller and during Buyer's normal business hours, and only to the extent such access does not interfere with or disrupt Buyer's normal business operations. Such access shall include (a) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the costs and expenses thereof. During the Post-Closing Cooperation Period, Buyer shall make designated personnel available to assist Seller with accessing information reasonably required for Seller's post-Closing Time activities (including, without limitation, preparation of tax returns), provided that such access does not interfere with the Buyer's business operations.

Section 6.5   Confidentiality; Privacy.

Intentionally Left Blank

Section 6.6   Public Announcements. From the date hereof until the earlier of the Closing or the termination of this Agreement, the Seller will give Buyer the opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the transactions contemplated hereby, or other public statements with respect to the transactions contemplated by this Agreement, and Seller shall not issue any such press release without the prior written approval of Buyer, in each case except as may be required by Law, court process or by obligations pursuant to any listing agreement with any national securities exchange. Seller shall use its commercially reasonable efforts to cause its Affiliates, employees, officers and directors to comply with this Section 6.6.

Section 6.7   Cure of Defaults; Adequate Assurance. Subject to the Approval Order, Seller shall, on or prior to the Closing, cure, any and all defaults and breaches under and satisfy any Liability arising from or relating to pre-Closing periods under the Contracts or Property Leases so that such Contracts and/or Property Leases intended to be assumed by Buyer as of the Closing in accordance with this Agreement may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement. Seller agrees that it will promptly take such actions as are necessary or desirable to obtain the Approval Order from the Bankruptcy Court providing for the assumption and assignment of the Contracts and Property Leases.

Section 6.8   Employment Matters. Buyer or an Affiliate of Buyer may offer

-30-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

employment, in advance of and contingent upon Closing and effective as of the Closing Time, to certain of the Identified Employees as determined by Buyer on such terms as Buyer or an Affiliate of Buyer shall determine in its sole discretion (exercised in accordance with the following); provided, however, that Buyer shall not have any obligation to assume any severance, retention or other similar contractual provision of any Identified Employee that is offered employment by Buyer. Seller shall terminate the employment of all Identified Employees to whom Buyer intends to make an offer immediately prior to the Closing Time and shall comply with any and all requirements of the WARN Act or any similar state law applicable to Seller in connection therewith. Each Identified Employee who accepts an offer of employment from Buyer or an Affiliate of Buyer shall be deemed to be a hired employee ("Hired Employee") on the day such employee commences active employment with Buyer or an Affiliate of Buyer (not earlier than the Closing Time).

Section 6.9   Further Agreements. Seller shall use commercially reasonable efforts to deliver to Buyer any mail or other communication received by Seller after the Closing Time pertaining to the Purchased Assets, the Business or the Assumed Liabilities, and any cash, checks or other instruments of payment in respect thereof. Buyer shall use all commercially reasonable efforts to promptly deliver to Seller any mail or other communication received by it after the Closing Time pertaining to the Excluded Assets or any Excluded Liabilities, and any cash, checks or other instruments of payment in respect thereof. From and after the Closing Time, Seller shall use all commercially reasonable efforts to refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to Buyer, and Buyer shall use all commercially reasonable efforts to refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Seller.

Section 6.10   Payment of Transfer Taxes and Tax Filings. All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by Buyer. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Approval Order or, at Closing, Seller or Buyer, as appropriate, provides an appropriate resale exemption certificate or other evidence acceptable to Buyer or Seller, as appropriate, of exemption from such Transfer Taxes. Seller and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Seller shall pay all Transfer Taxes and shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer, and Buyer shall promptly reimburse Seller pursuant to the first sentence of this Section. Each party hereto shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

-31-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Section 6.11   Utilities. To the extent practicable, the parties hereto shall notify the gas, water, sewage treatment, telephone and electric utility companies that Buyer shall be responsible for the payment of all obligations of the Business or the Purchased Assets incurred therefor on or after the Closing Time. Buyer shall be responsible for the payment of all charges for such services incurred after the Closing Time. Seller shall be responsible, as debtors-in-possession, for the payment of all charges for such services incurred from and after the Petition Date through the Closing Time. Seller shall use commercially reasonable efforts to cause the telephone companies to render a bill for telephone service incurred from and after the Petition Date to and including the Closing Time, and Seller shall be responsible for the payment of such bill.

