# Exhibit "A"

# Part 1 of 3



## SUBLEASE

This Sublease, entered into on this 11ᵗʰ day of July, 2006 by SC Kiosks, Inc., (hereinafter referred to as "Sublandlord") and Warehouse 86, LLC, a Phoenix Arizona company (hereinafter referred to as "Subtenant").

### RECITALS:

**R-1**   Industrial Developments International Inc., a Delaware Corporation ("Landlord") and Wireless Retail, Inc, a Texas corporation ("Tenant"), entered into that certain lease dated August 1, 2003, relating to certain space known as Suite 110 in the Airways Distribution Center located at 481 Airport Industrial Drive, Southaven, Mississippi (collectively the "Prime Lease"), a copy of which is attached hereto as <u>Schedule A</u>.

**R-2**   SC Kiosks, Inc., ("Sublandlord") is the successor in interest to Wireless Retail, Inc. by assignment dated October 1, 2004.

**R-3**   Sublandlord desires to sublease to Subtenant the premises described in the Prime Lease, and Subtenant desires to sublease the same from Sublandlord, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by and between the parties hereto as follows:

1.   <u>Definitions.</u> Except as otherwise expressly defined herein, all capitalized terms used in this Sublease and/or in the Landlord Consent attached hereto shall have the meanings ascribed to them in the Prime Lease.

2.   <u>Subleased Premises and Subleased Equipment.</u>

(a)   Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, the premises leased in the Prime Lease which totals approximately 177,039 rentable square feet of space, out of a 246,078 square foot Building C of the Airways Distribution Center with an address of 481 Airport Industrial Drive, Suite 110, Southaven, Mississippi 38671, as identified on <u>Exhibit "A" to Schedule A</u> attached hereto and made a part hereof (hereinafter sometimes referred to as the "Subleased Premises").

(b)   Sublandlord hereby subleases to Subtenant and Subtenant hereby subleases from Sublandlord, the Subleased Equipment described on <u>Exhibit B</u> to this Sublease (the "Subleased Equipment") located in the Subleased Premises. The sublease of the Subleased Equipment is governed by the terms and conditions set out on <u>Schedule B, Special Terms and Conditions Applicable to Sublease of Equipment</u> which is attached hereto and made a part hereof for all purposes and to those terms and conditions of this Sublease expressly made applicable to the Subleased Equipment herein on in <u>Schedule B</u>.

FILED

JUL 3 1 2006

3.    Prime Lease; Role of Sublandlord and Landlord.

(a)    Except as modified or excluded herein or as may be manifestly inconsistent with the terms of this Sublease or with the status of Subtenant, all terms of the Prime Lease are incorporated by reference herein, and all references to "Landlord" in the Prime Lease shall be deemed to refer to Sublandlord, and, all references to "Tenant" will be deemed to refer to Subtenant. Except as otherwise provided in this Sublease, Subtenant shall have all the benefits and/or rights of Sublandlord, as Tenant, and Subtenant agrees to abide by and perform all obligations of "Tenant" in the Prime Lease, insofar as such obligations relate to the Subleased Premises and Subtenant's use thereof. Sublandlord shall abide by and perform all obligations of 'Landlord" therein, except as set forth in this Sublease.   In the event of any conflict or inconsistency between the terms of this Sublease and the terms of the Prime Lease incorporated herein to describe the rights and duties of Sublandlord and Subtenant, the terms of this Sublease shall prevail and supersede the incorporated terms of the Prime Lease. Exhibit B, Exhibit E, Exhibit G, Exhibit H to the Prime Lease shall not be applicable to this Sublease. Sections 2, 3, 4, 5 and 10 of Exhibit C to the Prime Lease will not apply to this Sublease.

(b)    Sublandlord is not the owner of the Subleased Premises, therefore Sublandlord shall not be obligated to perform those obligations of Landlord which Sublandlord cannot immediately and unilaterally perform in its capacity as "Tenant" under the Prime Lease. Nor shall Sublandlord be deemed to have made any representations made by Landlord in the Prime Lease. Without limiting the foregoing, under no circumstances shall Sublandlord be obligated to repair, reconstruct or rebuild the Subleased Premises, the Building, common areas, or any part thereof. Sublandlord shall reasonably cooperate with Subtenant in attempting to cause Landlord to fulfill its obligations to Sublandlord in the Prime Lease.   Subtenant agrees to indemnify and hold Sublandlord harmless from all loss, cost, expense or liability incurred by Sublandlord in such regard. Sublandlord shall have no liability to Subtenant resulting from any such breach of Landlord under the Prime Lease.   If Sublandlord recovers damages from Landlord for violation of Landlord's obligations under the Lease relating to the time of Subtenant's occupancy, Sublandlord shall remit to Subtenant such damages, less Sublandlord's cost of recovering the damages. Subtenant acknowledge that in certain circumstances, Sublandlord has no authority to grant privileges to, or consent to actions by, Subtenant, including such privileges or consents which may have been granted to Sublandlord or consented to by Landlord in the Prime Lease. With respect to all matters for which Subtenant must ask approval under the Prime Lease or hereunder, including, without limitation, approval of any signage of Subtenant, the consent of both Sublandlord and Landlord must be obtained.

(c)    The following provisions of the Prime Lease shall not be effective as to Subtenant, and Subtenant shall not be obligated to comply with the provisions nor be entitled to avail itself of the benefits of the provisions:  (i) Section 5.(b);  (ii) Sections 7.(a); (iii) Section 17.; (iv) Section 29.  With respect to Section 24, Sublandlord does not have a mortgagee with respect to the property.  Section 24 shall apply only to mortgages of Landlord.

4.    Term; Subtenant's Access.    The term of this Sublease shall commence on July 14, 2006 and expire at 12:00 midnight on September 30, 2008 ("Sublease Term").

5.  Condition, Acceptance and Use of Subleased Premises.

(a)  At the commencement of the Sublease Term as stipulated in Section 4, Subtenant shall accept the Subleased Premises in its existing condition and state of repair. Subtenant acknowledges that no representations, statements or warranties, express or implied, have been made by or on behalf of the Sublandlord in respect to its condition, or the use or occupation that may be made thereof, and that Sublandlord shall in no event whatsoever be liable for any latent defects in the Subleased Premises or in the equipment therein. Sublandlord shall enforce the provisions of the Prime Lease with regard to Landlord's obligations to provide services to the Subleased Premises and common areas.

