# Exhibit
## "A"

# Part 3 of 3

**EXHIBIT B**

Preliminary Plans and Specifications/Work

**BASE BUILDING
SPECIFICATIONS**

| | |
|---|---|
| **BUILDING AREA:** | 246,078 square feet |
| **PREMISES:** | 177,039 square feet on the west side of the building, including approximately 11,130 square feet of office space. |
| **PREMISES CONFIGURATION:** | 702' X 250' |
| **PARKING AREA:** | Approximately 239 parking spaces provided. Note: Landlord is constructing approximately 82 of the 239 parking spaces as part of the improvements for Tenant. |
| **FIRE PROTECTION:** | ESFR sprinkler system with electric booster pump. |
| **COLUMN SPACING:** | 54' X 50' |
| **CLEAR CEILING HEIGHT:** | 30' minimum |
| **WAREHOUSE HEATING AND VENTILATION:** | Gas fired Cambridge units provide heating to maintain 60° F when 15° F outside. |
| | Ventilation provided by roof-mounted exhaust fans, mechanically operated to provide three (3) air changes per hour in the warehouse area. Fire rated belt driven fans are used to minimize fan noise. Wall and roof mounted louvers provide the make-up air. |
| **FLOOR SPECIFICATIONS:** | 6" concrete slab on soil cement treated grade, 4,000 PSI. The floor is sealed with a water based penetrating sealer (Dayton Superior J-17 or equal). Construction specifications are F,35, F,25. |
| **ROOF AND DRAINS:** | EPDM single ply, reinforced membrane with minimum thickness of 45 mils. Roof is black, mechanically fastened, and insulated to R-10 with a ten year warranty. The roof drains to the rear to a gutter and downspouts. |
| **EXTERIOR WALLS:** | Painted concrete tilt wall with architectural reveals. |
| **INTERIOR WALLS:** | All interior warehouse walls will be painted white. |
| **EXIT DOORS:** | Landlord shall provide sufficient exit man doors as required by code, subject to review of tenant's equipment layout. |
| **SECURITY LIGHTING:** | Car parking and truck court lighting to be provided to 1.5 FC average by pole and building mounted fixtures. |
| **TRUCK LOADING:** | Thirty-six (36) manually operated dock high loading doors (9'x10' doors; 4' above grade). |

ATL01/11405526v9

EXHIBIT C

Special Stipulations

The Special Stipulations set forth herein are hereby incorporated into the body of the lease to which these Special Stipulations are attached (the "Lease"), and to the extent of any conflict between these Special Stipulations and the preceding language, these Special Stipulations shall govern and control.

1.      SNDA.   Simultaneously with the execution of this Lease, Landlord and Tenant shall execute a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as Exhibit "F". Notwithstanding anything to the contrary contained in Section 24 of this Lease, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien and security title of any Mortgage created after the Lease Date provided that the holder of said Mortgage agrees not to disturb Tenant's possession of the Demised Premises so long as Tenant is not in default hereunder, as evidenced by a subordination and non-disturbance agreement signed by said holder which agreement may include (a) the conditions contained in Section 24(e) of this Lease, (b) a requirement that said holder be given notice and opportunity to cure a landlord default and (c) other provisions customarily required by lenders. Tenant shall promptly execute such a subordination and non-disturbation and non-disturbance agreement upon Landlord's request.

2.      Construction of Demised Premises.

(a)      Notwithstanding the provisions of Section 17 of this Lease, Landlord shall be responsible for the cost of the construction of the portion of the Improvements designated as office improvements, which shall include restrooms and break rooms whether or not attached to the office space (collectively, the "Office Improvements") only up to an amount equal to $499,936 (the "Tenant Allowance"). Prior to commencement of construction of the Office Improvements, Landlord shall provide to Tenant a Work Order Agreement setting forth the amount of the hard costs of the Office Improvements, together with an administrative and coordination fee charged by Landlord against the Tenant Allowance equal to five percent (5%) of the total cost to complete the design, permit process and construction of the Office Improvements. Tenant shall have five (5) business days after receipt of the Work Order Agreement in which to review and to give to Landlord written notice of its approval of the Work Order Agreement or its requested changes to the plans and specifications for the Office Improvements in order that the cost of the Office Improvements may be revised. If Tenant fails to approve or request changes to the Work Order Agreement within five (5) business days after its receipt thereof, then Tenant shall be deemed to have approved the Work Order Agreement and the same shall thereupon be final. If Tenant requests any changes to the Work Order Agreement, Landlord shall make those changes which are reasonably requested by Tenant and shall within ten (10) days of its receipt of such request submit the revised portion of the Work Order Agreement to Tenant. In no event shall the cost of constructing the demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant be included in the calculation of the cost of the Office Improvements. In the event the Work Order Agreement, as approved (or deemed approved) by Tenant provides that the construction of the Office Improvements will cost in excess of the amount of the Tenant Allowance, Tenant agrees to pay such excess amount within ten (10) calendar days following Substantial Completion of the Office Improvements. Failure by Tenant to make such payment to Landlord shall be a default hereunder. If Tenant does not use the full amount of the Tenant Allowance, the difference between the amount of the Tenant Allowance actually used and the full Tenant Allowance is hereinafter referred to as the "Allowance Savings". Landlord shall, at its option either (a) credit the amount of the Allowance Savings against Tenant's first installment of Base Rent or (b) pay the amount of the Allowance Savings directly to Tenant within a reasonable amount of time following Landlord's determination of the amount such Allowance Savings.

(b)      For purposes of this Special Stipulation, the cost of the construction of the Office Improvements shall be deemed to include, but not be limited to, the cost of the Plans and Specifications related to the Office Improvements, permits related solely to the Office Improvements and all tenant build-out related to the Office Improvements, including, without limitation, demising walls (other than demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant), utilities, and portions of the heating, ventilating and air conditioning system servicing the Office Improvements

3.      Right of First Offer to Lease.   So long as the Lease is in full force and effect and no Event of Default has occurred and is then continuing and no facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, Landlord hereby grants to Tenant a right of first offer (the "Right of First Offer") to expand the Demised Premises to include that 40,500 square foot area labeled on Exhibit A attached hereto (the "Offer Space") subject to the terms and conditions set forth herein.

(a)      Tenant's and any guarantor's then current financial condition, as revealed by its most current financial statements (which shall include quarterly and annual financial statements, including income statements, balance sheets, and cash flow statements, as required by Landlord), must demonstrate either that each of Tenant's and such guarantor's net worth is at least equal to its net worth at the time the Lease was signed; or that Tenant and such guarantor otherwise meet financial criteria acceptable to Landlord.

C-1

(b)    The term of the Right of First Offer shall commence on the Lease Commencement Date and continue throughout the initial Term (the "First Offer Period"), unless sooner terminated pursuant to the terms hereof.

