# Exhibit "B"

# Part 2 of 2

of such illegal, invalid or unenforceable clause or provision there shall be substituted a clause ... provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(c)    All rights, powers, and privileges conferred hereunder upon the parties hereto shall be cumulative, but not restrictive to those given by law.

(d)    TIME IS OF THE ESSENCE OF THIS LEASE.

(e)    No failure of Landlord or Tenant to exercise any power given Landlord or Tenant hereunder or to insist upon strict compliance by Landlord or Tenant with its obligations hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's or Tenant's rights to demand exact compliance with the terms hereof.

(f)    This Lease contains the entire agreement of the parties hereto as to the subject matter of this Lease and no prior representations, inducements, letters of intent, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force and effect. Any future amendment to this Lease must be in writing and signed by the parties hereto. The masculine (or neuter) pronoun, singular number shall include the masculine, feminine and neuter gender and the singular and plural number.

(g)    This contract shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; Tenant has a usufruct, not subject to levy and sale, and not assignable by Tenant except as expressly set forth herein.

(h)    Under no circumstances shall Tenant have the right to record this Lease or a memorandum thereof.

(i)    The captions of this Lease are for convenience only and are not a part of this Lease, and do not in any way define, limit, describe or amplify the terms or provisions of this Lease or the scope or intent thereof.

(j)    This Lease may be executed in multiple counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same agreement.

(k)    This Lease shall be interpreted under the laws of the State where the Demised Premises are located.

(l)    The parties acknowledge that this Lease is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party. No inference shall be made from any item which has been stricken from this Lease other than the deletion of such item.

36.    Special Stipulations.  The Special Stipulations, if any, attached hereto as Exhibit C, are incorporated herein and made a part hereof, and to the extent of any conflict between the foregoing provisions and the Special Stipulations, the Special Stipulations shall govern and control.

37.    Lease Date.  For purposes of this Lease, the term "Lease Date" shall mean the later date upon which this Lease is signed by Landlord and Tenant.

38.    Authority.  If Tenant is not a natural person, Tenant shall cause its corporate secretary or general partner, as applicable, to execute the certificate attached hereto as Exhibit E.  Tenant is authorized by all required corporate or partnership action to enter into this Lease and the individual(s) signing this Lease on behalf of Tenant are each authorized to bind Tenant to its terms.

39.    No Offer Until Executed.  The submission of this Lease by Landlord to Tenant for examination or consideration does not constitute an offer by Landlord to lease the Demised Premises and this Lease shall become effective, if at all, only upon the execution and delivery thereof by Landlord and Tenant.  Execution and delivery of this Lease by Tenant to Landlord constitutes an offer to lease the Demised Premises on the terms contained herein.  The offer by Tenant will be irrevocable until 6:00 p.m. Eastern time for ten (10) business days after the date of execution of this Lease by Tenant and delivery to Landlord.

40.    Memorandum of Lease.  At Tenant's request, Landlord shall execute, acknowledge and deliver to Tenant a memorandum of this Lease substantially in the form attached hereto as Exhibit "G", which shall be countersigned by Tenant and recorded in the official records of the jurisdiction in which the Demised Premises are located at Tenant's expense.

[the remainder of this page is intentionally left blank]

-20-

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands under seals, the day and year first above written.

Date: 6/17/03

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation

By: _____
Name: Timothy J. Gunter
Title: Secretary

Attest: _____
Name: G. Bryan Blasingame
Title: Assistant Secretary

[CORPORATE SEAL]

Date: 06/09/03
07/16/03

TENANT:

WIRELESS RETAIL, INC., a Texas corporation

By: _____
Name: J. DAN McMAHAN
Title: PRESIDENT + CEO

Attest: _____
Name: STUART MYRICK
Title: E.D. REALESTATE & RETAIL OPS

[CORPORATE SEAL]

-21-

ATL01/11405526v9

ATTESTATION

Landlord - Corporation:

STATE OF _Georgia_

COUNTY OF _Fulton_

    BEFORE ME, a Notary Public in and for said County, personally appeared _Tim Gunter_ _____ and _Bryan Blesingame_ _____, known to me to be the person(s) who, as _Secretary_ _____ and _Assistant Secretary_ _____, respectively, of Industrial Developments International, Inc., the corporation which executed the foregoing instrument in its capacity as Landlord, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

    IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this 17 day of _June_ _____, 20_03_

        _Mona L Kenton_
        Notary Public
        My Commission Expires: _2-8-05_

*(Notary seal: MONA KENTON, NOTARY PUBLIC, GEORGIA, GWINNETT COUNTY, EXPIRES FEB. 8, 2005)*

Tenant - Corporation:

STATE OF _Arizona_

COUNTY OF _Maricopa_

    BEFORE ME, a Notary Public in and for said County, personally appeared _____ _J. Dan McMahan_ and _____, known to me to be the person(s) who, as _President & CEO_ _____ and _____, respectively, of Wireless Retail, Inc., the corporation which executed the foregoing instrument in its capacity as Tenant, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

    IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this 9th day of _June_ _____, 20_03_.

*(Notary seal: VICTORIA PARKER, Notary Public, Maricopa Co., AZ, My Comm. Expires Sept. 22, 2003)*

        _Victoria Parker_
        Notary Public

My Commission Expires: _Sept 22, 2003_

-22-

EXHIBIT A



a-1

Exhibit A continued

Located upon the real property described as follows (the "Premises Real Property"):

Being Part of the JMH Development property as described in Book 368 Page 509 and being in the Northeast Quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, DeSoto County, Mississippi and being more particularly described as follows:

Commencing at the recognized and accepted northeast corner of the northeast quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, Desoto County, Mississippi; thence South 00 Degrees 09 Minutes 32 Seconds West with the centerline of Airways Boulevard a distance of 1529.64 feet to a point; thence North 90 Degrees 00 Minutes 00 Seconds West a distance of 1677.91 feet to a point on curve in the south line of Airport Industrial Drive, said point being the true point of beginning; thence southeastwardly along a curve to the right having a radius of 35.00 feet a distance of 54.71 feet (chord = South 44 Degrees 35 Minutes 00 Seconds East 49.31 feet, Delta = 89 Degrees 33 Minutes 34 Seconds) to a point in the west line of Market Street (proposed); thence South 00 Degrees 11 Minutes 47 Seconds West with the west line of Market Street (proposed) a distance of 467.49 feet to a point in the north line of Lot 8, Airport Industrial Park P.B.P. (proposed); thence North 89 Degrees 48 Minutes 13 Seconds West with the north line of Lot 8 (proposed) a distance of 1055.59 feet to a point in the east line of Hamilton Road; thence North 00 Degrees 24 Minutes 18 Seconds West with the east line of Hamilton Road a distance of 461.85 feet to a point of curvature; thence northeastwardly along a curve to the right having a radius of 35.00 feet a distance of 55.16 feet (chord = North 44 Degrees 44 Minutes 28 Seconds East 49.62 feet, Delta = 90 Degrees 17 Minutes 33 Seconds) to a point of tangency in the south line of Airport Industrial Drive; thence North 89 Degrees 53 Minutes 14 Seconds East with the south line of Airport Industrial Drive a distance of 983.51 feet to a point of curvature; thence southeastwardly along a curve to the right having a radius of 566.00 feet and with the south line of Airport Industrial Drive a distance of 7.40 feet (chord = South 89 Degrees 44 Minutes 16 Seconds East 7.40 feet, Delta = 00 Degrees 44 Minutes 59 Seconds) to the point of beginning and containing 12.13 acres of land.

Note:
In the event of the subdivision of the Premises Real Property and the balance of the real estate not constituting part of the Premises Real Property, the Premises Real Property shall be described in said subdivision plat as "Lot 7 in Airport Industrial Park P.B.P.".

EXHIBIT B

Preliminary Plans and Specifications/Work

## BASE BUILDING SPECIFICATIONS

| | |
|---|---|
| **BUILDING AREA:** | 246,078 square feet |
| **PREMISES:** | 177,039 square feet on the west side of the building, including approximately 11,130 square feet of office space. |
| **PREMISES CONFIGURATION:** | 702' X 250' |
| **PARKING AREA:** | Approximately 239 parking spaces provided. Note: Landlord is constructing approximately 82 of the 239 parking spaces as part of the improvements for Tenant. |
| **FIRE PROTECTION:** | ESFR sprinkler system with electric booster pump. |
| **COLUMN SPACING:** | 54' X 50' |
| **CLEAR CELING HEIGHT:** | 30' minimum |
| **WAREHOUSE HEATING AND VENTILATION:** | Gas fired Cambridge units provide heating to maintain 60° F when 15° F outside.<br><br>Ventilation provided by roof mounted exhaust fans, mechanically operated to provide three (3) air changes per hour in the warehouse area. Fire rated belt driven fans are used to minimize fan noise. Wall and roof mounted louvers provide the make-up air. |
| **FLOOR SPECIFICATIONS:** | 6" concrete slab on soil cement treated grade, 4,000 PSI. The floor is sealed with a water based penetrating sealer (Dayton Superior J-17 or equal). Construction specifications are $F_f 35$, $F_l 25$. |
| **ROOF AND DRAINS:** | EPDM single ply, reinforced membrane with minimum thickness of 45 mils. Roof is black, mechanically fastened, and insulated to R-10 with a ten year warranty. The roof drains to the rear to a gutter and downspouts. |
| **EXTERIOR WALLS:** | Painted concrete tilt wall with architectural reveals. |
| **INTERIOR WALLS:** | All interior warehouse walls will be painted white. |
| **EXIT DOORS:** | Landlord shall provide sufficient exit man doors as required by code, subject to review of tenant's equipment layout. |
| **SECURITY LIGHTING:** | Car parking and truck court lighting to be provided to 1.5 FC average by pole and building mounted fixtures. |
| **TRUCK LOADING:** | Thirty-six (36) manually operated dock high loading doors (9'x10' doors; 4' above grade). |

b-1

One manually operated grade level door provided (14'X16').

| | |
|---|---|
| **TRUCK COURT:** | 130' total (50' concrete paving on compacted subgrade reinforced with wire mesh. |
| **CONCRETE APRON SPECIFICATIONS:** | 7", 3,000 PSI concrete paving on compacted subgrade reinforced with wire mesh. |
| **LANDSCAPING:** | Class A landscaping including automatic irrigation system. |
| **SIGNAGE:** | Tenant may install building or ground mounted signage subject to Landlord's approval of design and location. |
| **CODE COMPLIANCE:** | Building and improvements will meet all code requirements including A.D.A. guidelines, as required at time of initial occupancy by Tenant. |

**TENANT IMPROVEMENTS**

| | |
|---|---|
| **POWER:** | 277/480 volt, three phase, four wire; amperage to be provided on a design/build basis. Tenant requires 225 amps at 480 volt for Tenant's equipment. Distribution and hookup is by Tenant. |
| **BATTERY AREA:** | Power for ten (10) disconnects at 480 volt, 30 amps provided. Distribution and hookup by Tenant. |
| | Plumbing provided for eyewash, floor drain, and hose bib in the battery charging area. |
| **DOCK EQUIPMENT:** | Landlord to install, mechanical dock levelers (25,000 pound equal to RITE-HITE), dock lights, dock seals (equal to Frommelt), track guards and bumpers on twenty-nine (29) doors. One of the dock doors shall be used for a trash compactor, furnished and installed by Tenant. |
| **LIGHTING:** | Warehouse: 400 watt metal halide fixtures to provide 30 foot-candles at the warehouse floor. |
| | In 8,000 SF of processing and pick areas, fluorescent fixtures will be dropped from the rack structure to approximately 14' a.f.f. to provide 100 foot-candles. |
| | Offices: Standard UV-type ballasts providing 100 foot-candles (part of office allowance). |
| **STRUCTURAL SUPPORT FOR CONVEYOR SYSTEM:** | No structural enhancements have been included for Tenant's equipment. |

ATL01/11405526v9

## EXHIBIT C

### Special Stipulations

The Special Stipulations set forth herein are hereby incorporated into the body of the lease to which these Special Stipulations are attached (the "Lease"), and to the extent of any conflict between these Special Stipulations and the preceding language, these Special Stipulations shall govern and control.