Section 6.12   Proration of Taxes and Certain Charges.

(a) All real property Taxes, personal property Taxes or similar ad valorem obligations (and no other Taxes) levied with respect to the Purchased Assets for any taxable period that includes a day before the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Seller and Buyer as of the Closing Date paid by Buyer as of the Closing Date. Seller shall be responsible for the payment of all Taxes incurred or accrued through the Closing Date and Buyer shall be responsible for the payment of all Taxes incurred or accrued after the Closing Date. If any such Taxes subject to proration are paid by Buyer, on one hand, or Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund). Additionally, if any of Seller's portion of taxes are not currently paid at time of Closing, said portion may be deducted from the $100,000 cash proceeds being paid by Buyer, at Seller's election.

(b) Except as otherwise expressly provided herein, all installments of special assessments or other charges on or with respect to the Purchased Assets payable by Seller for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing Date and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with respect thereto. Seller shall be responsible for the payment of all charges incurred or accrued through the Closing Date. If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of the Closing Date. If such charges or rates are assessed based upon usage of utility or similar services, such charges shall be prorated based upon meter readings taken on the Closing Date.

Section 6.13   Reasonable Efforts; Notification.

(a) Each of the parties will use all reasonable efforts to take, or cause to be taken, all actions and use all reasonable efforts to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things which to its Knowledge are necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including: (i) the obtaining of all other necessary actions, non-actions, waivers, and

-32-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Permits from Governmental Entities and the making of all other necessary registrations and filings, (ii) the obtaining of all consents from the Consent Parties, if any, and (iii) in each case to the extent the same do not expand the rights and obligations of the applicable party pursuant to the other provisions of this Agreement, the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the transactions contemplated by this Agreement.

(b) Except as required by Law, each party hereto shall promptly inform the other of any communication from any Governmental Entity regarding any of the transactions contemplated by this Agreement. If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Government Entity with respect to the transactions contemplated by this Agreement, then such party will use its reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.

(c) To the extent commercially reasonable and as may be mutually agreed to between Seller and Buyer, Seller and its Affiliates, employees and agents shall, at Buyer's expense, post-closing, provide those services and communications that are reasonably requested by Buyer to assist Buyer in maintaining and continuing operation of the Acquired Leased Facilities.

Section 6.14 Rejected Contracts. Seller shall not reject any Assumed Contract, Assumed Real Property Leases, Assumed Equipment Leases, or Acquired Intellectual Property without the prior written consent of Buyer.

Section 6.15 Adequate Assurances. Buyer will use commercially reasonable efforts to provide Seller with information regarding Buyer's intended business plans and capital structure on and after the Closing Time, and shall cooperate with Seller in communicating with third parties to Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases or Acquired Intellectual Property as may be reasonably necessary to assist Seller in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases and Acquired Intellectual Property (collectively, "Assumed Agreements"). Buyer shall be fully responsible for providing evidence at the Sale Hearing of such adequate assurance of future performance with respect to all of the foregoing, it being understood and agreed that Buyer shall bear the risk of any failure to satisfy such requirement and Buyer's obligations to close the transaction hereunder shall not be conditioned upon the assumption and assignment of any Assumed Agreement that can not be assumed and assigned by reason of such failure to provide adequate assurance of future performance as required herein.

Section 6.16 Further Assurances. Subject to the terms and conditions herein provided, following the Closing Time, Seller shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, as shall be reasonably

-33-

requested to vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets. Seller shall take such reasonable steps as may be reasonably necessary or appropriate at and after the Closing, so that Buyer shall be placed in actual possession and operating control of the Purchased Assets. Seller shall provide copies or otherwise make available to Buyer and Buyer's Representatives, all information and records (financial and otherwise) relating to, or otherwise used or useful in the Business, and not otherwise included in the Purchased Assets.

Section 6.17 Post-Closing Reconciliation. With respect to any and all amounts received or collected from and after the Closing by the Seller attributable to, or in respect of, any of the Purchased Assets or by Buyer attributable to, or in respect of, any of the Excluded Assets, Seller or Buyer, as the case may be, shall (i) hold such amounts in trust for and on behalf of the other party, (ii) provide prompt notice of such receipt or collection to the other party, (iii) pay promptly (and in any event within 2 Business Days of their receipt or collection) to the other party any and all such amounts so received or collected by wire transfer of immediately available funds to an account or accounts designated by the other party or by other means acceptable to the other party.