(b)  Acceptance of the Subleased Premises by Subtenant shall be construed as recognition that the Subleased Premises are in a good state of repair and in sanitary condition. Subtenant shall maintain in good working order heating, air conditioning and ventilations systems, glass, windows and doors, sprinkler, all plumbing and sewage systems, fixtures, interior walls, floors (including floor slabs), ceilings, storefronts, plate glass, skylights, all electrical facilities and equipment referenced in Section 10 of Prime Lease. During the Sublease Term, Subtenant shall maintain in full force and affect a service contract for the maintenance of the heating, ventilation and air conditioning, fire/life safety systems. Subtenant shall deliver to Sublandlord (i) a copy of said service contract within thirty (30) days of the Sublease Commencement Date, and (ii) thereafter, a copy of a renewal or substitute service contract within thirty (3) days prior to the expiration of the existing service contract.

(c)  Sublandlord shall use commercially reasonable efforts to leave uncut in good working order, all communication and network wiring located in the Subleased Premises which exists as of the date of execution of this Sublease. Subtenant shall have access to and use of such wiring throughout the Sublease Term at no additional charge.

(d)  Pursuant to Section 2(b), Subtenant shall lease from Sublandlord and have the right to use Sublandlord's Subleased Equipment described on Exhibit B. Subtenant acknowledges and agrees that Sublandlord's Subleased Equipment shall remain the personal property of Sublandlord until Subtenant purchases the Subleased Equipment, pursuant to the terms in Schedule B. Furniture and Phone system associated with the Subleased Premises shall not remain for Subtenant's use. Security monitoring system, including cameras and digital recording equipment shall remain in the Sublease Premises throughout the Sublease Term and be conveyed to Subtenant at the expiration of the Sublease Term.

(e)  Subtenant shall use and occupy the Subleased Premises solely for general distribution and warehouse services, and in accordance with the uses permitted under applicable zoning regulations, and shall not use the Subleased Premises for any other purpose. Subtenant shall not use or occupy the Subleased Premises for any unlawful purpose.

(f)  Subtenant shall surrender the Subleased Premises at the expiration of the Sublease Term hereof, or any renewal thereof, or upon other termination hereunder, in the same condition as when Subtenant took possession, reasonable wear and tear excepted.

Sublease — Page 3

6.    Rent

(a)    Minimum Rent for Subleased Premises.  Subtenant covenants and agrees to pay Sublandlord as minimum rent ("Minimum Rent") for the Subleased Premises without, notice or demand, and without off-set; deduction or abatement, except as stated herein, annual rental at the rate of Two Dollars and 40/100 ($2.40) per rentable square foot of the Subleased Premises per annum payable in monthly installments of Thirty Five Thousand Four Hundred Seven Dollars and 80/100 ($35,407.80) in advance, commencing as described herein and on the first day of each and every successive month thereafter of the Sublease Term.

(b)    Additional Rent.  Subtenant agrees to pay any and all additional charges as defined in Section 6 of the Prime Lease attributable to the Subleased Premises as Additional Rent ("Additional Rent").   Subtenant's expenses of operation paid to persons other than Sublandlord, including utilities, trash and maintenance costs, are not considered Additional Rent, and are payable at Subtenant's own expense.

(c)    Equipment Rent.  Subtenant agrees to pay for the exclusive use of  the Subleased Equipment, (described on Exhibit B), throughout the Sublease Term, without notice or demand, and without off-set; deduction or abatement, except as stated herein, equipment rental in monthly installments as follows:  With respect to the Material Handling Equipment (designated as such on Exhibit B) the sum of Five Thousand Nine Hundred Forty Six Dollars and 00/100 ($5,946.00) per month and with respect to Conveyor/Racking and Miscellaneous Owned Equipment (designated as such on Exhibit B) the sum of Four Thousand Four Hundred Twenty Five Dollars and 00/100 ($4,425.00) all payable in advance, commencing as described herein and on the first day of each and every successive month thereafter of the Sublease Term.

(d)    Rent.  Minimum Rent, Additional Rent, and Equipment Rent and all other sums owed by Subtenant to Sublandlord under the terms of this Sublease including Schedule B, shall be collectively referred to herein as "Rent".

(e)    Rent  Commencement Dates.  Subject to  Section 4 herein,  the Rent Commencement Date shall be July 14, 2006.

(f)    Payments.  All Rent payable pursuant to this Sublease shall be payable to Sublandlord at the address set forth for notices to Sublandlord in Section 16 below or at such other place as Sublandlord may from time to time designate in writing to the Subtenant.

(g)    Payments to Landlord.  The execution of this Sublease by the parties does not relieve any obligation of the Sublandlord, as tenant in the Prime Lease, to pay the required Rents and Additional Rents, or any other monetary obligation, to the Landlord in the Prime Lease in the amounts as required by the Prime Lease.

(h)    Security Deposit.  The Subtenant shall deliver to Sublandlord a the sum of Thirty Five Thousand Four Hundred Seven Dollars and 80/100 ($35,407.80), as a security deposit which shall be maintained throughout the Sublease Term and applied or retained in

accordance with the terms and conditions of Section 5(a) of the Prime Lease. Sublandlord may comingle the security deposit with Sublandlord's own funds, and Sublandlord shall be entitled to all interest or other earnings from the security deposit.

(i)      Assignment of Right to Receive Termination Fees.      Subtenant acknowledges that a material inducement for Sublandlord to enter into this Sublease and without which Sublandlord would not lease the Sublease Premises to Subtenant is the receipt by Sublandlord of an assignment, in form acceptable to Sublandlord in Sublandlord's reasonable discretion, by which Subtenant assigns to Sublandlord as collateral to secure payment of all sums due to Sublandlord hereunder, Subtenant's right to receive Termination Fees as defined in the Service Agreement between Subtenant and United Parcel Service of America, Inc.

(j)      Personal Property Taxes.      Subtenant shall pay and be liable for all personal property taxes on Subtenant's furniture, equipment, fixtures, and the Subleased Equipment (described on Exhibit B). Such payment shall be made by Subtenant directly to such governmental body if billed to Subtenant, or if billed to Sublandlord, such payment shall be paid as Additional Rent to Sublandlord.