(c)    Subject to the other terms of this Right of First Offer, after any part of the Offer Space has or will "become available" (as defined herein) for leasing by Landlord, Landlord shall not, during the term of this Right of First Offer, lease to a third party that available portion of the Offer Space (the "Available Offer Space") without first offering Tenant the right to lease such Available Offer Space as set forth herein.

(i)    Space shall be deemed to "become available" when Landlord desires to lease all or a portion of the Offer Space.

(ii)    Notwithstanding subsection c(i) above, Offer Space shall not be deemed to "become available" if the space is (a) assigned or subleased by the current tenant of the space; or (b) re-let by the current tenant or permitted subtenant of the space by renewal, extension, or renegotiation of the Lease; or (c) leased on a temporary basis for a period of less than twelve (12) months without any right to extend.

(d)    Consistent with subsection (c), Landlord shall not lease any such Available Offer Space to a third party unless and until Landlord has first offered the Available Offer Space to Tenant in writing (the "Offer", the date of presentment of such Offer shall hereinafter be referred to as the "Offer Date"). The Offer shall contain (i) a description of the Available Offer Space (which description shall include the square footage amount and location of such Available Offer Space) and an attached floor plan that shows the Available Offer Space; (ii) the date on which Landlord expects the Available Offer Space to become available; (iii) the base rent for the Available Offer Space; and (iv) the term for the Available Offer Space (which shall be no less than the remainder of the Term of this Lease then in effect). Upon receipt of the Offer, Tenant shall have the right, for a period of five (5) calendar days after receipt of the Offer, to exercise the Right of First Offer by giving Landlord written notice that Tenant desires to lease the Available Offer Space at the base rent and upon the special terms and conditions as are contained in the Offer.

(e)    If, within such five (5-)day period, Tenant exercises the Right of First Offer, then Landlord and Tenant shall amend the Lease to include the Available Offer Space subject to the same terms and conditions as the Lease, as modified, with respect to the Available Offer Space, by the terms and conditions of the Offer. If this Lease is guaranteed now or at anytime in the future, Tenant simultaneously shall deliver to Landlord an original, signed, and notarized reaffirmation of each Guarantor's personal guaranty, in form and substance acceptable to Landlord.

(f)    If, within such five (5)-day period, Tenant declines or fails to exercise the Right of First Offer, Landlord shall then have the right to lease the Available Offer Space in portions or in its entirety to a third party, unrelated to and unaffiliated with Landlord, at any time within twelve (12) months after the Offer Date, without regard to the restrictions in this Right of First Offer and on whatever terms and conditions Landlord may decide in its sole discretion, provided the base rent (as adjusted to account for any changes in the tenant improvement allowance), additional rent and any rent concessions are not substantially more favorable to such tenant than those set forth in the Offer, without again complying with all the provisions of this Right of First Offer. In the event Landlord does not lease the Available Offer Space to a third party within twelve (12) months after the Offer Date, Landlord shall thereafter be required to again comply with the provisions of this Special Stipulation 3 prior to leasing the Available Offer space to a Third Party.

(g)    If Landlord does lease all or any portion of the Available Offer Space to such a third party after complying with the terms and conditions of this Right of First Offer, then the Right of First Offer shall terminate, and Tenant shall have no further Right of First Offer.

(h)    If Landlord desires to lease the Available Offer Space at a base rent rate substantially less than the base rent rate set forth in the Offer (provided, that if the base rent rate is at least ninety percent (90%) of the base rent rate set forth in the Offer, said base rent rate shall be conclusively deemed to be not substantially less than the base rent set forth in the Offer), or if Landlord desires to materially alter or modify the special terms and conditions of the Offer, if any, Landlord shall be required to present the altered or modified Offer to Tenant pursuant to this Right of First Offer, in the same manner that the original Offer was submitted to Tenant.

(i)    This Right of First Offer is personal to Wireless Retail, Inc. and shall become null and void upon the occurrence of an assignment of Tenant's interest in the Lease or a sublet of all or a part of the Demised Premises

(j)    This Right of First Offer shall be null and void if Tenant is a holdover Tenant pursuant to Section 30(c) of the Lease at the time Landlord is required to notify Tenant of the Offer or at the time Tenant exercises its Right of Offer.

4.    <u>Option to Extend Term.</u>

c-2

(a)        Landlord hereby grants to Tenant two (2) consecutive options to extend the Term for a period of five (5) years each time, each such option to be exercised by Tenant giving written notice of its exercise to Landlord in the manner provided in this Lease at least one hundred eighty (180) days prior to (but not more than two hundred ten (210) days prior to) the expiration of the Term, as it may have been previously extended. No extension option may be exercised by Tenant if an Event of Default has occurred and is then continuing or any facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default either at the time of exercise of the option or at the time the applicable Term would otherwise have expired if the applicable option had not been exercised.

(b)        If Tenant exercises its options to extend the Term, Landlord shall, within thirty (30) days after the receipt of Tenant's notice of exercise, notify Tenant in writing of Landlord's reasonable determination of the Base Rent for the Demised Premises for the applicable five (5) year option period (including any space added thereto pursuant to Special Stipulation 3), which amount shall be based on the greater of (i) the market rate for such space or (ii) the Annual Base Rent rate to be in effect immediately prior to the commencement of such option period. Tenant shall have thirty (30) days from its receipt of Landlord's notice to notify Landlord in writing that Tenant does not agree with Landlord's determination of the Base Rent and that Tenant elects to determine the Prevailing Market Rate (as defined and calculated below). If Tenant does not notify Landlord of such election within thirty (30) days of its receipt of Landlord's notice, Base Rent for the Demised Premises for the applicable extended term shall be the Base Rent set forth in Landlord's notice to Tenant. The phrase "Prevailing Market Rate" shall mean the then prevailing market rate for base minimum rental calculated on a per square foot basis for leases covering buildings comparable to the Building (as adjusted for any variances between such buildings and the Building) located in the area of Southaven, Mississippi (hereinafter referred to as the "Market Area"). The Prevailing Market Rate shall be determined by an appraisal procedure as follows:

In the event that Tenant notifies Landlord that Tenant disagrees with Landlord's determination of the market rate and that Tenant elects to determine the Prevailing Market Rate, then Tenant shall specify, in such notice to Landlord, Tenant's selection of a real estate appraiser who shall act on Tenant's behalf in determining the Prevailing Market Rate. Within twenty (20) days after Landlord's receipt of Tenant's selection of a real estate appraiser, Landlord, by written notice to Tenant, shall designate a real estate appraiser, who shall act on Landlord's behalf in the determination of the Prevailing Market Rate. Within twenty (20) days of the selection of Landlord's appraiser, the two (2) appraisers shall render a joint written determination of the Prevailing Market Rate, which determination shall take into consideration any differences between the Building and those buildings comparable to the Building located in the Market Area, including without limitation age, location, setting and type of building. If the two (2) appraisers are unable to agree upon a joint written determination within said twenty (20) day period, the two appraisers shall select a third appraiser within such twenty (20) day period. Within twenty (20) days after the appointment of the third appraiser, the third appraiser shall render a written determination of the Prevailing Market Rate by selecting, without change, the determination of one (1) of the original appraisers as to the Prevailing Market Rate and such determination shall be final, conclusive and binding. All appraisers selected in accordance with this subparagraph shall have at least ten (10) years prior experience in the commercial leasing market of the Market Area and shall be members of the American Institute of Real Estate Appraisers or similar professional organization. If either Landlord or Tenant fails or refuses to select an appraiser, the other appraiser shall alone determine the Prevailing Market Rate. Landlord and Tenant agree that they shall be bound by the determination of Prevailing Market Rate pursuant to this paragraph. Landlord shall bear the fee and expenses of its appraiser; Tenant shall bear the fee and expenses of its appraiser; and Landlord and Tenant shall share equally the fee and expenses of the third appraiser, if any.

Notwithstanding anything to the contrary contained herein, in the event the Prevailing Market Rate as determined herein is less than the Annual Base Rent to be in effect immediately prior to the commencement of such option period, the Base Rent during the applicable extension Term shall equal the Annual Base Rent in effect during the last year of the Term.

(c)        Except for the Base Rent, which shall be determined as set forth in subparagraph (b) above, leasing of the Demised Premises by Tenant for the applicable extended term shall be subject to all of the same terms and conditions set forth in this Lease, including Tenant's obligation to pay Tenant's share of Operating Expenses as provided in this Lease; provided, however, that any improvement allowances, termination rights, rent abatements or other concessions applicable to the Demised Premises during the initial Term shall not be applicable during any such extended term, nor shall Tenant have any additional extension options unless expressly provided for in this Lease. Landlord and Tenant shall enter into an amendment to this Lease to evidence Tenant's exercise of its renewal option. If this Lease is guaranteed, it shall be a condition of Landlord's granting the renewal that Tenant deliver to Landlord a reaffirmation of the guaranty in which the guarantor acknowledges Tenant's exercise of its renewal option and reaffirms that the guaranty is in full force and effect and applies to said renewal.

5.        Tenant's Early Occupancy. If and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of the Demised Premises shown on Exhibit "A-1" attached hereto and incorporated herein (the "First Entry Space") on the date which is the later of (a) July 1, 2003 or (b) the twenty-fifth (25th) day following the Approval Date (as defined in Section 17 of this

e-3

Lease) (such date of early entry to be referred to as the "First Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the First Entry Space for occupancy; provided however, that the First Entry Date shall be postponed by one (1) day for every day of Tenant Delay or delay caused by force majeure (collectively, "Excused Delay"). Further, if and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of Demised Premises shown on Exhibit "A-2" attached hereto and incorporated herein (the "Second Entry Space") on the date which is the thirtieth (30th) day following the First Entry Date (the "Second Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the Demised Premises for occupancy; provided that the Second Entry Date shall be postponed by one (1) day for every day of Excused Delay. The provisions of this Special Stipulation Number 5 are subject to the following: during any period of early entry, (i) Tenant shall comply with all terms and conditions of this Lease other than the obligation to pay Base Rent, (ii) Tenant shall not interfere with Landlord's completion of the Demised Premises, (iii) Tenant shall not begin operation of its business and (iv) Tenant shall be responsible for payment of all costs and charges for gas, steam, electricity, fuel, light, power, telephone, heat and any other utility or service used or consumed by Tenant or Tenant's agents or employees (but not by Landlord or Landlord's agents or contractors in Landlord's completion of the Improvements pursuant to Section 17 of this Lease) in or servicing the Demised Premises during such period of early entry. Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant during the early occupancy period

In the event that Landlord does not allow access to Tenant of the First Entry Space by the First Entry Date or the Second Entry Space by the Second Entry Date, as extended by Excused Delay (each day after the First Entry Date or Second Entry Date for which Landlord does not grant Tenant access to the applicable space shall be hereinafter referred to as a "Day of Delay"), from and after the Base Rent Commencement Date, Tenant shall receive a credit against Base Rent equal to one day of Base Rent for each Day of Delay until said credit is fully realized by Tenant, as its sole remedy.

6.    Building Compliance with Laws.  Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, the design and construction of the Improvements in accordance with the Plans and Specifications will materially comply with all applicable federal, state, county and municipal laws, ordinances and codes in effect as of the Lease Date, excepting therefrom any requirements related to Tenant's specific use of the Demised Premises. Further, subject to the last sentence hereof, Landlord, at its sole cost and expense, shall be responsible for causing the Improvements to comply with Title III of the Americans With Disabilities Act of 1990 (the "ADA"), or the regulations promulgated thereunder (as said Title III is in effect and pertains to the general public), as of the Lease Commencement Date  During the Term, Tenant hereby agrees that it shall be responsible, at its sole cost and expense, for (a) causing the Building, the Building Common Area and the Demised Premises to comply with Title III of the ADA as a result of (i) any special requirements of the ADA relating to accommodations for individual employees, invitees and/or guests of Tenant and (ii) any improvements or alterations made to the Demised Premises by Tenant, and (b) complying with all obligations of Tenant under Title I of the ADA.

7.    Road Access.  Landlord represents and warrants to Tenant that, as of the First Entry Date, Tenant will have temporary access to Hamilton Road for purposes of ingress and egress to and from the Building and that, as of the Lease Commencement Date, Tenant will have permanent access to Hamilton Road for such purposes.

8.    Additional Operating Expense Exclusions.

The following items shall be excluded from Operating Expenses:

a.    Expenditures for capital improvements except as expressly allowed under the Lease;
b.    Tenant improvements expenses for other tenants of the Building;
c.    The cost of any work performed for, or equipment furnished to, any tenant of the Building to the extent performed for, or furnished to Tenant;
d.    The cost of any repair in accordance with the casualty and condemnation sections of this Lease to the extent covered by insurance or condemnation proceeds;
e.    Any expenses for repairs and maintenance which are actually covered by warranty;
f.    Charges for electricity, steam and other utilities which are separately reimbursed by any tenant;
g.    Interest and penalties due to late payment of any amounts owed by Landlord, except as may be incurred as a result of Tenant's failure to timely pay its portion of such amounts or as a result of Landlord's contesting such amounts in good faith; and
h.    The cost of correcting defects covered by Landlord's warranty contained in Section 17(e) of this Lease, within such warranty period.
i.    Management fees, royalties or other fees charged for the management of the Property in excess of 3 1/2% per annum.