1.    SNDA.    Simultaneously with the execution of this Lease, Landlord and Tenant shall execute a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as Exhibit "F". Notwithstanding anything to the contrary contained in Section 24 of this Lease, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien and security title of any Mortgage created after the Lease Date provided that the holder of said Mortgage agrees not to disturb Tenant's possession of the Demised Premises so long as Tenant is not in default hereunder, as evidenced by a subordination and non-disturbance agreement signed by said holder which agreement may include (a) the conditions contained in Section 24(e) of this Lease, (b) a requirement that said holder be given notice and opportunity to cure a landlord default and (c) other provisions customarily required by lenders. Tenant shall promptly execute such a subordination and non-disturbance agreement upon Landlord's request.

2.    Construction of Demised Premises.

(a)    Notwithstanding the provisions of Section 17 of this Lease, Landlord shall be responsible for the cost of the construction of the portion of the Improvements designated as office improvements, which shall include restrooms and break rooms whether or not attached to the office space (collectively, the "Office Improvements") only up to an amount equal to $499,936 (the "Tenant Allowance"). Prior to commencement of construction of the Office Improvements, Landlord shall provide to Tenant a Work Order Agreement setting forth the amount of the hard costs of the Office Improvements, together with an administrative and coordination fee charged by Landlord against the Tenant Allowance equal to five percent (5%) of the total cost to complete the design, permit process and construction of the Office Improvements. Tenant shall have five (5) business days after receipt of the Work Order Agreement in which to review and to give to Landlord written notice of its approval of the Work Order Agreement or its requested changes to the plans and specifications for the Office Improvements in order that the cost of the Office Improvements may be revised. If Tenant fails to approve or request changes to the Work Order Agreement within five (5) business days after its receipt thereof, then Tenant shall be deemed to have approved the Work Order Agreement and the same shall thereupon be final. If Tenant requests any changes to the Work Order Agreement, Landlord shall make those changes which are reasonably requested by Tenant and shall within ten (10) days of its receipt of such request submit the revised portion of the Work Order Agreement to Tenant. In no event shall the cost of constructing the demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant be included in the calculation of the cost of the Office Improvements. In the event the Work Order Agreement, as approved (or deemed approved) by Tenant provides that the construction of the Office Improvements will cost in excess of the amount of the Tenant Allowance, Tenant agrees to pay such excess amount within ten (10) calendar days following Substantial Completion of the Office Improvements. Failure by Tenant to make such payment to Landlord shall be a default hereunder. If Tenant does not use the full amount of the Tenant Allowance, the difference between the amount of the Tenant Allowance actually used and the full Tenant Allowance is hereinafter referred to as the "Allowance Savings". Landlord shall, at its option either (a) credit the amount of the Allowance savings against Tenant's first installment of Base Rent or (b) pay the amount of the Allowance Savings directly to Tenant within a reasonable amount of time following Landlord's determination of the amount such Allowance Savings.

(b)    For purposes of this Special Stipulation, the cost of the construction of the Office Improvements shall be deemed to include, but not be limited to, the cost of the Plans and Specifications related to the Office Improvements, permits related solely to the Office Improvements and all tenant build-out related to the Office Improvements, including, without limitation, demising walls (other than demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant), utilities, and portions of the heating, ventilating and air conditioning system servicing the Office Improvements.

3.    Right of First Offer to Lease.    So long as the Lease is in full force and effect and no Event of Default has occurred and is then continuing and no facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, Landlord hereby grants to Tenant a right of first offer (the "Right of First Offer") to expand the Demised Premises to include that 40,500 square foot area labeled on Exhibit A attached hereto (the "Offer Space") subject to the terms and conditions set forth herein.

(a)    Tenant's and any guarantor's then current financial condition, as revealed by its most current financial statements (which shall include quarterly and annual financial statements, including income statements, balance sheets, and cash flow statements, as required by Landlord), must demonstrate either that each of Tenant's and such guarantor's net worth is at least equal to its net worth at the time the Lease was signed; or that Tenant and such guarantor otherwise meet financial criteria acceptable to Landlord.

c-1

ATL01/11405526v9

(b)     The term of the Right of First Offer shall commence on the Lease Commencement Date and continue throughout the initial Term (the "First Offer Period"), unless sooner terminated pursuant to the terms hereof.

(c)     Subject to the other terms of this Right of First Offer, after any part of the Offer Space has or will "become available" (as defined herein) for leasing by Landlord, Landlord shall not, during the term of the Right of First Offer, lease to a third party that available portion of the Offer Space (the "Available Offer Space") without first offering Tenant the right to lease such Available Offer Space as set forth herein.

(i)     Space shall be deemed to "become available" when Landlord desires to lease all or a portion of the Offer Space.

(ii)    Notwithstanding subsection c(i) above, Offer Space shall not be deemed to "become available" if the space is (a) assigned or subleased by the current tenant of the space; or (b) re-let by the current tenant or permitted subtenant of the space by renewal, extension, or renegotiation or (c) leased on a temporary basis for a period of less than twelve (12) months without any right to extend.

(d)     Consistent with subsection (c), Landlord shall not lease any such Available Offer Space to a third party unless and until Landlord has first offered the Available Offer Space to Tenant in writing (the "Offer", the date of presentment of such Offer shall hereinafter be referred to as the "Offer Date"). The Offer shall contain (i) a description of the Available Offer Space (which description shall include the square footage amount and location of such Available Offer Space) and an attached floor plan that shows the Available Offer Space; (ii) the date on which Landlord expects the Available Offer Space to become available; (iii) the base rent for the Available Offer Space; and (iv) the term for the Available Offer Space (which shall be no less than the remainder of the Term of this Lease then in effect). Upon receipt of the Offer, Tenant shall have the right, for a period of five (5) calendar days after receipt of the Offer, to exercise the Right of First Offer by giving Landlord written notice that Tenant desires to lease the Available Offer Space at the base rent and upon the special terms and conditions as are contained in the Offer.