Section 6.18 Assignment Assistance. To the extent that any debtor other than Seller owns any property, assets, rights, titles or interests of any kind and nature used exclusively in connection with the Business or located at the Acquired Leased Facilities, Seller hereby covenants that it will (and it will cause such other debtors to), from time to time, prior to or subsequent to the Closing, without further consideration, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all further acts, conveyances, transfers, assignments and assurances as reasonably may be required to convey or transfer to Buyer any such property, assets, rights, titles or interests.

Section 6.19 Change of Name. Within ten (10) Business Days after the Closing Date Seller shall commence the process to amend its governing documents and take all reasonable other actions, including action in the Case, necessary to change its name to one sufficiently dissimilar to Seller's present name, in Buyer's reasonable judgment, to avoid confusion.

ARTICLE 7

CONDITIONS TO OBLIGATIONS OF THE BUYER

Section 7.1 Conditions Precedent to Obligations of Buyer. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Time of each of the following conditions:

(a) Accuracy of Representations and Warranties. Each of the representations and warranties of Seller contained herein shall be true and correct in all material respects on the date hereof and on the Closing Time, with the same force and effect as though such representations and warranties had been made on and as of the Closing Time, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date.

-34-

(b) Performance of Obligations. Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Time.

(c) Officer's Certificate. Buyer shall have received a certificate, dated the Closing Time, of an appropriate officer of Seller, identifying any failure of any representation or warranty that is not true and correct on and as of the Closing Time and otherwise to the effect that the conditions specified in Section 7.1(a) and Section 7.1(b) above have been fulfilled.

(d) Bankruptcy Court Approval. The Bankruptcy Court shall have entered an Order or Orders (the "Approval Order") on or before December 18, 2008 in substantially the form set forth in Exhibit K hereto, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, with such changes only as are mutually approved by Buyer and Seller: (A) the execution, delivery and performance by Seller of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein free and clear of all Liens, claims and interests, in, to and under each and all of the Purchased Assets, and (C) the performance by Seller of its obligations under this Agreement; (ii) authorizes and directs Seller to assume and assign to Buyer the Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases and Acquired Intellectual Property; and (iii) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code. The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified. To the extent the same may not be transferable pursuant to applicable law, the Approval Order may exclude approval of the sale of the Purchased Assets that are not necessary to the operation of the Business. Seller shall have delivered to Buyer (i) a certified copy of the Order or Orders providing for Bankruptcy Court approval, and (ii) copies of all affidavits of service of Seller's motion seeking the Approval Order or notice of such motion filed by or on behalf of Seller. In addition to the provisions set forth above, the Approval Order shall find and order, with respect to each Assumed Real Property Lease, subject to appropriate showing of adequate assurance of future performance by Buyer, cure by Seller or Buyer, as and if applicable, in accordance with the provisions of Section 6.8 hereof, and applicable law, that: (i) it is free from default and in full force and effect; and (ii) any extension or renewal option in such Assumed Real Property Lease which purports to be personal only to Seller or to a named entity in such Assumed Real Property Lease or to be exercisable only by Seller or an entity operating under a specific trade name is an unenforceable restriction on assignment and, that all extension or renewal options may be freely exercised by Buyer and its Affiliates and their respective successors and assigns.

(e) Assumed Contracts and Leases. All of the Assumed Contracts, Assumed Real Property Leases, Acquired Intellectual Property and Assumed Equipment Leases (i) shall be in full force and assignable to and assumable by Buyer without the consent of the other party thereto pursuant to Section 365 of the Bankruptcy Code or consent thereto shall have been obtained, and (ii) have had all of Seller's breaches, defaults and Liabilities thereunder arising from or relating to pre-Closing periods satisfied and cured in accordance with Section 6.7 hereof.

-35-

(f) No Material Adverse Change. Other than the filing of the Cases, since the date hereof, no event, occurrence, fact, condition, change, development or effect shall have occurred or shall exist that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(g) No Violation of Law or Orders. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that (i) prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement or (ii) would adversely affect or interfere with the operation of the Business in a manner that would constitute a Material Adverse Effect.