7.     Signage. Subject to: (i) Exhibit I and Paragraph 5 of the Prime Lease; (ii) the prior written consent of Landlord and Sublandlord; and (iii) Subtenant occupying the entire Subleased Premises throughout the Sublease Term, Subtenant shall have the non-exclusive right to install signage at a mutually agreeable location of the Building. Such signage shall be proportionately equal in size to Subtenant's Proportionate Share, but in no event larger than Sublandlord's existing sign. Subtenant shall at its sole cost and expense erect signage approved in advance by Landlord and Sublandlord.

8.     Assumption of Obligations; Exclusion.

(a)    . Except as otherwise required by this Sublease, Subtenant agrees to assume and perform, according to the terms of the Prime Lease, all of the duties, covenants, agreements and obligations of Sublandlord under the Prime Lease, as and when required by the Prime Lease, with respect to the Subleased Premises, except Sublandlord's duty to make Rent payments to Landlord. Subtenant further agrees to keep and obey, according to the terms of the Prime Lease, all of the rules, restrictions, conditions and provisions which pertain to the Subleased Premises, and are imposed by the terms of the Prime Lease upon Sublandlord with respect to the Subleased Premises or upon the use of the Subleased Premises. Subtenant agrees that it will take good care of the Subleased Premises, and will commit no waste, and will not do, suffer, or permit to be done any injury to the same. It is hereby understood and agreed that Subtenant's rights to use, possess and enjoy the Subleased Premises are subject to the terms, conditions, rules and regulations of the Prime Lease and the rights and remedies of Landlord thereunder. Subtenant agrees to indemnify, defend and protect Sublandlord against, and to hold Sublandlord harmless from, any liability, damages, costs or expenses of any kind or nature, including court costs and reasonable attorneys' fees, resulting from any applicable failure by Subtenant to perform, keep and obey the terms of this Sublease and the requirements of the Prime Lease with respect to the Subleased Premises. Any applicable failure by Subtenant to perform, keep and obey the same shall be a default by Subtenant hereunder.

Sublandlord agrees to use commercially reasonable efforts to cause Landlord to perform all the duties, covenants, agreements and obligations of Landlord under the Prime Lease except as stated herein. Sublandlord shall pay any and all costs or expenses associated with the review and approval process of this Sublease by Landlord.

9.   **Title and Possession.** Sublandlord covenants, agrees and represents that it has full right and authority to enter into this Sublease for the full term hereof, that Sublandlord is not in default beyond any applicable cure periods under the Prime Lease and that Subtenant, subject to the provisions of the Prime Lease and upon paying the rents and other sums provided herein and upon performing the duties, covenants, agreements and obligations hereof and upon keeping and obeying all of the restrictions, conditions and provisions hereof, will have, hold and enjoy quiet possession of the Subleased Premises, free from claims of persons claiming by or through Sublandlord for the term herein granted but subject to all of the applicable duties, covenants, agreements, obligations, restrictions, conditions and provisions set forth or incorporated herein.

10.   **Insurance.**

(a)   Subtenant agrees, during the Sublease Term hereof, to carry and maintain liability insurance coverage to meet the requirements of Section 8 of the Prime Lease against liability with respect to events occurring on or about the Subleased Premises or arising out of the use and occupancy thereof by the Subtenant with the understanding that the general aggregate limits required by Subtenant shall not exceed $4,000,000.00. In addition to the requirements of Section 8 of the Prime Lease, Subtenant shall cause such policies of liability insurance to also include Sublandlord as an additional insured. Subtenant agrees to indemnify, protect, defend and hold Sublandlord and Landlord harmless against any and all claims, suits, actions, liabilities, costs and expenses, including reasonable attorneys' fees, resulting from the use or occupancy of the Subleased Premises by Subtenant, its employees, agents or contractors, or from any breach by Subtenant of its covenants hereunder or from any act, omission, accident, incident or occurrence upon the Subleased Premises during the Sublease Term hereof.

(b)   Subtenant shall maintain "all risk" property insurance with respect to the leasehold improvements and the Subleased Equipment in an amount equal to their replacement cost as may be approved by Sublandlord hereunder.

11.   **Sublandlord's Liability.** Except as specifically provided herein and except for Sublandlord's covenant not to voluntarily terminate the Prime Lease or otherwise place in jeopardy the validity of the Prime Lease, Sublandlord shall have no responsibility whatsoever with respect to the Subleased Premises, the condition thereof or Subtenant's property situated therein, except for loss, injury or damage caused by Sublandlord's gross negligence or willful misconduct. Sublandlord agrees to indemnify, protect, and hold Subtenant harmless from and against any and all claims, suits, actions, liabilities, costs and expenses, including reasonable attorneys' fees, resulting from or relating to the loss, injury or damage caused by the gross negligence or willful misconduct of the Sublandlord, its employees, agents or contractors, pursuant to the requirements of this Sublease or from any breach by the Sublandlord of the covenants of this Sublease or of the Prime Lease. Except as otherwise required by this Sublease,

Sublandlord shall not be liable for the failure by Landlord to keep and perform, according to the terms of the Prime Lease, Landlord's duties, covenants, agreements, obligations, restrictions, conditions and provisions, nor for any delay or interruption in Landlord's keeping and performing the same. Sublandlord hereby assigns to Subtenant, for so long as this Sublease shall be in force and effect, any and all rights of Sublandlord under the Prime Lease with respect only to the Subleased Premises and causes of action which Sublandlord may have against Landlord with respect to the Subleased Premises due to default by Landlord under the Prime Lease, excluding however: (i) those provisions of the Prime Lease specifically excluded from this Sublease; (ii) any right of self-help or rent abatement, unless Sublandlord receives the benefit thereof; and (iii) any right or remedy which affects any portion of the premises leased by the Prime Lease other than the Subleased Premises. Sublandlord agrees to cooperate with and join Subtenant in any claims or suits brought by Subtenant against Landlord under the Prime Lease, provided that such participation shall be without cost or expense to Sublandlord. Subtenant has inspected the Subleased Premises and its contents to its satisfaction and, except as specifically set forth herein, agrees to accept the Subleased Premises and its contents in its "as-is, where-is" condition without any obligations on Sublandlord to repair or modify the same. No allowances for moving, plans or tenant improvements are provided to Subtenant.

12.   Damage, Destruction or Condemnation.   In the event of damage or destruction of the Subleased Premises or the taking of all or any part thereof under the power of eminent domain, this Sublease shall terminate only if the Prime Lease is terminated as a result thereof, and the rent payable hereunder shall abate only as long as and to the extent that the rent due from Sublandlord to Landlord under the Prime Lease with respect to the Subleased Premises abates as a result thereof, Subtenant shall have no claim to insurance or condemnation proceeds beyond any right to such proceeds that Sublandlord may hold as Tenant under the Prime Lease, and then only if and to the extent that Sublandlord actually receives any such proceeds..