9.    Inspection Rights.

a.    Landlord's books and records pertaining to the calculation of Operating Expenses for any calendar year within the Term may be inspected by Tenant (or by an independent certified accountant) at

Tenant's expense, at any reasonable time within sixty (60) days after Tenant's receipt of Landlord's statement for Operating Expenses; provided that Tenant shall give Landlord not less than fifteen (15) days' prior written notice of any such inspection. If Landlord and Tenant agree that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year was incorrect, the parties shall enter into a written agreement confirming such error and then, and only then, Tenant shall be entitled to a credit against future Base Rent for said overpayment (or a refund of any overpayment if the Term has expired) or Tenant shall pay to Landlord the amount of any underpayment, as the case may be. If Tenant's inspection proves that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year resulted in an overpayment by more than fifteen percent (15%) of Tenant's share, Landlord shall also pay the reasonable fees and expenses of Tenant's independent professionals, if any, conducting said inspection.

        b.    All of the information obtained through Tenant's inspection with respect to financial matters (including, without limitation, costs, expenses, income) and any other matters pertaining to Landlord, the Demised Premises, the Building and/or the Project as well as any compromise, settlement, or adjustment reached between Landlord and Tenant relative to the results of the inspection shall be held in strict confidence by Tenant and its officers, agents, and employees; and Tenant shall cause its independent professionals and any of its officers, agents or employees to be similarly bound. The obligations within this subsection (b) shall survive the expiration or earlier termination of the Lease.

        10.    <u>Contesting of Taxes</u>. If Landlord does not elect to contest real estate taxes applicable to the Building and the Building Common Area for a particular tax period during the Term, Tenant may request that Landlord contest such taxes by written notice to Landlord given, if at all, within sixty (60) days following Tenant's receipt of the statement required to be delivered by Landlord pursuant to Section 6(a) of the Lease covering the tax period in question. Landlord may then elect either to contest such taxes or to allow Tenant to so contest such taxes subject to Landlord's reasonable approval of the firm or individual hired to conduct such contest. In either case, Tenant shall be responsible for all costs of contesting such taxes to the extent that said costs exceed the savings realized by such contest. Any resulting savings over and above the cost of such contest shall be distributed on a prorata basis between Landlord, Tenant and the other tenants of the Building that contributed toward payment of the applicable tax bill. Tenant shall have the right to seek an abatement of real estate taxes and other tax incentives. In the event Tenant receives an abatement or reduction in real estate taxes which is attributable solely to the Demised Premises, any such savings shall be credited solely to Tenant's share of Operating Expenses.

        11.    <u>Landlord Insurance</u>.

        (a)    Landlord shall maintain at all times during the Term of this Lease, with such deductible as Landlord in its sole judgment determines advisable, insurance on the "Special Form" or equivalent form on a Replacement Cost Basis against loss or damage to the Building. Such insurance shall be in the amount of 80% of the replacement value of the Building (excluding all fixtures and property required to be insured by Tenant under this Lease).

        (b)    Landlord shall maintain at all times during the Term commercial general liability insurance with limits at least equal to the amount as Tenant is required to maintain pursuant to Section 8(a)(i) of this Lease.

        12.    <u>Confidentiality</u>.

        (a)    Landlord will not disclose any aspect of Tenant's financial statements which Tenant designates to Landlord as confidential except (a) to Landlord's lenders or prospective purchasers or joint venture partners of or with respect to the Property, (b) in litigation between Landlord and Tenant, and/or (c) if required by Law.

        (b)    Landlord and Tenant agree to hold the terms of this Lease in strict confidence, and will not disclose, except for any disclosure required by Laws, such terms to any person other than the respective partners, directors, officers, employees, attorneys, accountants or financing sources of Landlord and Tenant, without the prior written consent of the other party. Notwithstanding the foregoing, Landlord may disclose any information in public notices required by Laws or otherwise traditionally made by entities similar to Landlord and the financial community.

        13.    <u>Disclosure of Underlying Title Exceptions; Description of Property</u>. Landlord has provided to Tenant a true and correct copy of its title insurance policy covering the property on which the Building is located, as well as Landlord's most current ALTA survey of such property.

## EXHIBIT D

### Rules And Regulations

These Rules and Regulations have been adopted by Landlord for the mutual benefit and protection of all the tenants of the Building in order to insure the safety, care and cleanliness of the Building and the preservation of order therein.

1.  The sidewalks shall not be obstructed or used for any purpose other than ingress and egress. No tenant and no employees of any tenant shall go upon the roof of the Building without the consent of Landlord.

2.  No awnings or other projections shall be attached to the outside walls of the Building.

3.  The plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags or other substances, including Hazardous Substances, shall be thrown therein.

4.  No tenant shall cause or permit any objectionable or offensive odors to be emitted from the Demised Premises.

5.  The Demised Premises shall not be used for (i) an auction, "fire sale", "liquidation sale", "going out of business sale" or any similar such sale or activity, (ii) lodging or sleeping, or (iii) any immoral or illegal purposes.

6.  No tenant shall make, or permit to be made any unseemly or disturbing noises, sounds or vibrations or disturb or interfere with tenants of this or neighboring buildings or premises or those having business with them.

7.  Each tenant must, upon the termination of this tenancy, return to the Landlord all keys of stores, offices, and rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys so furnished, such tenant shall pay to the Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

8.  Canvassing, soliciting and peddling in the Building and the Project are prohibited and each tenant shall cooperate to prevent such activity.

9.  Landlord will direct electricians as to where and how telephone or telegraph wires are to be introduced. No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Demised Premises shall be subject to the approval of Landlord.

10.  Parking spaces associated with the Building are intended for the exclusive use of passenger automobiles. Except for intermittent deliveries, no vehicles other than passenger automobiles may be parked in a parking space (other than spaces expressly designated on the Plans for truck parking) without the express written permission of Landlord. Trucks may be parked only in truck dock positions and in other paved areas expressly designated for such purpose in the Plans. Trailers may be parked only in paved areas expressly designated for such purpose in the Plans. Neither trucks nor trailers may be parked or staged in (i) areas adjacent to truck docks, serving any portion of the Building, which are intended by Landlord for truck maneuvering or (ii) any driveway, drive aisle or other paved area which provides ingress or egress for cars or trucks to or from any portion of the Building or any street adjoining the Building.

11.  No tenant shall use any area within the Project for storage purposes other than the interior of the Demised Premises.

d-1

ATL01/11405526v9

EXHIBIT E

CERTIFICATE OF AUTHORITY
CORPORATION

The undersigned, Secretary of WIRELESS RETAIL, INC., a _Texas_ corporation ("Tenant"), hereby certifies as follows to INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation ("Landlord"), in connection with Tenant's proposed lease of premises in Building C, at Airways Distribution Center, DeSoto County, Mississippi (the "Premises");

1.   Tenant is duly organized, validly existing and in good standing under the laws of the State of _Texas_ , and duly qualified to do business in the State of Mississippi.