(e)     If, within such five (5)-day period, Tenant exercises the Right of First Offer, then Landlord and Tenant shall amend the Lease to include the Available Offer Space subject to the same terms and conditions as the Lease, as modified, with respect to the Available Offer Space, by the terms and conditions of the Offer. If this Lease is guaranteed now or at anytime in the future, Tenant simultaneously shall deliver to Landlord an original, signed, and notarized reaffirmation of each Guarantor's personal guaranty, in form and substance acceptable to Landlord.

(f)     If, within such five (5)-day period, Tenant declines or fails to exercise the Right of First Offer, Landlord shall then have the right to lease the Available Offer Space in portions or in its entirety to a third party, unrelated to and unaffiliated with Landlord, at any time within twelve (12) months after the Offer Date, without regard to the restrictions in this Right of First Offer and on whatever terms and conditions Landlord may decide in its sole discretion, provided the base rent (as adjusted to account for any changes in the tenant improvement allowance), additional rent and any rent concessions are not substantially more favorable to such tenant than those set forth in the Offer, without again complying with all the provisions of this Right of First Offer. In the event Landlord does not lease the Available Offer Space to a third party within twelve (12) months after the Offer Date, Landlord shall thereafter be required to again comply with the provisions of this Special Stipulation 3 prior to leasing the Available Offer space to a Third Party.

(g)     If Landlord does lease all or any portion of the Available Offer Space to such a third party after complying with the terms and conditions of this Right of First Offer, then the Right of First Offer shall terminate, and Tenant shall have no further Right of First Offer.

(h)     If Landlord desires to lease the Available Offer Space at a base rent rate substantially less than the base rent rate set forth in the Offer (provided, that if the base rent rate is at least ninety percent (90%) of the base rent rate set forth in the Offer, said base rent rate shall be conclusively deemed to be not substantially less than the base rent rate set forth in the Offer), or if Landlord desires to materially alter or modify the special terms and conditions of the Offer, if any, Landlord shall be required to present the altered or modified Offer to Tenant pursuant to this Right of First Offer, in the same manner that the original Offer was submitted to Tenant.

(i)     This Right of First Offer is personal to Wireless Retail, Inc. and shall become null and void upon the occurrence of an assignment of Tenant's interest in the Lease or a sublet of all or a part of the Demised Premises.

(j)     This Right of First Offer shall be null and void if Tenant is a holdover Tenant pursuant to Section 30(c) of the Lease at the time Landlord is required to notify Tenant of the Offer or at the time Tenant exercises its Right of Offer.

4.      Option to Extend Term.

c-2

(a)    Landlord hereby grants to Tenant two (2) consecutive options to extend the Term for a period of five (5) years each time, each such option to be exercised by Tenant giving written notice of its exercise to Landlord in the manner provided in this Lease at least one hundred eighty (180) days prior to (but not more than two hundred ten (210) days prior to) the expiration of the Term, as it may have been previously extended. No extension option may be exercised by Tenant if an Event of Default has occurred and is then continuing or any facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default either at the time of exercise of the option or at the time the applicable Term would otherwise have expired if the applicable option had not been exercised.

(b)    If Tenant exercises its options to extend the Term, Landlord shall, within thirty (30) days after the receipt of Tenant's notice of exercise, notify Tenant in writing of Landlord's reasonable determination of the Base Rent for the Demised Premises for the applicable five (5) year option period (including any space added thereto pursuant to Special Stipulation 3), which amount shall be based on the greater of (i) the market rate for such space or (ii) the Annual Base Rent rate to be in effect immediately prior to the commencement of such option period. Tenant shall have thirty (30) days from its receipt of Landlord's notice to notify Landlord in writing that Tenant does not agree with Landlord's determination of the Base Rent and that Tenant elects to determine the Prevailing Market Rate (as defined and calculated below). If Tenant does not notify Landlord of such election within thirty (30) days of its receipt of Landlord's notice, Base Rent for the Demised Premises for the applicable extended term shall be the Base Rent set forth in Landlord's notice to Tenant. The phrase "Prevailing Market Rate" shall mean the then prevailing market rate for base minimum rental calculated on a per square foot basis for leases covering buildings comparable to the Building (as adjusted for any variances between such buildings and the Building) located in the area of Southaven, Mississippi (hereinafter referred to as the "Market Area"). The Prevailing Market Rate shall be determined by an appraisal procedure as follows:

In the event that Tenant notifies Landlord that Tenant disagrees with Landlord's determination of the market rate and that Tenant elects to determine the Prevailing Market Rate, then Tenant shall specify, in such notice to Landlord, Tenant's selection of a real estate appraiser who shall act on Tenant's behalf in determining the Prevailing Market Rate. Within twenty (20) days after Landlord's receipt of Tenant's selection of a real estate appraiser, Landlord, by written notice to Tenant, shall designate a real estate appraiser, who shall act on Landlord's behalf in the determination of the Prevailing Market Rate. Within twenty (20) days of the selection of Landlord's appraiser, the two (2) appraisers shall render a joint written determination of the Prevailing Market Rate, which determination shall take into consideration any differences between the Building and those buildings comparable to the Building located in the Market Area, including without limitation age, location, setting and type of building. If the two (2) appraisers are unable to agree upon a joint written determination within said twenty (20) day period, the two appraisers shall select a third appraiser within such twenty (20) day period. Within twenty (20) days after the appointment of the third appraiser, the third appraiser shall render a written determination of the Prevailing Market Rate by selecting, without change, the determination of one (1) of the original appraisers as to the Prevailing Market Rate and such determination shall be final, conclusive and binding. All appraisers selected in accordance with this subparagraph shall have at least ten (10) years prior experience in the commercial leasing market of the Market Area and shall be members of the American Institute of Real Estate Appraisers or similar professional organization. If either Landlord or Tenant fails or refuses to select an appraiser, the other appraiser shall alone determine the Prevailing Market Rate. Landlord and Tenant agree that they shall be bound by the determination of Prevailing Market Rate pursuant to this paragraph. Landlord shall bear the fee and expenses of its appraiser; Tenant shall bear the fee and expenses of its appraiser; and Landlord and Tenant shall share equally the fee and expenses of the third appraiser, if any.