(h) Purchased Assets. No properties, assets and rights used or held by Seller for use in the Business, or owned by Seller (and not an Excluded Asset or which does not become an Excluded Asset pursuant to the other provisions hereof) as are necessary to conduct the Business, shall be excluded from the Purchased Assets due to Seller's inability to assign such Contracts, Permits, or other properties, assets or rights, whereby the non-assignability thereof, individually or in the aggregate, would reasonably be expected to constitute a Material Adverse Effect.

(i) Employees. Buyer shall have satisfied itself that such of the Key Employees as Buyer may determine to hire will accept employment with Buyer.

(j) Mutual Approval of Schedules. On or before Seller's Schedule Delivery Date, Seller shall have completed and provided to Buyer any changes to all Schedules to this Agreement (including, without limitation, the Seller's Disclosure Schedule), and for Buyer's approval of any such material changes.

ARTICLE 8

CONDITIONS TO OBLIGATIONS OF THE SELLER

Section 8.1 Conditions Precedent to the Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Time of each of the following conditions:

(a) Accuracy of Representations and Warranties. The representations and warranties of Buyer contained herein shall be true and correct in all material respects on the date hereof and shall be true and correct in all respects on and as of the Closing Time, with the same force and effect as though such representations and warranties had been made on and as of the Closing Time, except to the extent that any such representations or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such date; provided, however, that the failure of any such representations or warranties to be true and correct on and as of the Closing Time shall not constitute a basis for Seller to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has or would reasonably be expected to have a material and adverse affect on

-36-

Buyer's ability to perform its obligations under this Agreement.

(b) *Performance of Obligations*. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Time.

(c) *Officer's Certificate*. Seller shall have received a certificate, dated the Closing Time, of an officer of Buyer to the effect that the conditions specified in Section 8.1(a) and (b) above have been fulfilled.

(d) *Approval Order*. The Approval Order shall be in full force and effect and as of the Closing shall not be stayed, enjoined or modified.

(e) *No Violation of Law or Orders*. No provisions of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other transactions contemplated by this Agreement.

(f) *Mutual Approval of Schedules*. Three (3) or more business days prior to the Closing Date, Buyer shall have approved any material changes to the Schedules to the Agreement.

### ARTICLE 9

### TERMINATION

Section 9.1 *Termination of Agreement*. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a) by written agreement of Seller and Buyer;

(b) by Buyer:

(i) at any time after December 29, 2008, unless extended or provided herein, if the Closing shall not have occurred; provided, however, that Buyer is not in material and willful breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder (including, without limitation, Buyer's obligation to close pursuant to Section 3.1 hereof);

(ii) If any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

(iii)if (x) there shall have been a material breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement and in respect of representations and warranties, notice of which has been provided to Seller prior to the

-37-

conclusion of the Auction, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by the Company or, (y) if Buyer elects to terminate this Agreement pursuant to Section 10.4(c);

(iv) at any time after December 18, 2008, if the Approval Order shall not have been entered; or

(v) upon (i) entry of an Order of the Bankruptcy Court or other court of competent jurisdiction approving any Alternate Transaction (other than with Buyer) and provision of notice by Buyer, or (ii) the consummation of such Alternate Transaction (other than with Buyer).

(c) by Seller:

(i) at any time after December 29, 2008, unless extended as provided herein, if the Closing shall not have occurred; provided, however, that Seller is not in material and willful breach of any of its representations and warranties contained in this Agreement, or has failed in any material respect to perform any of its obligations hereunder (including, without limitation, Seller's obligation to close pursuant to Section 3.1 hereof);

(ii) if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

(iii)if there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, to the extent that the same have not theretofore lapsed or been terminated in accordance with the other provisions of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Buyer;

(iv) at any time after December 18, 2008, if the Approval Order shall not have been entered;

(v) upon (i) entry of an Order of the Bankruptcy Court or other court of competent jurisdiction approving an Alternate Transaction (other than with Buyer) and provision of notice by Seller, or (ii) the consummation of such Alternate Transaction (other than with Buyer).