13.   Release and Waiver of Subrogation   To the extent its insurance coverage is not thereby impaired, Sublandlord and Subtenant each hereby releases all causes of action and rights of recovery against each other and their respective agents, officers and employees for any loss, regardless of cause or origin, to the extent of any recovery to either party from any policy(s) of insurance carried or required to be carried hereunder. Sublandlord and Subtenant agree that any policies presently existing or obtained on or after the date hereof (including renewals of present policies) shall include a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.

14.   Alterations, Improvement.   No alterations, additions or improvements in or upon the Subleased Premises shall be made by Subtenant without the prior written consent by Sublandlord, which consent shall not be unreasonably withheld or delayed and, to the extent required by Section 6 of the Prime Lease, the consent of Landlord. Subtenant shall comply with the provisions of Section 6 of the Prime Lease with respect to any such alterations, additions or improvements. All alterations, additions and improvements shall be made in accordance with applicable building codes and laws and in compliance with all provisions of the Prime Lease. Upon the termination or expiration of the Sublease Term hereof, all such alterations, additions and improvements (except personal property, business and trade fixtures, machinery and

equipment, furniture and movable partitions owned by Subtenant) shall be and remain part of the Subleased Premises and be surrendered therewith without disturbance, molestation or injury and shall not be removed by Subtenant unless such removal is required by Sublandlord, in which case Subtenant shall remove the same and restore the Subleased Premises to the same condition in which they were on the date hereof, reasonable wear and tear excepted. If Subtenant shall fail to remove the same and restore the Subleased Premises to the same condition as of the effective date of this Sublease, reasonable wear and tear excepted, then Sublandlord may, but shall not be obligated to, do so at the expense of Subtenant. Personal property, business and trade fixtures, machinery and equipment, furniture and movable partitions owned by Subtenant shall be and remain the property of Subtenant and may be removed by Subtenant at any time during the Sublease Term hereof when Subtenant is not in default hereunder, and in any event, shall be removed on or before the expiration of the Sublease Term hereof. Subtenant shall repair any damage caused by such removal. Subtenant covenants and agrees to indemnify, protect and defend Sublandlord against, and hold Sublandlord harmless from, all liens, whether for labor or materials arising as the result of alterations, additions, repairs or improvements to the Subleased Premises made by Subtenant during the Sublease Term.

15.     Default. If any rent reserved or other monetary payment referred to herein, or any part thereof, whether the same be demanded or not, shall remain unpaid for a period of five (5) days from the date of written notice to Subtenant that such payment is past due; or if any other material term, condition or covenant of this Sublease, on the part of Subtenant to be kept or performed, shall be violated or neglected, and if Subtenant shall fail to correct the same within thirty (30) days from the date of written notice from Sublandlord to Subtenant specifying the violation, or such longer period as provided in Section 22 of the Prime Lease if Subtenant commences action to correct such violation and diligently prosecutes correction of such violation to completion; or if the Subleased Premises or Subtenant's interest therein shall be taken on execution or other process of law; or in the event of bankruptcy, receivership, insolvency, liquidation, dissolution or similar proceedings with respect to Subtenant, or if Subtenant shall enter into a general assignment of this Sublease for the benefit of creditors; or if any default under the Prime Lease shall occur with respect to Subtenant or the performance by Subtenant of any of its covenants and obligations under this Sublease, then and in any of said cases, Subtenant shall be deemed in default, and Sublandlord shall have the following rights and remedies against Subtenant: (i) to terminate this Sublease, (ii) to cure or attempt to cure the default, whereupon Subtenant shall upon demand reimburse Sublandlord for all costs thus expended together with interest thereon at the lesser rate (the "Interest Rate") of the highest rate permitted by law or two percent (2%) above the prime interest rate as established in The Wall Street Journal, (iii) to sue for Subtenant's performance, whereupon Subtenant shall upon demand reimburse Sublandlord for all costs thus expended together with interest thereon at the Interest Rate; (iv) to exercise all remedies set forth in the Prime Lease as if Sublandlord were the Landlord and Subtenant were the Tenant thereunder, or (v) to re-enter and take possession of the Subleased Premises, and to remove any property therein, without liability for damage to, and without the obligation to store such property but may store same at Subtenant's expense. In the event of such re-entry, Sublandlord may, but shall not be obligated to, relet the Subleased Premises, or any part thereof from time to time, in the name of Sublandlord or Subtenant, without further notice, for such term or terms, on such conditions and for such uses and purposes as Sublandlord, in its reasonable discretion, may determine, and Sublandlord may collect and receive all rents derived therefrom

and apply the same, after deduction of all appropriate expenses (including broker's, consultant's and attorney's fees, if incurred, and the expenses of putting the property in leasable condition), to the payment of the rent and other sums payable hereunder, Subtenant remaining liable for any deficiency to the extent required by this Sublease. Sublandlord shall not be responsible or liable for any failure to relet the Subleased Premises or any part thereof, or for failure to collect any rent connected therewith. The exercise by Sublandlord of any remedy shall not preclude the subsequent or simultaneous exercise of any other remedy. No delay in exercising any remedy shall be deemed a waiver thereof. In addition, any payment not made when due shall bear interest until paid at the Interest Rate.

　　　　16.　　Notices.　Any notice or communication required or permitted to be given or served by either party hereto upon the other shall be deemed given or served in accordance with the provisions of this Sublease when mailed in a sealed wrapper by United States registered or certified mail, return receipt requested, or delivered to a nationally recognized overnight courier, postage prepaid, properly addressed as follows:

| | |
|---|---|
| If to Sublandlord: | SC Kiosks, Inc.<br>300 RadioShack Circle, MS CF4-101<br>Fort Worth, TX 76102<br>Attention: David Goldberg |
| Payments: | c/o RadioShack Corporation<br>300 RadioShack Circle, MS WF6-316<br>Fort Worth, TX 76102<br>Attn: Rent Accounting |
| If to Subtenant: | Warehouse 86 LLC<br>6055 Primacy Parkway, Suite 115<br>Memphis, TN 38119<br><br>Attention: Ernest Strahan, III |

Each mailed notice or communication shall be deemed to have been given to, or served upon, the party to which it is addressed upon the acceptance or refusal of the same after it is deposited in the United States registered or certified mail, postage prepaid, or the day after the same is delivered for overnight delivery to such courier, properly addressed in the manner above provided. Any party hereto may change its address for the service of notice hereunder by serving written notice hereunder upon the other party hereto, in the manner specified above, at least ten (10) days prior to the effective date of such change.