2.   That the following named persons, acting individually, are each authorized and empowered to negotiate and execute, on behalf of Tenant, a lease of the Premises and that the signature opposite the name of each individual is an authentic signature:

| J. DAN McMAHAN | PRESIDENT & CEO | |
| --- | --- | --- |
| (name) | (title) | (signature) |
| | | |
| (name) | (title) | (signature) |
| | | |
| (name) | (title) | (signature) |

3.   That the foregoing authority was conferred upon the person(s) named above by the Board of Directors of Tenant, at a duly convened meeting held _____, 2005.

Secretary

[CORPORATE SEAL]

# IMAGING
# SERVICES

EXHIBIT F

SNDA

SUBORDINATION, NON-DISTURBANCE,
AND ATTORNMENT AGREEMENT
(Commercial Real Estate)

THIS AGREEMENT, made effective as of the _____ day of _____, 2003, by and between _____, a _____ ("Tenant"), with its principal offices at _____ and U.S. BANK NATIONAL ASSOCIATION, a national banking association ("Lender"), whose mailing address is c/o Commercial Real Estate Loan Department, 150 4ᵗʰ Avenue North, CN-TN-PL02, Nashville, TN 37219, and/or its participants, successors or assigns.

WITNESSETH:

A.    WHEREAS, by Lease dated _____, 200__ (hereinafter referred to as the "Lease"), Industrial Developments International, Inc., a Delaware corporation ("Landlord"), leased to Tenant a portion of the building located at and commonly known as _____ (such building and the land on which the building is located being called the "Property," and the portions of such building leased to Tenant pursuant to the Lease being called the "Premises"); and

B.    WHEREAS, Landlord has obtained a loan from Lender secured by, among other things, a deed of trust on the Property (the "Deed of Trust"), and as a condition of such loan, Landlord is required to obtain from Tenant certain written agreements; and

C.    WHEREAS, Tenant and Lender desire hereby to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of the following agreement.

NOW THEREFORE, for and in consideration of the premises and of the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tenant and Lender agree as follows:

1.    The Lease and the rights of Tenant thereunder are and shall be subject and subordinate to the lien of the Deed of Trust and to all of the terms, conditions and provisions thereof, to all advances made or to be made thereunder, to the full extent of the principal sum, interest thereon and other amounts from time to time secured thereby, and to any renewal, substitution, extension, modification or replacement thereof, including any increase in the indebtedness secured thereby or any supplements thereto. In the event that Lender or any other person (Lender, any other such person and their successors and assigns being referred to herein as the "Purchaser") acquires title to the Property pursuant to the exercise of any remedy provided for in the Deed of Trust or by reason of the acceptance of a deed in lieu of foreclosure, Tenant covenants and agrees to attorn to and recognize and be bound to Purchaser as its new landlord, and subject to the other terms, provisions and conditions of this Agreement, the Lease shall continue in full force and effect as a direct lease between Tenant and Purchaser.

2.    So long as the Lease is in full force and effect and Tenant shall not be in default under any provision of the Lease or this Agreement, and no event has occurred which has continued to exist for a period of time (after notice, if any, required by the Lease) as would entitle Landlord to terminate the Lease or would cause, without further action by Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder:

a.    the right of possession of Tenant to the Property shall not be terminated or disturbed by any steps or proceedings taken by Lender in the exercise of any of its rights under the Deed of Trust;

b.    the Lease shall not be terminated or affected by said exercise of any remedy provided for in the Deed of Trust, and Lender hereby covenants that any sale by it of the Property pursuant to the exercise of any rights and remedies under the Deed of Trust or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder.

3.    In no event shall Lender or any other Purchaser be:

a.    liable for any act or omission of any prior landlord;

b.    liable for the return of any security deposit which has not been delivered to the Purchaser;

d-2

ATL01/11405526v9

c.    subject to any offsets or defenses which Tenant might have against any prior landlord;

d.    bound by any payment of rent or additional rent which Tenant might have paid to any prior landlord for more than the current month.

4.    Tenant agrees to give prompt written notice to Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or abate the rent payable thereunder, and agrees that notwithstanding any provision of the Lease, no notice of cancellation thereof shall be effective unless Lender has received the notice aforesaid and has failed within 30 days of the date of receipt thereof to cure, or if the default cannot be cured within 30 days, has failed to commence and to pursue diligently the cure of Landlord's default which gave rise to such right of cancellation or abatement. Tenant further agrees to give such notices to any successor-in-interest of Lender, provided that such successor-in-interest shall have given written notice to Tenant of its acquisition of Lender's interest in the Deed of Trust and designated the address to which such notices are to be sent.

5.    Tenant acknowledges that Landlord has executed and delivered to Lender an Assignment of Rents and Leases conveying the rentals under the Lease as additional security under said loan, and Tenant hereby expressly consents to and recognizes such Assignment, and agrees to pay the rent to Lender or its nominee whenever Lender claims the rent under the terms of said Assignment.

6.    Tenant agrees that it will not, without the prior written consent of Lender, do any of the following, and any such purported action without such consent shall be void as against Lender:

a.    make a prepayment in excess of one month of rent under the Lease;

b.    subordinate or permit subordination of the Lease to any lien subordinate to the Deed of Trust; or

c.    make or enter into any amendment or modification or termination of the Lease.

7.    Tenant agrees to certify in writing to Lender, upon request, whether or not any default on the part of Landlord exists under the Lease and the nature of any such default. Tenant states that as of this date, the Lease is in full force and effect, without modification, a copy of said Lease being attached hereto Tenant further states as follows:

a.    Tenant is the tenant under the Lease for the Premises, which contain approximately _____ rentable square feet of space.

b.    Tenant has accepted possession of the Premises pursuant to the Lease. The Lease term commenced on _____, 200__. The termination date of the Lease term, excluding renewals and extensions, is _____, 20__. Tenant has the right to extend or renew the Lease for _____ period(s) of _____ years.

c.    Any improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant in all respects, and Landlord has fulfilled all of its duties under the Lease.

d.    The Lease has not been assigned, modified, supplemented or amended in any way by Tenant. The Lease constitutes the entire agreement between the parties and there are no other agreements concerning the Premises, and Tenant is not entitled to receive any concession or benefit (rental or otherwise) or other similar compensation in connection with renting the Premises other than as set forth in the Lease.

e.    The Lease is valid and in full force and effect, and, to the best of Tenant's knowledge, no party thereto is presently in default thereunder. Tenant has no defense, set-off or counterclaim against Landlord arising out of the Lease or in any way relating thereto, and no event has occurred and no condition exists, which with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

f.    No rent or other sum payable under the Lease has been paid more than one month in advance.

g.    The amount of the security deposit, if any, to secure Tenant's performance under the Lease is $_____.

8.    The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of either party hereto. However, Tenant agrees to execute and deliver to

ATL01/11405526v9

d-3

Lender or to any person to whom Tenant herein agrees to attorn to such other instruments as either shall request in order to effect said provisions.