Notwithstanding anything to the contrary contained herein, in the event the Prevailing Market Rate as determined herein is less than the Annual Base Rent to be in effect immediately prior to the commencement of such option period, the Base Rent during the applicable extension Term shall equal the Annual Base Rent in effect during the last year of the Term.

(c)    Except for the Base Rent, which shall be determined as set forth in subparagraph (b) above, leasing of the Demised Premises by Tenant for the applicable extended term shall be subject to all of the same terms and conditions set forth in this Lease, including Tenant's obligation to pay Tenant's share of Operating Expenses as provided in this Lease; provided, however, that any improvement allowances, termination rights, rent abatements or other concessions applicable to the Demised Premises during the initial Term shall not be applicable during any such extended term, nor shall Tenant have any additional extension options unless expressly provided for in this Lease. Landlord and Tenant shall enter into an amendment to this Lease to evidence Tenant's exercise of its renewal option. If this Lease is guaranteed, it shall be a condition of Landlord's granting the renewal that Tenant deliver to Landlord a reaffirmation of the guaranty in which the guarantor acknowledges Tenant's exercise of its renewal option and reaffirms that the guaranty is in full force and effect and applies to said renewal.

5.    Tenant's Early Occupancy. If and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of the Demised Premises shown on Exhibit "A-1" attached hereto and incorporated herein (the "First Entry Space") on the date which is the later of (a) July 1, 2003 or (b) the twenty-fifth (25th) day following the Approval Date (as defined in Section 17 of this

Lease) (such date of early entry to be referred to as the "First Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the First Entry Space for occupancy; provided however, that the First Entry Date shall be postponed by one (1) day for every day of Tenant Delay or delay caused by force majeure (collectively, "Excused Delay"). Further, if and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of Demised Premises shown on Exhibit "A-2" attached hereto and incorporated herein (the "Second Entry Space") on the date which is the thirtieth (30th) day following the First Entry Date (the "Second Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the Demised Premises for occupancy; provided that the Second Entry Date shall be postponed by one (1) day for every day of Excused Delay. The provisions of this Special Stipulation Number 5 are subject to the following: during any period of early entry, (i) Tenant shall comply with all terms and conditions of this Lease other than the obligation to pay Base Rent, (ii) Tenant shall not interfere with Landlord's completion of the Demised Premises, (iii) Tenant shall not begin operation of its business and (iv) Tenant shall be responsible for payment of all costs and charges for gas, steam, electricity, fuel, light, power, telephone, heat and any other utility or service used or consumed by Tenant or Tenant's agents or employees (but not by Landlord or Landlord's agents or contractors in Landlord's completion of the Improvements pursuant to Section 17 of this Lease) in or servicing the Demised Premises during such period of early entry. Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant during the early occupancy period.

In the event that Landlord does not allow access to Tenant of the First Entry Space by the First Entry Date or the Second Entry Space by the Second Entry Date, as extended by Excused Delay (each day after the First Entry Date or Second Entry Date for which Landlord does not grant Tenant access to the applicable space shall be hereinafter referred to as a "Day of Delay"), from and after the Base Rent Commencement Date, Tenant shall receive a credit against Base Rent equal to one day of Base Rent for each Day of Delay until said credit is fully realized by Tenant, as its sole remedy.

6.   Building Compliance with Laws.  Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, the design and construction of the Improvements in accordance with the Plans and Specifications will materially comply with all applicable federal, state, county and municipal laws, ordinances and codes in effect as of the Lease Date, excepting therefrom any requirements related to Tenant's specific use of the Demised Premises. Further, subject to the last sentence hereof, Landlord, at its sole cost and expense, shall be responsible for causing the Improvements to comply with Title III of the Americans With Disabilities Act of 1990 (the "ADA"), or the regulations promulgated thereunder (as said Title III is in effect and pertains to the general public), as of the Lease Commencement Date. During the Term, Tenant hereby agrees that it shall be responsible, at its sole cost and expense, for (a) causing the Building, the Building Common Area and the Demised Premises to comply with Title III of the ADA as a result of (i) any special requirements of the ADA relating to accommodations for individual employees, invitees and/or guests of Tenant and (ii) any improvements or alterations made to the Demised Premises by Tenant, and (b) complying with all obligations of Tenant under Title I of the ADA.

7.   Road Access.  Landlord represents and warrants to Tenant that, as of the First Entry Date, Tenant will have temporary access to Hamilton Road for purposes of ingress and egress to and from the Building and that, as of the Lease Commencement Date, Tenant will have permanent access to Hamilton Road for such purposes.

8.   Additional Operating Expense Exclusions.

The following items shall be excluded from Operating Expenses:

a.   Expenditures for capital improvements except as expressly allowed under the Lease;
b.   Tenant improvements expenses for other tenants of the Building;
c.   The cost of any work performed for, or equipment furnished to, any tenant of the Building to the extent performed for, or furnished to Tenant;
d.   The cost of any repair in accordance with the casualty and condemnation sections of this Lease to the extent covered by insurance or condemnation proceeds;
e.   Any expenses for repairs and maintenance which are actually covered by warranty;
f.   Charges for electricity, steam and other utilities which are separately reimbursed by any tenant;
g.   Interest and penalties due to late payment of any amounts owed by Landlord, except as may be incurred as a result of Tenant's failure to timely pay its portion of such amounts or as a result of Landlord's contesting such amounts in good faith; and
h.   The cost of correcting defects covered by Landlord's warranty contained in Section 17(e) of this Lease, within such warranty period.
i.   Management fees, royalties or other fees charged for the management of the Property in excess of 3 1/2% per annum.