Section 9.2 *Consequences of Termination*. If this Agreement is terminated under Section 9.1, written notice thereof will forthwith be given to the other party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or liability of Seller or Buyer to the other, except that:

-38-

(a) each party will return or destroy all documents, workpapers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the party furnishing the same;

(b) notwithstanding the foregoing, this Section 9.2 and Section 6.6 (Public Announcements), Section 10.1 (Expenses), Section 10.5 (Notices), Section 10.6 (Choice of Law), Section 10.8 (Acknowledgment and Release), Section 10.12 (Exclusive Jurisdiction), Section 10.13 (Waiver of Right to Trial by Jury) and Section 10.14 (Beneficiaries) shall survive any such termination of this Agreement.

(c) The Deposit shall be returned to Buyer plus interest, if any, accrued thereon.

### ARTICLE 10

### MISCELLANEOUS

Section 10.1 *Expenses*. Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby. As between Buyer and Seller, Seller shall bear all costs of any Persons (other than Buyer, its agents or Affiliates) entitled to reimbursement by the Bankruptcy Court.

Section 10.2 *Assignment*. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller; provided, that Buyer may assign its rights and liabilities hereunder to one or more Affiliates of Buyer, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 10.3 *Parties in Interest*. This Agreement shall be binding upon and inure solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either Seller or Buyer, nor any Representative, or controlling Person of each of the parties hereto and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the transactions contemplated hereby.

Section 10.4 *Risk of Loss*.

(a) *Casualty*. Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Time. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Time, then with respect to such

-39-

Purchased Assets Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets with an adjustment to the Purchase Price as set forth below in this Section 10.4(a); or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 would not be satisfied. If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, Seller will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

(b) *Condemnation*. In the event that any portion of the Purchased Assets is taken by eminent domain or condemnation prior to the Closing Time and such taking materially and adversely affects the use or utility of the Business, Buyer may within the later of (x) ten (10) days after it receives written notice of such taking or (y) two (2) days after the Auction Date either (i) proceed to close notwithstanding the eminent domain or condemnation proceeding, in which event Seller will assign to Buyer their entire right, title and interest in and to any award, with a reduction in the Purchase Price equal to the value of the Purchased Assets impacted by such proceeding; or (ii) exclude such Purchased Asset, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 7.1 is not satisfied or, if Buyer chooses to do so, purchase the remaining Purchased Assets with a reduction in the Purchase Price equal to the value of the remaining Purchased Assets subject to condemnation. If Buyer closes notwithstanding a condemnation of any Purchased Asset, Seller will deliver and/or assign to Buyer any proceeds with respect to such condemnation.

(c) *Rejected Leases*. In the event that any Assumed Real Property Lease is or has been rejected by Seller under the Bankruptcy Code prior to the Closing Time, Buyer may, at Buyer's option, within the later of (x) ten (10) days after Buyer receives written notice of such rejection either: (i) terminate this Agreement, or (ii) proceed to close notwithstanding the rejection of the Property Lease. A termination pursuant to this Section 10.4(c) shall constitute a termination under Section 9.1(b)(iii).

Section 10.5 *Notices*. All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile, addressed as set forth below, or to such other address as such party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after normal business hours, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

-40-

If to Seller:     Warehouse 86, LLC
                  3865 Perkins Road
                  Memphis, Tennessee 38118
                  Attn: Ernie K. Strahan, III
                  Facsimile: (601)510-9033

With a copy to:   Steve Rosenblatt
                  210 East Capitol Street, 17th Floor
                  Jackson, Mississippi 39201
                  Facsimile: (601)985-4500

If to Buyer:      Warehouse86 Ventures, LLC
                  5139 Palomar Lane
                  Dallas, Texas 75229
                  Attn: Ken May
                  Fax: (214) 363-1029

With a copy to:   Michael Chance
                  Baker, Donelson, Bearman, Caldwell & Berkowitz PC
                  6060 Poplar Avenue, Suite 440
                  Memphis, Tennessee 38119
                  Fax: (901) 577-4207

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

Section 10.6  Choice of Law. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the state of Tennessee, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

Section 10.7  Entire Agreement; Amendments and Waivers. This Agreement, the Escrow Agreement, and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all other prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and the Company, or in the case of a waiver, by the party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