Sublandlord and Subtenant appoint the following representative as a point of contact for operational matters relating to the Sublease and the Subleased Premises:

Subtenant:　　Eric Eilertsen, CEO_____

Sublandlord:    Bill Knotts, VP of Corporate Real Estate

17.    Surrender of Subleased Premises. Upon the expiration of the Sublease Term, or upon any earlier termination of this Sublease, Subtenant shall quit and surrender possession of the Subleased Premises to Sublandlord in as good order and condition as the same are now or hereafter may be improved by Landlord or Subtenant, reasonable wear and tear and repairs which are Landlord's obligation excepted, and shall, without expense to Sublandlord, remove or cause to be removed from the Subleased Premises all debris and rubbish, all furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitioning and other articles of personal property owned by Subtenant or installed or placed by Subtenant at its expense in the Subleased Premises, and all similar articles of any other persons claiming under Subtenant, and Subtenant shall repair all damage to the Subleased Premises resulting solely from such removal. Upon the expiration of this Sublease, or if Sublandlord or Landlord re-enters or re-takes possession of the Subleased Premises prior to the normal expiration of this Sublease, Sublandlord or Landlord shall have the right, but not the obligation, to remove from the Subleased Premises all personal property located therein belonging to Subtenant, and either party may discard such debris, rubbish and personal property or place such personal property in storage in a public warehouse, all at the expense and risk of Subtenant.

18.    Termination of Prime Lease. It is understood and agreed by and between the parties hereto that the existence of this Sublease is dependent and conditioned upon the continued existence of the Prime Lease and this Sublease shall automatically terminate on the termination, cancellation or expiration of the Prime Lease.  Notwithstanding the foregoing, Sublandlord shall not voluntarily terminate the Prime Lease as it relates to the Subleased Premises during the Sublease Term.

19.    Waiver. No provision of this Sublease shall be deemed to have been waived unless such waiver is in writing signed by the party holding the privilege of agreeing to such waiver. A waiver by one party of any default, breach or failure of the other party under this Sublease shall not be construed as a waiver of any subsequent or different default, breach or failure.

20.    Access to the Subleased Premises. Subtenant shall allow Sublandlord and/or Landlord, and the agents, employees and contractors of either, access to the Subleased Premises under the terms and for the purposes set forth in the Prime Lease or to exhibit the Subleased Premises to prospective purchasers, Mortgagees, ground lessors or tenants in accordance with the provisions of the Prime Lease.

21.    Holding Over. If Subtenant or anyone claiming under Subtenant holds over after the expiration or earlier termination of the Sublease Term hereof without the express written consent of Sublandlord, Subtenant shall become a tenant at sufferance only, at the rental rate payable under the Prime Lease upon the date of such expiration, plus any amount payable to Landlord as a result of such holdover, including any holdover costs for the entire premises described in the Prime Lease, and otherwise upon the terms, covenants and conditions herein specified, so far as applicable. Acceptance by Sublandlord of rent after such termination shall not constitute a consent to a holdover hereunder or result in a renewal. The foregoing provisions of

this paragraph are in addition to and do not affect Sublandlord's right of reentry or any other rights of Sublandlord hereunder or as otherwise provided by law and Subtenant shall be liable to Sublandlord for any holding over after the expiration or earlier termination of the Sublease Term hereof.

22.     Subordination. This Sublease is subject and subordinate to the Prime Lease and to any and all matters which the Prime Lease is or shall be subordinate. In the event the Prime Lease is terminated, or re-entry or dispossession of the Sublandlord by the Landlord under the Prime Lease, Landlord, at its option, may either terminate the Sublease, in which case the Subtenant agrees to peacefully vacate the Subleased Premises, or require the Subtenant to attorn to Landlord as its sublessor pursuant to the then applicable terms of the Sublease for the remaining term thereof, except that Landlord shall not be (i) liable for any previous act or omission of Sublandlord under the Sublease, or (ii) bound by any previous modification of the Sublease not agreed to in writing by Landlord or by a previous prepayment of Rent more than one (1) month in advance.

23. Choice of Law.   Unless otherwise specified herein, the parties agree that the interpretation and enforcement of this Sublease and related documents will be construed in accordance with all applicable federal laws. If no federal laws are available to interpret such Sublease and related documents, then applicable Texas law will be used to interpret such Sublease and related documents.

24.     Successors and Assigns. All of the terms, covenants, provisions and conditions of this Sublease shall be binding upon and inure to the benefit of the successors and assigns of Sublandlord and on the successors and assigns of Subtenant but only to the extent herein specified.

25.     Captions. The captions herein are for convenience only and are not a part of this Sublease.

26.     Interest. Should interest become due and payable pursuant to the requirements of this Sublease, Subtenant shall pay to Sublandlord such interest on all sums from the time said sum shall become due and payable until the same is paid at the Interest Rate, unless such sums are paid in accordance with the terms and conditions of the Prime Lease and no interest is due thereunder.

27.     Relationship of Parties. This Sublease does not and shall not create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between Sublandlord and Subtenant, except that of Sublandlord and Subtenant.

28.     Brokerage. Sublandlord and Subtenant each represents to the other that no real estate broker or agent is involved in this Sublease and no commissions are due to any agent or broker with respect to this sublease except for The Staubach Company and McKee & McFarland.

29.     Approval of Predecessors. This Sublease is contingent upon the approval of Landlord or its successors in interest.

Sublease – Page 11

30.   Severability. In the event any part of this Sublease is held to be unenforceable or invalid, for any reason, the balance of this Sublease shall not be affected and shall remain in full force and effect during the Sublease Term.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be executed as of the day and year first above written.

WITNESS/ATTEST:                          SUBLANDLORD:
                                          SC Kiosks, Inc.

By: _____
Name:        DAVID S. GOLDBERG
Title:    VP SCKiosks, Inc.
Date:

WITNESS/ATTEST:                          SUBTENANT:

By: _____
Name:   ERNEST K. STRAHAN, III
Title:   CFO
Date:   7/11/96

Landlord's Consent

The undersigned Landlord, Industrial Developments International, Inc., a Delaware Corporation hereby consents to the this Sublease under the terms and conditions of the Sublease.