9.    The agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and assigns, and, without limiting such, the agreements of Lender shall specifically be binding upon any Purchaser of the Property at foreclosure or otherwise.

10.    This Agreement may not be modified other than by an agreement in writing signed by the parties hereto or their respective successors.

11.    This Agreement may be signed in counterparts.

12.    If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions hereof shall not be affected thereby, but each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

13.    All notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against written receipt or sent by certified or registered mail, return receipt requested, postage prepaid and addressed as provided in the first paragraph of this Agreement, or at such other address as from time to time designated by the party receiving the notice.

IN WITNESS WHEREOF, Tenant and Lender have caused this instrument to be executed as of the day and year first above written.

TENANT:

_____

By:_____
Name:_____
Title:_____

LENDER:

U.S. BANK NATIONAL ASSOCIATION

By:_____
Name:_____
Title:_____

*AGREED:*

LANDLORD:

INDUSTRIAL DEVELOPMENTS
INTERNATIONAL, INC.

By:_____
Name:_____
Title:_____

**IMAGING SERVICES**

**IMAGING SERVICES**

d-4

ATL01/11405526v9

STATE OF _____
COUNTY OF _____, ss:

The foregoing instrument was acknowledged before me this _____ day of _____, 2003, by
_____, _____, of _____ _____, a
_____, on behalf of the _____.

_____
Notary Public

STATE OF _____
COUNTY OF _____, ss:

The foregoing instrument was acknowledged before me this _____ day of _____, 2003, by
_____, _____ of U.S. Bank National Association, a national banking
association, on behalf of the national banking association.

_____
Notary Public

# IMAGING SERVICES

# IMAGING SERVICES

d-5

ATL01/11405572649

**EXHIBIT G**

FORM OF MEMORANDUM OF LEASE

WHEN RECORDED RETURN TO:

Helen D. Shapiro, Esq.
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE shall evidence that there is in existence a Lease as hereinafter described. It is executed by the parties hereto for recording purposes only as to the Lease hereinafter described, and it is not intended and shall not modify, amend, supersede or otherwise effect the terms and provisions of said Lease.

| | | |
|---|---|---|
| 1. | Name of Document: | INDUSTRIAL LEASE AGREEMENT |
| 2. | | Name of Landlord:    INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation |
| 3. | Name of Tenant: | WIRELESS RETAIL, INC., a Texas corporation |
| 6. | Date of Lease: | _____, 2003 |
| 7. | Initial Lease Term: | Five years, commencing on _____, 2003 and ending _____, 2008. |
| 8. | Option to Extend: | Lessee has the option to extend the initial lease term for two (2) additional periods of five (5) years each. |
| 9 | Demised Premises: | Approximately 177,039  square feet in the building located on the real property more particularly described in Exhibit "A" attached hereto, together with the improvements thereon. |

[Signature Pages Follow]

**IMAGING**
**SERVICES**

**IMAGING**
**SERVICES**

ATL01/11405326v9

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Lease as of the day and year first written above.

Date: _____

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation

By: _____
   Name:
   Title:

Attest: _____
    Name:
    Title:

          [CORPORATE SEAL]

TENANT:

Date: _____

WIRELESS RETAIL, INC., a Texas corporation

By: _____
   Name:
   Title:

Attest: _____
    Name:
    Title:

          [CORPORATE SEAL]

# IMAGING SERVICES

## ATTESTATION

Landlord:

STATE OF

COUNTY OF

BEFORE ME, a Notary Public in and for said County, personally appeared _____ and _____, known to me to be the person(s) who, as _____ and _____ respectively, of Industrial Developments International, Inc., the corporation which executed the foregoing instrument in its capacity as Landlord, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I hereunto subscribed my name, and affixed my official seal, this _____ day of _____, 2003.


Notary Public
My Commission Expires:

Tenant:

STATE OF

COUNTY OF

BEFORE ME, a Notary Public in and for said County, personally appeared _____ and _____, known to me to be the person(s) who, as _____ and _____ respectively, of Wireless Retail, Inc., the corporation which executed the foregoing instrument in its capacity as Tenant, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I hereunto subscribed my name, and affixed my official seal, this _____ day of _____, 2003.


Notary Public
My Commission Expires:

ATL01/11405526v9

EXHIBIT H

CONVEYOR SYSTEM



**SCHEDULE B**
Special Terms and Conditions Applicable to Sublease of Equipment
described on Exhibit B to the Sublease.

The Subleased Equipment affected by this Schedule B of this Sublease is subject to that certain Master Lease Agreement between Sublessor's predecessor in interest Wireless Retail, Inc., as Lessee, and General Electric Capital Corporation as Lessor dated as of July 3, 2003. For purposes of this Schedule B, Sublandlord under the Sublease is referred to as Sublessor and Warehouse 86, LLC is referred to as Sublessee.

1. TERM:

The term of the Equipment Sublease shall commence on July 14, 2006. The Sublease with respect to Material Handling Equipment (as designated on Exhibit B to the Sublease) will expire at September 30, 2007 and the Sublease with respect to Conveyor/Racking and Miscellaneous Owned Equipment (as designated on Exhibit B to the Sublease) will expire at 12:00 midnight on September 30, 2008, or at such earlier time as the Sublease terminates.

2. TAXES:

(a) If permitted by law, Sublessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Subleased Equipment (or purchase. ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), Lessor, Sublessor or Sublessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Sublessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Sublessor. Sublessee shall promptly reimburse Sublessor (on an after tax basis) for any Taxes charged to or assessed against Sublessor. Sublessee shall show Sublessor as the owner of the Equipment on all tax reports or returns, and send Sublessor a copy of each report or return and evidence of Sublessee's payment of Taxes upon request.

(b) Sublessee's obligations, and Sublessor's rights and privileges, contained in this Section 2 shall survive the expiration or other termination of this Agreement.

3. REPORTS:

(a) If any tax or other lien shall attach to any Subleased Equipment, Sublessee will notify Sublessor in writing, within ten (10) days after Sublessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Subleased Equipment on the date of the notice

(b) Sublessee will deliver to Sublessor, Sublessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Sublessee. Sublessee will deliver to Sublessor copies of Sublessee's quarterly financial report certified by the chief financial officer of Sublessee, within ninety (90) days of the close of each fiscal quarter of Sublessee, Sublessee will deliver to Sublessor all forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Sublessor may inspect any Subleased Equipment during normal business hours after giving Sublessee reasonable prior notice.

(d) Sublessee will keep the Subleased Equipment at the Subleased Premises and will give Sublessor prior written notice of any relocation of Subleased Equipment. If Sublessor asks, Sublessee will promptly notify Sublessor in writing of the location of any Subleased Equipment

(e) If any Subleased Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000), or is otherwise involved in an accident causing personal injury or property damage. Sublessee will promptly and fully report the event to Sublessor in writing.