9.   Inspection Rights.

a.   Landlord's books and records pertaining to the calculation of Operating Expenses for any calendar year within the Term may be inspected by Tenant (or by an independent certified accountant) at

c-4

Tenant's expense, at any reasonable time within sixty (60) days after Tenant's receipt of Landlord's statement for Operating Expenses; provided that Tenant shall give Landlord not less than fifteen (15) days' prior written notice of any such inspection. If Landlord and Tenant agree that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year was incorrect, the parties shall enter into a written agreement confirming such error and then, and only then, Tenant shall be entitled to a credit against future Base Rent for said overpayment (or a refund of any overpayment if the Term has expired) or Tenant shall pay to Landlord the amount of any underpayment, as the case may be. If Tenant's inspection proves that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year resulted in an overpayment by more than fifteen percent (15%) of Tenant's share, Landlord shall also pay the reasonable fees and expenses of Tenant's independent professionals, if any, conducting said inspection.

      b.    All of the information obtained through Tenant's inspection with respect to financial matters (including, without limitation, costs, expenses, income) and any other matters pertaining to Landlord, the Demised Premises, the Building and/or the Project as well as any compromise, settlement, or adjustment reached between Landlord and Tenant relative to the results of the inspection shall be held in strict confidence by Tenant and its officers, agents, and employees; and Tenant shall cause its independent professionals and any of its officers, agents or employees to be similarly bound. The obligations within this subsection (b) shall survive the expiration or earlier termination of the Lease.

      10.    Contesting of Taxes. If Landlord does not elect to contest real estate taxes applicable to the Building and the Building Common Area for a particular tax period during the Term, Tenant may request that Landlord contest such taxes by written notice to Landlord given, if at all, within sixty (60) days following Tenant's receipt of the statement required to be delivered by Landlord pursuant to Section 6(a) of the Lease covering the tax period in question. Landlord may then elect either to contest such taxes or to allow Tenant to so contest such taxes subject to Landlord's reasonable approval of the firm or individual hired to conduct such contest. In either case, Tenant shall be responsible for all costs of contesting such taxes to the extent that said costs exceed the savings realized by such contest. Any resulting savings over and above the cost of such contest shall be distributed on a prorata basis between Landlord, Tenant and the other tenants of the Building that contributed toward payment of the applicable tax bill. Tenant shall have the right to seek an abatement of real estate taxes and other tax incentives. In the event Tenant receives an abatement or reduction in real estate taxes which is attributable solely to the Demised Premises, any such savings shall be credited solely to Tenant's share of Operating Expenses.

      11.    Landlord Insurance.

      (a)    Landlord shall maintain at all times during the Term of this Lease, with such deductible as Landlord in its sole judgment determines advisable, insurance on the "Special Form" or equivalent form on a Replacement Cost Basis against loss or damage to the Building. Such insurance shall be in the amount of 80% of the replacement value of the Building (excluding all fixtures and property required to be insured by Tenant under this Lease).

      (b)    Landlord shall maintain at all times during the Term commercial general liability insurance with limits at least equal to the amount as Tenant is required to maintain pursuant to Section 8(a)(i) of this Lease.

      12.    Confidentiality.

      (a)    Landlord will not disclose any aspect of Tenant's financial statements which Tenant designates to Landlord as confidential except (a) to Landlord's lenders or prospective purchasers or joint venture partners of or with respect to the Property, (b) in litigation between Landlord and Tenant, and/or (c) if required by Law.

      (b)    Landlord and Tenant agree to hold the terms of this Lease in strict confidence, and will not disclose, except for any disclosure required by Laws, such terms to any person other than the respective partners, directors, officers, employees, attorneys, accountants or financing sources of Landlord and Tenant, without the prior written consent of the other party. Notwithstanding the foregoing, Landlord may disclose any information in public notices required by Laws or otherwise traditionally made by entities similar to Landlord and the financial community.

      13.    Disclosure of Underlying Title Exceptions; Description of Property. Landlord has provided to Tenant a true and correct copy of its title insurance policy covering the property on which the Building is located, as well as Landlord's most current ALTA survey of such property.

EXHIBIT D

Rules And Regulations

These Rules and Regulations have been adopted by Landlord for the mutual benefit and protection of all the tenants of the Building in order to insure the safety, care and cleanliness of the Building and the preservation of order therein.

    1.    The sidewalks shall not be obstructed or used for any purpose other than ingress and egress. No tenant and no employees of any tenant shall go upon the roof of the Building without the consent of Landlord.

    2.    No awnings or other projections shall be attached to the outside walls of the Building.

    3.    The plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags or other substances, including Hazardous Substances, shall be thrown therein.

    4.    No tenant shall cause or permit any objectionable or offensive odors to be emitted from the Demised Premises.

    5.    The Demised Premises shall not be used for (i) an auction, "fire sale", "liquidation sale", "going out of business sale" or any similar such sale or activity, (ii) lodging or sleeping, or (iii) any immoral or illegal purposes.

    6.    No tenant shall make, or permit to be made any unseemly or disturbing noises, sounds or vibrations or disturb or interfere with tenants of this or neighboring buildings or premises or those having business with them.

    7.    Each tenant must, upon the termination of this tenancy, return to the Landlord all keys of stores, offices, and rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys so furnished, such tenant shall pay to the Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

    8.    Canvassing, soliciting and peddling in the Building and the Project are prohibited and each tenant shall cooperate to prevent such activity.

    9.    Landlord will direct electricians as to where and how telephone or telegraph wires are to be introduced. No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Demised Premises shall be subject to the approval of Landlord.