-41-

Section 10.8  Acknowledgment and Release. Seller acknowledges and agrees that the Buyer is the sole Person bound by, or liable with respect to, the obligations and Liabilities of Buyer under this Agreement, and that no Affiliate of Buyer or any of its Subsidiaries other than Buyer, or any current or former officer, director, stockholder, agent, attorney, employee, Affiliate, advisor or consultant of Buyer or any such other entity shall be bound by, or liable with respect to, any aspect of the Agreement. Buyer acknowledges and agrees that the Seller is the sole Person bound by, or liable with respect to, the obligations and Liabilities of Seller under this Agreement, and that no Affiliate of Seller or any of its Subsidiaries other than Seller, or any current or former officer, director, stockholder, agent, attorney, employee, Affiliate, advisor or consultant of Seller or any such other entity shall be bound by, or liable with respect to, any aspect of the Agreement.

Section 10.9  Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile or otherwise electronically. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

Section 10.10  Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

Section 10.11  Headings. The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 10.12  Exclusive Jurisdiction. Without limiting any party's right to appeal any order of the Bankruptcy Court, during the Case: (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide (insofar as they relate to Seller) any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 10.5.

Section 10.13  WAIVER OF RIGHT TO TRIAL BY JURY. SELLER AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

-42-

Section 10.14  Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein.

Section 10.15  Counting. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

Section 10.16  Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Nothing in the Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Disclosure Schedule identifies the exception with particularity and describes the relevant facts in detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant. If any Party prevails in any action, suit or claim for breach of this Agreement, such prevailing party shall be entitled to recover reasonable attorneys' fees in addition to other damages or costs or expenses.

[Signatures on Following Page]

-43-

IN WITNESS WHEREOF, this Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

WAREHOUSE86 VENTURES, LLC

By: _____
Name: William Doherty
Title: CEO

WAREHOUSE 86, LLC

By: _____
Name: ERNEST K. STRAHAN, III
Title: CFO/MEMBER-MANAGER

-44-

Schedule I -- Software Licenses

See Debtor's bankruptcy Schedules A & B; additionally, as follows:

Microsoft SQL Licenses
Microsoft Exchange 2007 E-Mail
Microsoft Exchange Client Access Licenses
Windows Server 2008 (Various versions)
Windows Server 2003 (various versions)
Microsoft Windows Client Access Licenses
Veritas Backup Exec
Symnatic Antivirus
Great Plains Accounting Software
Microsoft Office 2007
Visual Studio (MSDN)
ISA Server 2006

Schedule II -- Key Employees

A) Paul St. James.
B) Joy St. James
C) Ernest Strahan III

-45-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

-46-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 2.1 (d)

See Debtor's Bankruptcy Schedules A & B.

Schedule 2.1 (e) -- Permits

None, other than sales tax registrations in Arizona Tennessee Mississippi and Utah.

-47-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

-48-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 2.2(a) -- Excluded Assets

1. Memphis Recycling Services – lease of baler which was destroyed in the tornado.
2. All duly perfected consigned inventory not abandoned by consignors, if any.
3. All client contracts for consignment or resale of products which are intended for resale, including but not limited to the following:
   a. Baja Motorsports, LLC Liquidation Agreement
   b. Brands on Sale Liquidation Agreement
   c. Cambridge Integration Services – disposition agreement
   d. CH Enterprises Liquidation Agreement
   e. Mercantile, Inc. Liquidation Agreement
   f. Merchandise Manu., Inc. Liquidation Agreement
   g. NAILCO Group Liquidation Agreement
   h. Overstock.com, Inc. Liquidation Agreement

-49-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 4.3 -- No Contravention

None

-50-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 4.4 -- Required Third Party Approvals

None, pursuant to a sale or assignment under Section 363 &/or 365 of the Bankruptcy Code.

-51-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 4.12 – Intellectual Property

See Debtor's Bankruptcy Schedules A & B for a listing of all applicable property.

Note: In 2007, W86 sold a ARES software program to UPS, but retained certain usage rights to the software.

-52-

M EFC 1118579 v3
2791090-000005 11/03/2008
0 v
- 11/04/2008

Schedule 4.16 - - OSHA Citations or Violations

None

Schedule 4.13 Labor Matters

None.

Schedule 4A.7 - Bidtopia Intellectual Property

The unregistered names "Bidtopia" and "bidtopia.com" and in-house auction software.

Schedule 6.1(l) - - Allowable Contract Amendments

None