Landlord:
Industrial Developments International, Inc., a
Delaware Corporation

By: _____
Name:        See *Consent to Sublease* document
Title:
Date:

Sublease — Page 12

EXHIBIT A



## Exhibit A continued

Located upon the real property described as follows (the "Premises Real Property"):

Being Part of the JMH Development property as described in Book 368 Page 509 and being in the Northeast Quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, DeSoto County, Mississippi and being more particularly described as follows:

Commencing at the recognized and accepted northeast corner of the northeast quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, Desoto County, Mississippi; thence South 00 Degrees 09 Minutes 32 Seconds West with the centerline of Airways Boulevrad a distance of 1529.64 feet to a point; thence North 90 Degrees 00 Minutes 00 Seconds West a distance of 1677.91 feet to a point on curve in the south line of Airport Industrial Drive, said point being the true point of beginning; thence southeastwardly along a curve to the right having a radius of 35 00 feet a distance of 54 71 feet (chord = South 44 Degrees 35 Minutes 00 Seconds East 49.71 feet, Delta = 89 Degrees 33 Minutes 34 Seconds) to a point in the west line of Market Street (proposed); thence South 00 Degrees 11 Minutes 47 Seconds West with the west line of Market Street (proposed) a distance of 467.49 feet to a point in the north line of Lot 8, Airport Industrial Park P B.P. (proposed); thence North 89 Degrees 48 Minutes 13 Seconds West with the north line of Lot 8 (proposed) a distance of 1055.59 feet to a point in the east line of Hamilton Road; thence North 00 Degrees 24 Minutes 18 Seconds West with the east line of Hamilton Road a distance of 461.85 feet to a point of curvature; thence northeastwardly along a curve to the right having a radius of 35 00 feet a distance of 55 16 feet (chord = North 44 Degrees 44 Minutes 28 Seconds East 49 62 feet, Delta = 90 Degrees 17 Minutes 33 Seconds) to a point of tangency in the south line of Airport Industrial Drive; thence North 89 Degrees 53 Minutes 14 Seconds East with the south line of Airport Industrial Drive a distance of 983.51 feet to a point of curvature; thence southeastwardly along a curve to the right having a radius of 566.00 feet and with the south line of Airport Industrial Drive a distance of 7.40 feet (chord = South 89 Degrees 44 Minutes 16 Seconds East 7 40 feet, Delta = 00 Degrees 44 Minutes 59 Seconds) to the point of beginning and containing 12.13 acres of land.

Note:
In the event of the subdivision of the Premises Real Property and the balance of the real estate not constituting part of the Premises Real Property, the Premises Real Property shall be described in said subdivision plat as "Lot 7 in Airport Industrial Park P.B.P."

**EXHIBIT B**
(Subleased Equipment description)

**"MISCELLANEOUS OWNED EQUIPMENT "**

| Qty | Location | Item Name | Item Description | Model/Serial # |
|---|---|---|---|---|
| 1 | Server Room | Techlogics | Wireless Router | 9500 |
| 1 | Server Room | Power Supply | APC | 5000 |
| 1 | Server Room | Power Supply | APC | 3000XL |
| 1 | Server Room | KVM Switch | Belkin | n/a |
| 1 | Server Room | Switch | Catalyst | 3550 |
| 1 | Server Room | Switch | Catalyst | 3550 |
| 1 | Server Room | Switch | Catalyst | 6500 |
| 4 | Warehouse | Tapers | Tapers/Laminators | 3M 700E |
| 1 | Warehouse | Pallet Scale | Digital Read Out | UK |
| 8 | Warehouse | Workstation Desks | | UK |
| 275 | Warehouse | Grey Totes | | UK |
| 8 | Warehouse | Rolling Flat Carts | | UK |
| 8 | Warehouse | Laundry Baskets | | UK |
| 3 | Warehouse | Pallet Jacks | | UK |
| 15 | Warehouse | Trashcans | | UK |
| Multiple | Warehouse | Conveyor parts | Misc. spare parts | Siemens/UK |
| Multiple | Warehouse | Racking parts | Misc. spare parts | |
| 2 | Warehouse | Black Switch Boxes | | UK |

**"MATERIAL HANDLING EQUIPMENT LEASED FROM GE CAPITAL #4145183-002"**

| Qty | Location | Item Name | Item Description | Model/Serial # |
|---|---|---|---|---|
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265785 |
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265786 |
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265787 |
| 1 | Warehouse | Electric Reach | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265984 |
| 1 | Warehouse | Electric Reach | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265985 |
| 1 | Warehouse | Electric Forklift | With 2 batteries, 1 charger | RC3020-030 / 1A265502 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | With 2 batteries, 1 charger | PE4000-60 / 6A206583 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | With 2 batteries, 1 charger | PE4000-60 / 6A206584 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | | WP2030-45 / 5A316671 |
| 5 | Warehouse | Battery Stands | w/pans, roller station, hertralization & deionizing | |