(f) Sublessee will promptly notify Sublessor of any change in Sublessee's state of incorporation or organization.

4. DELIVERY, USE AND OPERATION:

(a) Sublessee agrees that the Subleased Equipment will be used by Sublessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Sublessee shall not discontinue use of the Subleased Equipment.

(b) Sublessee will not move any equipment from the Subleased Premises, without the prior written consent of Sublessor.

(c) Sublessee will keep the Subleased Equipment free and clear of all liens and encumbrances other than those which result from acts of Sublessor.

(d) Sublessor shall not disturb Sublessee's quiet enjoyment of the Subleased Equipment during the term of the Agreement unless a default has occurred and is continuing under the Agreement.

5. MAINTENANCE:

(a) Sublessee will, at its sole expense, maintain each unit of Subleased Equipment in good operating order and repair, normal wear and tear excepted. The Sublessee shall also maintain the Subleased Equipment in accordance with manufacturer's recommendations Sublessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Sublessor requests, Sublessee shall affix plates, tags or other identifying labels showing ownership thereof by Sublessor. The tags or labels shall be placed in a prominent position on each unit of Subleased Equipment.

(b) Sublessee will not attach or install anything on any Subleased Equipment that will impair the originally intended function or use of such Subleased Equipment without the prior written consent of Sublessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Subleased Equipment that is not readily removable shall become the property of Sublessor, until Subleased Equipment is purchased by Subtenant in accordance with Sublease section 6. (c). All Additions shall be made only in compliance with applicable law. Sublessee will not attach or install any Subleased Equipment to or in any other personal or real property without the prior written consent of Sublessor

6. STIPULATED LOSS VALUE: If for any reason any unit of Subleased Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ("Casualty Occurrences") Sublessee shall promptly and fully notify Sublessor in writing. Sublessee shall pay Sublessor the sum of (i) the Stipulated Loss Value (as set out on the list of Stipulated Loss Values attached to the Master Lease Agreement as Exhibit C of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; (ii) all rent and which are then due under the Sublease on the Payment Date for the affected unit The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

7. INSURANCE:

(a) Sublessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Subleased Equipment from any cause whatsoever.

(b) Sublessee agrees, at its own expense, to keep all Subleased Equipment insured for such amounts and against such hazards as Sublessor may reasonably require All such policies shall be with companies, and on terms, reasonably satisfactory to Sublessor The insurance shall include coverage for damage to or loss of the Subleased Equipment; liability for personal injuries, death or property damage Sublessor shall be named as additional insured with a loss payable clause in favor of Sublessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Sublessee The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION US DOLLARS ($1,000,000.00) total liability per occurrence. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Subleased Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Sublessor, Sublessee agrees to deliver to Sublessor evidence of insurance reasonably satisfactory to Sublessor.

(c) Sublessee hereby appoints Sublessor as Sublessee's attorney-in-fact with power to appoint Lessor as a substitute attorney-in-fact, to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Sublessor shall not act as Sublessee's attorney-in-fact and will not appoint Landlord as substitute attorney in fact, unless Sublessee is in default. Sublessee shall pay any reasonable expenses of Sublessor and Lessor in adjusting or collecting insurance. Sublessee will not make adjustments with insurers except with respect to claims for damage to any unit of Subleased Equipment where the repair costs are less than the

lesser of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000.00). Sublessor or Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Subleased Equipment or any portion thereof, or (ii) satisfy any obligation of Sublessee to Sublessor under this Agreement.

## 8. RETURN OF EQUIPMENT:

(a) At the expiration of the Term of this Sublease with respect to any equipment, Sublessee shall perform any testing and repairs required to place the units of Subleased Equipment in the same condition and appearance as when received by Sublessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Subleased Equipment. If required, the units of Subleased Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Sublessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Subleased Equipment. All Subleased Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Subleased Equipment was originally intended to be used. All waste material and fluid must be removed from the Subleased Equipment and disposed of in accordance with then current waste disposal laws.

(b) Until Sublessee has fully complied with the requirements of Section 8(a) above, Sublessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term Sublessor may terminate the Sublessee's right to use the Subleased Equipment upon thirty (30) days notice to Sublessee.

(c) Sublessee shall provide to Sublessor a detailed inventory of all components of the Subleased Equipment including model and serial numbers Sublessee shall also provide an up-to-date copy of all other documentation pertaining to the Subleased Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Sublessor at least one hundred (100) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Sublessee shall make each item of the Subleased Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination for that item of Subleased Equipment, Sublessor shall provide Sublessee with reasonable notice prior to any inspection Sublessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Subleased Equipment

## 9. DEFAULT AND REMEDIES:

(a) Sublessor may in writing declare this Agreement in default if: (i) Sublessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Sublessee breaches any of its insurance obligations under Section 7 of this Schedule A; (iii) Sublessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Sublessor; (iv) any representation or warranty made by Sublessee in connection with this Agreement shall be false or misleading in any material respect; (v)

Sublessee or any guarantor or other obligor for the Sublessee's obligations hereunder ("Guarantor") becomes insolvent or ceases to do business as a going concern; (vi) any Subleased Equipment is illegally used; (vii) if Sublessee or any Guarantor is a natural person, any death or incompetence of Sublessee or such Guarantor; or (viii) a petition is filed by or against Sublessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date.

(b) After a default, at the request of Sublessor, Sublessee shall comply with the provisions of Section 8(a) Sublessee hereby authorizes Sublessor or Lessor to peacefully enter any premises where any Subleased Equipment may be add take possession of the Subleased Equipment Sublessee shall immediately pay to Sublessor without further demand as liquidated damages for loss of a bargain and not as a penalty, all rents and other sums then due under the Sublease (calculated as of the rent payment date prior to the declaration of default). Sublessor may terminate this Agreement as to any or all of the Subleased Equipment. A termination shall occur only upon written notice by Sublessor to Sublessee . Sublessor may, but shall not be required to, sell Subleased Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Subleased Equipment present at the place of sale Sublessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Subleased Equipment. Sublessor or Lessor may use Subleased premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Sublessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Subleased Equipment: then, (ii) to the extent not previously paid by Sublessee, to pay Sublessor all sums due from Sublessee under this Agreement; then (iii) to reimburse to Sublessee any sums previously paid by Sublessee as liquidated damages; and (iv) any surplus shall be retained by Sublessor. Sublessee shall immediately pay any deficiency in (i) and (ii) above.