    10.    Parking spaces associated with the Building are intended for the exclusive use of passenger automobiles. Except for intermittent deliveries, no vehicles other than passenger automobiles may be parked in a parking space (other than spaces expressly designated on the Plans for truck parking) without the express written permission of Landlord. Trucks may be parked only in truck dock positions and in other paved areas expressly designated for such purpose in the Plans. Trailers may be parked only in paved areas expressly designated for such purpose in the Plans. Neither trucks nor trailers may be parked or staged in (i) areas adjacent to truck docks, serving any portion of the Building, which are intended by Landlord for truck maneuvering or (ii) any driveway, drive aisle or other paved area which provides ingress or egress for cars or trucks to or from any portion of the Building or any street adjoining the Building.

    11.    No tenant shall use any area within the Project for storage purposes other than the interior of the Demised Premises.

d-1

EXHIBIT E

CERTIFICATE OF AUTHORITY
CORPORATION

The undersigned, Secretary of WIRELESS RETAIL, INC., a _Texas_ corporation ("Tenant"), hereby certifies as follows to INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation ("Landlord"), in connection with Tenant's proposed lease of premises in Building C, at Airways Distribution Center, DeSoto County, Mississippi (the "Premises"):

1.    Tenant is duly organized, validly existing and in good standing under the laws of the State of _Texas_, and duly qualified to do business in the State of Mississippi.

2.    That the following named persons, acting individually, are each authorized and empowered to negotiate and execute, on behalf of Tenant, a lease of the Premises and that the signature opposite the name of each individual is an authentic signature:

| J. DAN McMAHAN | PRESIDENT & CEO | |
|---|---|---|
| (name) | (title) | (signature) |
| | | |
| (name) | (title) | (signature) |
| | | |
| (name) | (title) | (signature) |

3.    That the foregoing authority was conferred upon the person(s) named above by the Board of Directors of Tenant, at a duly convened meeting held _____, 2003.

Secretary

[CORPORATE SEAL]

ATL01/11405526v9

EXHIBIT F

SNDA

### SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT
(Commercial Real Estate)

THIS AGREEMENT, made effective as of the _____ day of _____, 2003, by and between _____, a _____ ("Tenant"), with its principal offices at _____, and U.S. BANK NATIONAL ASSOCIATION, a national banking association ("Lender"), whose mailing address is c/o Commercial Real Estate Loan Department, 150 4th Avenue North, CN-TN-PL02, Nashville, TN 37219, and/or its participants, successors or assigns.

### W I T N E S S E T H:

A.   WHEREAS, by Lease dated _____, 200__ (hereinafter referred to as the "Lease"), Industrial Developments International, Inc., a Delaware corporation ("Landlord"), leased to Tenant a portion of the building located at and commonly known as _____ (such building and the land on which the building is located being called the "Property," and the portions of such building leased to Tenant pursuant to the Lease being called the "Premises"); and

B.   WHEREAS, Landlord has obtained a loan from Lender secured by, among other things, a deed of trust on the Property (the "Deed of Trust"), and as a condition of such loan, Landlord is required to obtain from Tenant certain written agreements; and

C.   WHEREAS, Tenant and Lender desire hereby to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of the following agreement.

NOW THEREFORE, for and in consideration of the premises and of the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tenant and Lender agree as follows:

1.   The Lease and the rights of Tenant thereunder are and shall be subject and subordinate to the lien of the Deed of Trust and to all of the terms, conditions and provisions thereof, to all advances made or to be made thereunder, to the full extent of the principal sum, interest thereon and other amounts from time to time secured thereby, and to any renewal, substitution, extension, modification or replacement thereof, including any increase in the indebtedness secured thereby or any supplements thereto. In the event that Lender or any other person (Lender, any other such person and their successors and assigns being referred to herein as the "Purchaser") acquires title to the Property pursuant to the exercise of any remedy provided for in the Deed of Trust or by reason of the acceptance of a deed in lieu of foreclosure, Tenant covenants and agrees to attorn to and recognize and be bound to Purchaser as its new landlord, and subject to the other terms, provisions and conditions of this Agreement, the Lease shall continue in full force and effect as a direct lease between Tenant and Purchaser.

2.   So long as the Lease is in full force and effect and Tenant shall not be in default under any provision of the Lease or this Agreement, and no event has occurred which has continued to exist for a period of time (after notice, if any, required by the Lease) as would entitle Landlord to terminate the Lease or would cause, without further action by Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder:

a.   the right of possession of Tenant to the Property shall not be terminated or disturbed by any steps or proceedings taken by Lender in the exercise of any of its rights under the Deed of Trust;

b.   the Lease shall not be terminated or affected by said exercise of any remedy provided for in the Deed of Trust, and Lender hereby covenants that any sale by it of the Property pursuant to the exercise of any rights and remedies under the Deed of Trust or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder.

3.   In no event shall Lender or any other Purchaser be:

a.   liable for any act or omission of any prior landlord;

b.   liable for the return of any security deposit which has not been delivered to the Purchaser;

    c.     subject to any offsets or defenses which Tenant might have against any prior landlord;

    d.     bound by any payment of rent or additional rent which Tenant might have paid to any prior landlord for more than the current month.

    4.     Tenant agrees to give prompt written notice to Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or abate the rent payable thereunder, and agrees that notwithstanding any provision of the Lease, no notice of cancellation thereof shall be effective unless Lender has received the notice aforesaid and has failed within 30 days of the date of receipt thereof to cure, or if the default cannot be cured within 30 days, has failed to commence and to pursue diligently the cure of Landlord's default which gave rise to such right of cancellation or abatement. Tenant further agrees to give such notices to any successor-in-interest of Lender, provided that such successor-in-interest shall have given written notice to Tenant of its acquisition of Lender's interest in the Deed of Trust and designated the address to which such notices are to be sent.

    5.     Tenant acknowledges that Landlord has executed and delivered to Lender an Assignment of Rents and Leases conveying the rentals under the Lease as additional security for said loan, and Tenant hereby expressly consents to and recognizes such Assignment, and agrees to pay the rent to Lender or its nominee whenever Lender claims or requests the rent under the terms of said Assignment.