| | | | | | system | | | | |
|---|---|---|---|---|---|---|---|---|---|

## "CONVEYOR / RACKING EQUIPMENT LEASED FROM GE CAPITAL #4145183-001"

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| RT+ | 0100 | 1102 | Belt Driven Live Roller | 30.25" | 163'-0" | 1.50 | 70 | FS | Tri-Wide Support, Gap Plates\ |
| RG+ | 0100 A | 0200 | Gravity Roller | 21.25" | 163'-0" | | | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0100 B | 0200 | Gravity Roller | 21.25" | 163'-0" | | | FS | Tri-Wide Support, Gap Plates |
| WG+ | 0101 | 0300 | Gravity Miscellaneous | 30.25" | 4'-0" | | | FS | Gravity Gate |
| RT+ | 0102 | 1256 | Lineshaft Conveyor | 30.25" | 10'-9" | .750 | 90 | FS | (1) 90° Curve |
| RA+ | 0103 | 1265 | Flat Belt APC | 30.25" | 36'-0" | 1.00 | 160 | FS | DZB, Photo Eye Accum |
| BT+ | 0104 | 0410 | Belt on Roller | 30.25" | 30'-0" | 1.00 | 80/160 | FS | Powertail, Vector Drive |
| RT+ | 0105 | 1102 | Belt Driven Live Roller | 30.25" | 166'-3" | 1.50 | 70 | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0105 A | 0200 | Gravity Roller | 24.25" | 166'-6" | | | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0105 B | 0200 | Gravity Roller | 24.25" | 166'-6" | | | FS | Tri-Wide Support, Gap Plates |
| WG+ | 0106 | 0300 | Gravity Miscellaneous | 30.25" | 4'-0" | | | FS | Gravity Gate |
| RT+ | 0107 | 1256 | Lineshaft Conveyor | 30.25" | 14'-9" | .750 | 90 | FS | (1) 90° Curve |
| RA+ | 0108 | 1265 | Flat Belt APC | 30.25" | 96'-0" | 1.50 | 160 | FS | DZB, Photo Eye Accum |
| BT+ | 0109 | 0410 | Belt on Roller | 30.25" | 32'-3" | 1.00 | 80/160 | FS | Powertail, Vector Drive |
| BT+ | 0110 | 0220 | Wide Belt Merge | 74" | 16'-0" | 3.00 | 250 | FS | With Powered Verti-belt |
| VB+ | 0110 A | 0220 | Fixed Verti-belt | 4" | 16'-0" | 1.00 | 300 | FS | Mounted to Unit BT+0110 |
| RT+ | 0111 | 0410 | Belt on Roller | 30.25" | 15'-11" | 2.00 | 250 | FS | |
| SS+ | 0112 | 2455 | PS 140 Positive Sorter | 39.25" | 113'-4" | 20.00 | 325 | FS | (7) Diverts w/20° Spurs, (1) 70° Curve, (5) Future Diverts |

| Unit | | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|---|
| RG+ | 0113 | 0100 | Gravity Wheel | 30.25" | 10'-0" | | | FS | |
| RT+ | 0114 | 1256 | Lineshaft Conveyor | 30.25" | 29'-5" | 1.50 | 150 | FS | (1) 90° Curve |
| RA+ | 0115 | 0200 | Flat Belt Apc | 30.25" | 45'-0" | 1.00 | 160 | FS | Fixed End Stop |
| BT+ | 0116 | 0410 | Belt on Roller | 30.25" | 24'-5" | 2.00 | 140 | FS | Powertail, Brake Motor |
| RT+ | 0116 S | 0996 | Round Belt Live Roller | 30.25" | 9'-6" | | 140 | FS | (1) 70° Curve, Slave Driven From Unit BT+0116 |
| BT+ | 0117 | 0410 | Belt on Roller | 30.25" | 32'-0" | 2.00 | 170 | FS | Powertail, Brake Motor |
| RA+ | 0118 | 1265 | Flat Belt APC | 30.25" | 108'-0" | 2.00 | 200 | FS | DZB, Photo Eye Accum |
| BM+ | 0119 | 2305 | Meter Belt | 31.375" | 10'-0" | 1.00 | 100/210 | FS | Powertail, Brake Motor |
| RT+ | 0120 | 0996 | Round Belt Live Roller | 30.25" | 6'-9" | 1.00 | 220 | FS | (1) 45° Curve |
| WG+ | 0200 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0201 | 1265 | Flat Belt APC | 24.25" | 57'-0" | 1.50 | 160 | FS | DZB |
| RT+ | 0202 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RA+ | 0203 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0204 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0204 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0205 | 1102 | Belt Driven Live Roller | 24.25" | 65'-0" | 1.00 | 60 | FS | Gap Plates |
| RG+ | 0206 | 0200 | Gravity Wheel | 24.25" | 10'-0" | | | FS | |
| RT+ | 0207 | 0996 | Round Belt Live Roller | 24.25" | 9'-0" | 1.00 | 120 | FS | (1) 90° Curve |
| RA+ | 0208 | 1265 | Flat Belt APC | 24.25" | 48'-0" | 1.00 | 130 | FS | DZB,Photo Eye Accum |

| Unit | Model | | Description | Conv. Width. | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|------|-------|---|-------------|--------------|------------|-----|-------------|--------------|---------|
| BT+ | 0209 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| WG+ | 0210 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0211 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0212 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RT+ | 0213 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0214 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0214 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0215 | 1102 | Belt Driven Live Roller | 24.25" | 61'-0" | 1.00 | 60 | FS | Gap Plates |
| WG+ | 0216 | 0200 | Gravity Wheel | 24.25" | 10'-0" | | | FS | |
| RT+ | 0217 | 0996 | Round Belt Live Roller | 24.25" | 9'-0" | 1.00 | 120 | FS | (1) 90° Curve |
| RA+ | 0218 | 1265 | Flat Belt APC | 24.25" | 48'-0" | | 130 | FS | DZB, Photo Eye Accum |
| BT+ | 0219 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| WG+ | 0220 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0221 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RG+ | 0222 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RA+ | 0223 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye |
| RT+ | 0224 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0224 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0225 | 1102 | Belt Driven Live Roller | 24.25" | 61'-0" | 1.00 | 60 | FS | Gap Plates |

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|------|-------|-------------|-------------|------------|-----|-------------|--------------|---------|
| RT+ | 0226 | 1256 | Lineshaft Conveyor | 24.25" | 36'-7" | 1.00 | 120 | FS | Three (3) 90° Curves |
| RA+ | 0227 | 1265 | Flat Belt APC | 24.25" | 43'-0" | 1.00 | 130 | FS | DZB, Photo Eye Accum |
| BT+ | 0228 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| RT+ | 0229 | 1102 | Belt Driven Live Roller | 30.25 | 16'-0" | 2.00 | 140 | FS | Sawtooth Merge w/ (3) tooth infeed |
| RT+ | 0229 S | 0996 | Round Belt Live Roller | 30.25 | 7'-0" | SD | 140 | FS | One (1) 45° Curve, Slave Driven |
| RA+ | 0230 | 1265 | Flat Belt APC | 30.25 | 66'-0" | 1.50 | 160 | FS | Photo Eye Accum, Stop |
| RT+ | 0231 | 1256 | Lineshaft Conveyor | 30.25 | 101'-0" | 2.00 | 90 | FS | Two (2) 90° Curves, One (1) 60° Curve, One (1) 30° Merge |
| BT+ | 0232 | 0410 | Belt on Roller | 30.25 | 48'-0" | 2.00 | 120 | FS | Powertail, Brake Motor |
| RT+ | 0233 | 0996 | Live Belt Live Roller | 30.25 | 25'-0" | 1.00 | 130 | FS | Two (2) 90° Curves |
| RA+ | 0234 | 1265 | Flat Belt APC | 30.25 | 153'-0" | 3.00 | 200 | FS | DZB, Photoeye accum. |
| BM+ | 0235 | 2305 | Meter Belt | 31.375 | 10'-0" | 1.00 | 100/210 | FS | Powertail, Brake Motor |
| RT+ | 0236 | 0996 | Round Belt Live Roller | 30.25 | 6'-9" | 1.00 | 220 | FS | (1) 45° Curve |
| RG+ | 0237 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | | |
| RG+ | 0239 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | FS | With 3' Gate |
| RG= | 0240 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | | |
| RG+ | 0242 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | FS | With 3' Gate |
| RT+ | 0300 | 1131 | Live Roller | 36.25 | 28'-4" | 2.00 | 250 | FS/PLT | Sawtooth Merge, With(4) Teeth Infeeds |
| RA+ | 0301 | 1265 | Flat Belt APC | 30.25" | 48'-0" | 2.00 | 220 | FS/PLT | DZB, Photo Eye Accum |
| BI+ | 0302 | 2305 | Meter Belt | 31.375" | 12'-0" | 2.00 | 110/220 | FS/PLT | Powertail, Vector Drive |
| BT+ | 0303 | 0977 | Flat Belt Turn | 30" | 90° | 3.00 | 280 | FS/PLT | |
| BT+ | 0304 | 0977 | Flat Belt | 30" | 90° | 3.00 | 280 | FS/PL | |