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute Sublessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising Sublessee shall pay Sublessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Sublessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default

(d) Any default under the terms of this or any other agreement between Sublessor and Sublessee may be declared by Sublessor a default under this and any such other agreement

10. ASSIGNMENT: SUBLESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER. OR SUBLET ANY SUBLEASED EQUIPMENT OR THE INTEREST OF SUBLESSEE IN THE SUBLEASED EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR AND SUBLESSOR. Sublessor may, without the consent of Sublessee, assign the Agreement. Sublessee agrees that if Sublessee receives written notice of an assignment from Sublessor, Sublessee will pay all rent and all other amounts payable with respect to any Subleased Equipment under this Schedule A to such assignee or as instructed by Sublessor. Sublessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee Sublessee hereby waives and agrees not to assert against any

such assignee any defense, set-off, recoupment claim or counterclaim which Sublessee has or may at any time have against Sublessor for any reason whatsoever

11. NET LEASE: Sublessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Subleased Equipment is damaged or destroyed, if it is defective or if Sublessee no longer can use it. Sublessee is not entitled to reduce or set-off against rent or other amounts due to Sublessor or to anyone to whom Sublessor assigns this Agreement whether Sublessee's claim arises out of this Agreement, any statement by Sublessor, Sublessor's liability or any manufacturer's liability, strict liability, negligence or otherwise

12. INDEMNIFICATION:

(a) Sublessee hereby agrees to indemnify Lessor and Sublessor, their agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Subleased Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's or Sublessor's gross negligence or willful misconduct ("Claims").

This indemnity shall include, but is not limited to. Lessor's or Sublessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Subleased Equipment, the ownership of Subleased Equipment during the term of this Agreement, and the delivery, lease, possession. maintenance, uses, condition, return or operation of Subleased Equipment (including, without limitation. latent and other defects, whether or not discoverable by Sublessor or Sublessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Subleased Equipment sold or disposed of after use by Sublessee, any Sublessee or employees of Sublessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing

(b) Sublessor At no time during the term of this Agreement will Sublessee take or omit to take, nor will it permit any Sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or Sublessor or by this Agreement), which will result in the disqualification of any Subleased Equipment for, or recapture of, all or any portion of tax benefits accruing to Lessor with respect to the Subleased Equipment.

(c) If as a result of a breach of any representation, warranty or covenant of the Sublessee contained in the Master Lease (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Subleased Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "Loss"), then Sublessee shall pay to Lessor, as an indemnity an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were

used by Lessor in originally evaluating the transaction ("Net Economic Return") . If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted. Sublessee shall indemnify and hold Sublessor harmless from any cost or liability to Lessor under this paragraph.

.(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's and Sublessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of and shall be enforceable by Lessor, and/or Sublessor, and their successors and assigns

15. DISCLAIMER: SUBLESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE SUBLEASED EQUIPMENT WITHOUT ANY ASSISTANCE FROM SUBLESSOR, ITS AGENTS OR EMPLOYEES. SUBLESSOR DOES NOT MAKE, HAS NOT MADE, NOR. SHALL BE DEEMED TO MAKE OR. HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE SUBLEASED EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY. COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR. WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK. OR. COPYRIGHT INFRINGEMENT, OR TITLE All such risks, as between Sublessor and Sublessee, are to be borne by Sublessee. Without limiting the foregoing, Sublessor shall have no responsibility or liability to Sublessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Subleased Equipment, any inadequacy thereof any deficiency or defect (latent or otherwise) of the Subleased Equipment, or any other circumstance in connection with the Subleased Equipment; (ii) the use, operation or performance of any Subleased Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Subleased Equipment. If, and so long as, no default exists under this Agreement and the Sublease, Sublessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Sublessor may have against any Supplier of the Subleased Equipment at Sublessee's sole cost and expense, in the name of and for the account of Sublessor and/or Sublessee, as their interests may appear

16. REPRESENTATIONS AND WARRANTIES OF SUBLESSEE; Sublessee makes each of the following representations and warranties to Sublessor;

(a) Sublessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents") Sublessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdictions) where the Subleased Equipment is or is to be located;

(b) The Documents have been duly authorized, executed and delivered by Sublessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws;

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Sublessee of the Documents except such as have already been obtained;

(d) The entry into and performance by Sublessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Sublessee or any provision of Sublessee's Certificate of Incorporation or bylaws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Subleased Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Sublessee is a party;

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Sublessee, which if decided against Sublessee will have a material adverse effect on the ability of Sublessee to fulfill its obligations under this Agreement;

(f) The Subleased Equipment is and will remain tangible personal property;

(g) Each financial statement delivered to Sublessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change;

(h) Sublessee's exact legal name is as set forth in the first sentence of the Sublease  and Sublessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of the Sublease );

(i) The Subleased Equipment will at all times be used for commercial or business purposes as defined in the Sublease;

(j) Sublessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Sublessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

17. PURCHASE OPTION:

(a) Pursuant to Sublease Section 6.(c), Sublessee may at Sublease expiration purchase the Subleased Equipment on an AS IS BASIS for cash equal to the sum of Six Hundred Sixty Nine Thousand Dollars and 00/100 ($669,000.00) plus all applicable sales taxes.  Sublessee must notify Sublessor of its intent to purchase the Subleased Equipment in writing as follows; (i) Material Handling Equipment notice received by Sublandlord on or before March 15, 2007, payment of Sixty Nine Thousand Dollars and 00/100 ($69,000) plus sales tax (if applicable)

must be received by Sublandlord on or before September 15, 2007; (ii) Conveyor/Racking and Miscellaneous Owned Equipment notice received by Sublandord on or before April 15, 2008, payment of Six Hundred Thousand Dollars and 00/100 ($600,000) plus sales tax (if applicable) must be received by Sublandlord on or before August 15, 2008. If Sublessee is in default or if the Sublease has already been terminated Sublessee may not purchase the Subleased Equipment.

18. MISCELLANEOUS:

(a) SUBLESSEE AND SUBLESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN SUBLESSEE AND SUBLESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN SUBLESSEE AND SUBLESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Subleased Equipment shall remain Lessor's property unless Sublessor purchases the Subleased Equipment from Lessor and until such time Sublessee shall only have the right to use the Subleased Equipment as a Sublessee. Any cancellation or termination by Lessor of the Master Lease Agreement, any Schedule, supplement or amendment hereto, or the lease of any Subleased Equipment hereunder shall not release Sublessee from any then outstanding obligations to Sublessor hereunder. All Subleased Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Subleased Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property.

(c) If Sublessee does not comply with any provision of this Agreement, Sublessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Sublessor in effecting such compliance shall constitute additional rent due to Sublessor. Sublessee shall pay the additional rent within five (5) days after the date Sublessor sends notice to Sublessee requesting payment. Sublessee's effecting such compliance shall not be a waiver of Sublessee's default.

(d) Any rent or other amount not paid to Sublessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto.

(e) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN

ACCORDANCE WITH, THE INTERNAL. LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE SUBLEASED EQUIPMENT.

(f) Any cancellation or termination by Sublessor, pursuant to the provisions of this Agreement, supplement or amendment hereto, of the lease of any Subleased Equipment hereunder, shall not release Sublessee from any then outstanding obligations to Sublessor hereunder.

(g) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and .thereby (collectively. the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended- and shall be construed in a manner consistent with such purpose In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.