    6.     Tenant agrees that it will not, without the prior written consent of Lender, do any of the following, and any such purported action without such consent shall be void as against Lender:

    a.     make a prepayment in excess of one month of rent under the Lease;

    b.     subordinate or permit subordination of the Lease to any lien subordinate to the Deed of Trust; or

    c.     make or enter into any amendment or modification or termination of the Lease.

    7.     Tenant agrees to certify in writing to Lender, upon request, whether or not any default on the part of Landlord exists under the Lease and the nature of any such default. Tenant states that as of this date, the Lease is in full force and effect, without modification, a copy of said Lease being attached hereto. Tenant further states as follows:

    a.     Tenant is the tenant under the Lease for the Premises, which contain approximately _____ rentable square feet of space.

    b.     Tenant has accepted possession of the Premises pursuant to the Lease. The Lease term commenced on _____, 200__. The termination date of the Lease term, excluding renewals and extensions, is _____, 20__. Tenant has the right to extend or renew the Lease for _____ period(s) of _____ years.

    c.     Any improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant in all respects, and Landlord has fulfilled all of its duties under the Lease.

    d.     The Lease has not been assigned, modified, supplemented or amended in any way by Tenant. The Lease constitutes the entire agreement between the parties and there are no other agreements concerning the Premises, and Tenant is not entitled to receive any concession or benefit (rental or otherwise) or other similar compensation in connection with renting the Premises other than as set forth in the Lease.

    e.     The Lease is valid and in full force and effect, and, to the best of Tenant's knowledge, no party thereto is presently in default thereunder. Tenant has no defense, set-off or counterclaim against Landlord arising out of the Lease or in any way relating thereto, and no event has occurred and no condition exists, which with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

    f.     No rent or other sum payable under the Lease has been paid more than one month in advance.

    g.     The amount of the security deposit, if any, to secure Tenant's performance under the Lease is $_____.

    8.     The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of either party hereto. However, Tenant agrees to execute and deliver to

Lender or to any person to whom Tenant herein agrees to attorn to such other instruments as either shall request in order to effect said provisions.

9.   The agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and assigns, and, without limiting such, the agreements of Lender shall specifically be binding upon any Purchaser of the Property at foreclosure or otherwise.

10.   This Agreement may not be modified other than by an agreement in writing signed by the parties hereto or their respective successors.

11.   This Agreement may be signed in counterparts.

12.   If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions hereof shall not be affected thereby, but each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

13.   All notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against written receipt or sent by certified or registered mail, return receipt requested, postage prepaid and addressed as provided in the first paragraph of this Agreement, or at such other address as from time to time designated by the party receiving the notice.

IN WITNESS WHEREOF, Tenant and Lender have caused this instrument to be executed as of the day and year first above written.

TENANT:

By:_____
Name:_____
Title:_____

LENDER:

U.S. BANK NATIONAL ASSOCIATION

By:_____
Name:_____
Title:_____

*AGREED:*

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC.

By:_____
Name:_____
Title:_____

d-4

ATL01/11405526v9

STATE OF _____
COUNTY OF _____, ss:

    The foregoing instrument was acknowledged before me this _____ day of _____, 2003, by
_____,        of    _____,     a
_____, on behalf of the _____.

                                   _____
                                   Notary Public

STATE OF _____
COUNTY OF _____, ss:

    The foregoing instrument was acknowledged before me this _____ day of _____, 2003, by
_____, _____ of U.S. Bank National Association, a national banking
association, on behalf of the national banking association.

                                     _____
                                   Notary Public

EXHIBIT G

FORM OF MEMORANDUM OF LEASE

WHEN RECORDED RETURN TO:

Helen D. Shapiro, Esq.
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona  85016

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE shall evidence that there is in existence a Lease as hereinafter described.  It is executed by the parties hereto for recording purposes only as to the Lease hereinafter described, and it is not intended and shall not modify, amend, supersede or otherwise effect the terms and provisions of said Lease.

| | | |
|---|---|---|
| 1. | Name of Document: | INDUSTRIAL LEASE AGREEMENT |
| 2. | | Name of Landlord:        INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation |
| 3. | Name of Tenant: | WIRELESS RETAIL, INC., a Texas corporation |
| 6. | Date of Lease: | _____, 2003 |
| 7. | Initial Lease Term: | Five years, commencing on _____, 2003 and ending _____, 2008. |
| 8. | Option to Extend: | Lessee has the option to extend the initial lease term for two (2) additional periods of five (5) years each. |
| 9. | Demised Premises: | Approximately 177,039  square feet in the building located on the real property more particularly described in Exhibit "A" attached hereto, together with the improvements thereon. |

[Signature Pages Follow]

d-6

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Lease as of the day and year first written above.

LANDLORD:

Date:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation

By:
   Name:
   Title:

Attest:
     Name:
     Title:

[CORPORATE SEAL]

TENANT:

Date:

WIRELESS RETAIL, INC., a Texas corporation

By:
   Name:
   Title:

Attest:
     Name:
     Title:

[CORPORATE SEAL]

ATL01/11405526v9

ATTESTATION

Landlord:

STATE OF

COUNTY OF

       BEFORE ME, a Notary Public in and for said County, personally appeared _____ and _____, known to me to be the person(s) who, as _____ and _____, respectively, of Industrial Developments International, Inc., the corporation which executed the foregoing instrument in its capacity as Landlord, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

       IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this _____ day of _____, 2003.


                                Notary Public
                                My Commission Expires:

Tenant:

STATE OF

COUNTY OF

       BEFORE ME, a Notary Public in and for said County, personally appeared _____ and _____, known to me to be the person(s) who, as _____ and _____, respectively, of Wireless Retail, Inc., the corporation which executed the foregoing instrument in its capacity as Tenant, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

       IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this _____ day of _____, 2003.


                                  Notary Public
                                My Commission Expires:

ATL01/11405526v9

EXHIBIT H

CONVEYOR SYSTEM



ATL01/11405526v9