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|------|-------|-------------|-------------|------------|-----|-------------|--------------|---------|
| | | Turn | | | | | T | |
| BT+ | 0305 | Slider Bed | 30" | 4'-0" | 1.00 | 280 | FS/PLT | |
| SC+ | 0306 | In-Motion Scale | 30" | 5'-0" | 1.00 | 280 | FS/PLT | |
| BT+ | 0306 A | Slider Bed | 30" | 4'-0" | 1.00 | 280 | FS/PLT | |
| SS+ | 0307 | PS 140 Positive Sorter | 39.25" | 166'-8" | 25.00 | 325 | FS/PLT | (6) Diverts w/ 20° Spurs & 70° Gravity Curves (4) Future Diverts |
| RT+ | 0308 | Round Belt Live Roller | 30.25" | 22'-10" | 1.00 | 300 | FS/PLT | (2) 90° Curve |
| RA+ | 0309 | Flat Belt APC | 30.25" | 87'-0" | 1.00 | 250 | FS/PLT | DZB, PE |
| BM+ | 0310 | Meter Belt | 30.625" | 10'-0" | 1.00 | 125/250 | FS/PLT | Powertail, Brake Motor |
| CH+ | 0311 | Gravity Chute | 30.25" | 25'-0" | | | FS | Typical of (4) |
| BF+ | 0312 | Powered Extendable | 30.25" | 26'-0"/60'-0" | | 0-120 | FS | Typical of (4) Units w/Transistion,Guide Tracks, & PowerTrax |
| BT+ | 0315 | Belt on Roller | 30.25" | 14'-0" | 1.00 | 120 | FS/PLT | Brake Motor |
| WG+ | 0316 | Gravity Wheel | 30.25 | 8'-5" | | | FS/PLT | (1) 70° Curve |
| RA+ | 0317 | Flat Belt APC | 30.25 | 30'-0" | 1.00 | 140 | FS/PLT | DZB, Photo Eye Accum |
| RG+ | 0317 A | Gravity Roller | 24.25 | 30'-0" | | | FS/PLT | Fixed End Stop |
| RG+ | 0317 B | Gravity Roller | 24.25 | 30'-0" | | | | Fixed End Stop |
| RT+ | 0318 A | Round Belt Live Roller | 30.25 | 15'-0" | 1.00 | 150 | FS/PLT | Two (2) 45° Curves |
| RA+ | 0318 | Flat Belt APC | 30.25" | 30'-0" | 1.00 | 200 | FS/PLT | DZB, Photo Eye Accum |
| BT+ | 0319 | Meter Belt | 30.625" | 10'-0" | 1.00 | 50/100 | FS/PLT | Powertail,Brake Motor |
| RT+ | 0320 | Flat Belt Live Roller | 72.25" | 12'-0" | 1.00 | 120 | FS/PLT | 2:1 Fixed Divert Rail Merge |
| RT+ | 0321 | Lineshaft | 30.25" | 18'-0" | .750 | 120 | FS/PL | (2) 90° Curve |

| Unit | | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|---|
| | | | Conveyor | | | | | T | |
| RA+ | 0322 | 1265 | Flat Belt APC | 30.25" | 48'-0" | 1.00 | 120 | FS/PL T | DZB, Photo Eye Accum |
| RG+ | 0322 A | 0200 | Gravity Roller | 24.25" | 60'-0" | | | FS/PL T | Fixed End Stops |
| RT+ | 0323 | 1256 | Lineshaft Conveyor | 30.25" | 18'-9" | .750 | 120 | FS/PL T | (2) 90° Curve |
| RA+ | 0324 | 1265 | Flat Belt APC | 30.25" | 30'-0" | 1.00 | 120 | FS/PL T | DZB, Photo Eye Accum |
| BM+ | 0325 | 2305 | Meter Belt | 30.625" | 10'-0" | 1.00 | 50/100 | FS/PL T | Brake Motor |
| RA+ | 0326 | 1265 | Flat Belt APC | 30.25" | 67'-0" | 1.00 | 90 | FS/PL T | DZB |
| RG+ | 0326 E | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 F | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 G | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 H | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RT+ | 0327 | 0996 | Round Belt Live Roller | 30.25" | 12'-0" | .750 | 100 | FS/PL T | 1) 90° Curve |

## SCHEDULE A

## PRIME LEASE

Lease dated August 1, 2003,
relating to certain space known as Suite 110
in the Airways Distribution Center
located at 481 Airport Industrial Drive,
Southaven, Mississippi

# IMAGING SERVICES

# IMAGING SERVICES

SCHEDULE A

PRIME LEASE

Lease dated August 1, 2003,
relating to certain space known as Suite 110
in the Airways Distribution Center
located at 481 Airport Industrial Drive,
Southaven, Mississippi

# IMAGING SERVICES

# IMAGING SERVICES

INDUSTRIAL LEASE AGREEMENT

BETWEEN

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC.

AS LANDLORD

AND

WIRELESS RETAIL, INC.

AS TENANT

# IMAGING
# SERVICES

# IMAGING
# SERVICES

ATL01/11405526v9