*THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

In re:

**WAREHOUSE 86, LLC**                    **CASE NO. 08-03423-EE**
                                         **Chapter 11**

      Debtor

## DISCLOSURE STATEMENT
## FOR DEBTOR'S CHAPTER 11 PLAN

Warehouse 86, LLC (the "Debtor") submits this Disclosure Statement pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders Claims against the Debtor and of equity interests in the Debtor ("Equity Interests") in connection with (i) the solicitation of acceptances of the Plan filed by the Debtor with the United States Bankruptcy Court for the Southern District of Mississippi (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing").

## I.   INTRODUCTION

Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

❖      The Plan (Exhibit "A");

❖      The Schedules of Assets and Liabilities, as amended (Exhibit "B"); and

❖      The Monthly Operating Report filed by the Debtor reflecting operations and balances as of May 31, 2009 (Exhibit "C");

- 1 -

After the Bankruptcy Court approves the Disclosure Statement a Ballot for the acceptance or rejection of the Plan will be sent to the holders of Claims that the Debtor believes may be entitled to vote to accept or reject the Plan.

On _____, 2009[1], after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan.

The Disclosure Statement Order, will set forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

### A.     HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. A class of Claims or Equity Interests is impaired if the Claims or Equity Interests constituting that

---

[1] Court to set date and time in a separate Order.

class are not paid in full or if the Claims or Equity Interests are affected by the Plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section II. Listed below, however, is a statement concerning whether each class of Claims or Equity Interests is entitled to vote to accept or reject a plan.

The Claim in Class 1 (Other Priority Claims) is impaired. As a result, the holder of such Claims is entitled to vote to accept or reject the Plan.

There are no Claims in Class 2 (Secured Claims) of the Plan, and therefore there are no holders of the Claims in that Class are entitled to vote to accept or reject the Plan.

The Claims in Class 3 (General Unsecured Claims) of the Plan are impaired and the holders of such Claims may receive a distribution under the Plan, but not in the full amount of their Claims. As a result, the holders of the Claims in Class 3 are entitled to vote to accept or reject the Plan.

The Equity Interests in Class 4 of the Plan are impaired because such Interests will not receive any distribution under the Plan and will not receive or retain any property under the Plan or on account of such Equity Interest, but will be extinguished under the Plan. Therefore, such Equity Interests are not entitled to vote to accept or reject the Plan but are deemed not to have accepted the Plan.

The Court will determine whether the impaired classes have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Claims in such classed. The Bankruptcy Code defines "acceptance" of a plan by a class of claims as

acceptance by creditors in that class that hold: (i) at least two-thirds (2/3) in dollar amount, and (ii) comprise more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the plan.

The vote of the class binds all members of the Class. Thus, if a Class votes to accept the Plan, the provisions of the Bankruptcy Code designed to protect rejecting classes cannot be invoked by members of that Class who voted to reject the Plan. Conversely, if a Class rejects the Plan, the member of such Class who voted to accept the Plan will be deprived of the benefits of the Plan if the Plan is not confirmed. Any subclass is treated as a separate Class for voting purposes.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right either to amend the Plan or to request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests. Under that Section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class, and that the value or benefits to be distributed to the members of such class will not be less than the members of that class would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor believes that the Plan as proposed satisfies all of the statutory requirements imposed by Section 1129 of the Bankruptcy Code. Any objections to the Plan filed and prosecuted by a party in interest, however, may prevent or delay Confirmation if the Court allows the objection, or appeals of a denial of an objection are pursued.

**THE DEBTOR BELIEVES THAT THE PLAN WILL MAXIMIZE THE DISTRIBUTION TO ITS CREDITORS, ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THE ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS. THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN.**

The Debtor's legal advisor is Butler, Snow, O'Mara, Stevens & Cannada, PLLC. The contact information is as follows:

> Stephen W. Rosenblatt; MB No. 5676
> John A. Crawford, Jr.; MB No. 10346
> Butler, Snow, O'Mara, Stevens & Cannada, PLLC
> Post Office Box 22567
> Jackson, MS 39225-2567
> Telephone No.: 601-948-5711
> Facsimile: 601-985-4500
> steve.rosenblatt@butlersnow.com
> jack.crawford@butlersnow.com
> www.butlersnow.com

### B.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot will be sent for the purpose of voting on the Plan. Ballots should be returned to:

> Clerk, United States Bankruptcy Court
> Southern District of Mississippi
> United States Bankruptcy Court
> Post Office Box 2448
> Jackson, Ms 39225-2448

or delivered to:

> Clerk, United States Bankruptcy Court
> Southern District of Mississippi
> United States Bankruptcy Court
> 100 East Capitol Street
> Room 101
> Jackson, Ms 39201

**IN ORDER TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE CLERK ON OR BEFORE 5:00 P.M. (central time) _____, 2009[2].**

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact Stephen W. Rosenblatt at (601) 985-4504.

### C.   CONFIRMATION HEARING

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2009 at _____ \_\_\_\_.m.[3] (prevailing Central Time) before the Honorable Edward Ellington, United States Bankruptcy Court for the Southern District of Mississippi, Room 106, 100 East Capitol Street, Jackson, Mississippi.  The Bankruptcy Court has directed that any objections to confirmation of the Plan must be served and filed so that they are received on or before_____, 2009 at 5:00 p.m.[4] (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

---

[2] Court to set date and time in a separate Order.

[3] Court to set date and time in a separate Order.

[4] Court to set date and time in a separate Order.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.   SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN AND BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR THE DEBTOR'S CREDITORS.

IRS CIRCULAR 230 NOTICE:   TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY

BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.    OVERVIEW OF THE PLAN

### A.    Summary of Classification and Treatment of Claims

The following table briefly summarizes the classification and treatment of Claims and Equity

Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Estimated Allowed Amount[5] | Approximate Percentage Recovery |
|---|---|---|---|---|
|  | Administrative Expense Claims | Paid in full, in Cash, on the later of the Effective Date or when such Claim becomes Allowed; | $10,000.00 | 100% |
|  | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in accordance with the orders allowing any such Claim. | $125,000.00 estimated | 100% |
|  | Priority Tax Claims | Paid in full, in Cash, on the Effective Date, plus interest. | $12,000.00 | 100% |
| 1 | Other Priority Claims | Impaired. Paid 90% of principal amount of Allowed Claim on the Effective Date. | $11,500.00 | 75% |
| 2 | Secured Claims | No Claims | $0 | 0% |
| 3 | General Unsecured Claims | Impaired. Paid only to the extent of remaining funds in the Disbursing Account after the payment of all Administrative Expense Claims and Priority Claims and Class 1 and 2 Claims. Avoidance Actions may be assigned to the Committee for prosecution for the benefit of holders of Class 3 Claims. | $3,500,000 | unknown |
| 4 | Equity Interests | Impaired. All existing Equity Interests in the Debtor will be extinguished and retired and the Debtor shall be dissolved. Holders of Equity Interests will receive no distributions under the Plan. | $0 | 0% |

---

[5] The amounts set forth herein are the Debtor's estimates of the principal amounts owed based on the Debtor's books and records and proofs of claims filed to date, as well as anticipated professional compensation and reimbursement claims. Actual amounts will depend upon the final reconciliation and resolution of all Administrative Expense Claims and Claims.  In addition, interest will accrue on these clams from the Petition Date until paid.  Accordingly, the actual amounts may vary from the amounts set forth herein. The Debtor reserves the right to contest any Claim.

The Debtor believes that the proposed Chapter 11 Plan which provides for a 100% recovery to all holders of Allowed Administrative Expense Claims and a 75% recovery of the principal amount to the holder of all Other Priority Claims, which provides for the possibility of a more than insignificant recovery for General Unsecured Creditors, and which provides that the Equity Interests will retain nothing, is in the best interest of creditors and should be approved.

**B.     CLAIMS AGAINST THE DEBTOR**

In order to evidence the claims of secured and unsecured creditors against the Debtor, copies of Amended Schedules D, E & F, are attached as a part of collective Exhibit "B" to this Disclosure Statement. A copy of the Claims Register as of June 30, 2009 is attached as Exhibit "D" to this Disclosure Statement.

**C.     ASSETS OF THE DEBTOR**

In order to indicate the assets of the Debtor at the time the case was filed, the Debtor has attached copies of its Schedules A and B, as a part of collective Exhibit "B" to this Disclosure Statement. The Debtor has sold substantially all of its assets as more particularly described in Section III herein. As of May 31, 2009, the Debtor had approximately $165,000.00 in its checking account, and still had not received any of the Insurance Proceeds from the tornado or the fire, as more particularly described in Section III herein.

Furthermore, the Debtor owns all Avoidance Actions granted to a Trustee or debtor-in-possession by the Bankruptcy Code, including, but without limitation, all preferential transfers, fraudulent conveyances and post-petition avoidance causes of action. As more particularly set forth in Section IV(I)(6) below, the Debtor has offered to assign these Avoidance Actions, including causes of action against insiders of the Debtor, to the Creditors' Committee

for prosecution for the benefit of the holders of Class 3 claims. The Court will retain jurisdiction of these avoidance claims post-confirmation if the Creditors' Committee elects to accept these Avoidance Actions. Any recovery from the Avoidance Actions will be for the benefit of the Class 3 unsecured creditors, less all costs of litigation and collection. In the event the Creditors' Committee declines to accept these Avoidance Actions, such Avoidance Actions shall be considered released and discharged.

## III.    GENERAL INFORMATION

### A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another purpose of chapter 11 is for the orderly liquidation of a debtor's business. A primary goal of chapter 11 is to promote equality of treatment for similarly situated creditors with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain exceptions, the order approving confirmation of a plan discharges a debtor from any

debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code.

### B.    CORPORATE STRUCTURE

Warehouse 86, LLC is a for-profit limited liability company organized and existing under the laws of the State of Arizona which was organized on November 16, 2001. It was qualified to do and did business at various times in the states of Utah, Tennessee and Mississippi.

The name and position of each of the Debtor's mangers is as follows:

| Name | Position |
|---|---|
| Paul St. James | Chief Executive Officer and Manager |
| Joy St. James | Chief Operating Officer and Manager |
| Ernie Strahan | Chief Financial Officer and Manager |

### C.    BACKGROUND FACTS; DESCRIPTION OF EVENTS LEADING TO BANKRUPTCY

Since 2004, the Company had a growth in yearly sales from about $1 million to an annualized rate of about $25 million as of June 2007. The Company derived its revenues as an online liquidator of distressed inventory and lost freight through its eBay online auction-based

storefront – "Bargainland." The Company had operated the Bargainland online store since 2001, eventually garnering the status as of July 2007 as the largest seller on eBay in terms of the number of closed transactions and total positive feedback from its customers. As of July 2007, the Company was processing and shipping its products from two warehouse facilities; one in Southaven, MS and one in Ogden, UT.

In June of 2007, eBay gave notice to the Company that it would begin to limit the number of monthly auctions the Company placed on eBay. This limitation began shortly after the notice was given; it began with a mandated 25% reduction in July with additional 25% reductions in each succeeding month through October, for a total auction reduction of approximately 75% of the number of auctions that the Company theretofore had on eBay. The basis eBay gave for this reduction was an assertion that the customer feedback rating of Bargainland was lower than eBay deemed appropriate, despite the fact that Bargainland's final rating of over 90% would be very attractive to almost any major retailer.

This massive reduction in the Company's venue for selling its products forced the Company to search for alternative venues, and it began that process in August 2007. After examining virtually every major online auction platform, the Company found that no site could handle even a fraction of the typically large volume of daily transactions to which it was accustomed to launching and closing. Therefore, in September 2007, the Company made the decision to launch a new online auction site, which began as "Bargainland Premier" and was later renamed "Bidtopia" in December 2007. The combined reduction in eBay auctions and startup of the Company's new auction site caused the Company's revenue from auction sales to drop from a monthly rate of about $2.1 million per month in May 2007 to less than $900,000 in January 2008.

On February 5, 2008, the Company suffered another financial blow.  A tornado hit the Company's warehouse and office facility in Southaven, MS causing tremendous damage to the building, including removing a significant portion of the roof.  The Company incurred significant damages to its inventory and equipment located within the building as a result of the tornado.

Six days later, on February 11, 2008, while dangerous sections of the roof structure were being cut away and removed, the roof to the facility was ignited by a contractor's workman who was cutting a seciton of the damaged roof with a welding torch.  Because water supplies to the building had been disrupted due to the tornado, firefighters were unable to extinguish the blaze until the building and substantially all of its remaining contents were destroyed.

Although these were major blows to the Company, both operationally and financially, within two weeks, the Company had located, leased, and begun to setup a new temporary facility.  During the next three months, the Company's remaining Southaven employees were heavily involved in cleanup and debris removal activities at the destroyed Southaven facility in addition to setting up the temporary facility.

Although the Company's new auction venue was beginning to stabilize revenues in January 2008, the loss of income from the business interuption from the tornado and the fire, coupled with the dramatic increase in expenses resulting from the tornado clean-up efforts, caused the Company's financial condition to deteriorate further.

Simultaneously with the launching of its new auction site, the Company began the process of seeking outside investment capital and resources to help stabilize the company.  The Company's desire was to align itself with partners who could bring not only capital, but also access to clients and/or operational talent.  In December 2007, the Company signed an agreement with Santi Company for Santi Company to act as the Company's consultant to assist it in

assessing the value of the Company, to conduct due diligence services, to provide value-creation services, to assist the Company in finding funding sources, and to assist the Company in completing a transaction to provide additional capital for the Company. Over the next seven to eight months, the Company was exposed to a multitude of potential investors, many of which had access to clients, additional business, and operational resources. The Company's management spent untold hours preparing presentations and courting these potential investors. Despite all the time devoted to this process by the Company management, not a single formal offer was presented via Santi Company to the Company which would provide funding, access to clients, or operational talent. In July 2008, at Santi Company's request, the Company signed an agreement terminating its previous agreement with Santi Company. The effort spent by the Company's management in this funding search diverted resources and energy away from its building additional core business, thereby further weakening the Company.

Shortly after terminating its agreement with Santi Company, the Company management began to seek funding on its own accord. Eventually, the Company entered into an agreement in which an investor would purchase substantially all of the assets of the Company on or before the specified closing date of October 1, 2008. This sale, however, was never consummated, as the prospective buyer was unable to close by the October 1, 2008 deadline.

Within days after the collapse of that failed sales attempt, the Company began discussions with Ken May, which eventually led to the Asset Purchase Agreement contained in the Sale Motion in the Company's bankruptcy case. The Company's management believed that this sales agreement provided for the maximum funding return to the creditors of the Company. In light of then-present economic conditions in the United States and throughout the world, the management of the Company felt extremely fortunate to have found Mr. May with his desire and

agreement to purchase substantially all of the assets of the Company in order to provide the maximum return to the creditors of the Company.

In order to effectuate the sale of these assets at an attractive price, the Company filed its chapter 11 bankruptcy case on or about November 4, 2008.

### D.    THE BANKRUPTCY CASE

On November 4, 2008 (the "Petition Date"), Debtor filed its Voluntary Petition under Chapter 11 of the Title 11 United States Code (the "Bankruptcy Code"). Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continued to operate its business and manage its properties and assets as Debtor in Possession under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.

On November 19, 2008, the United States Trustee, pursuant to its authority under Section 1102 of the Bankruptcy Code, appointed an official committee of unsecured creditors (the "Creditors' Committee") (Dkt. # 062). The current members of the Creditors' Committee are:

| NAME OF CREDITOR | REPRESENTATIVE |
|---|---|
| Katt Worldwide Logistics, Inc.<br>4102 So. Mendenhall Road<br>Memphis, TN 38115<br>Telephone (901) 507-3918<br>Fax (901) 322-2938 | Teresa M. Shipe |
| Overstock.com, Inc.<br>6350 S. 3000 E.<br>Salt Lake City, Utah 54212<br>Telephone (801) 947-4341<br>Fax (801) 947-3144 | Edwin W. Christensen |
| Thomas Sales & Services, Inc.<br>2300 Sitler St., Bldg. 685<br>Memphis, TN 38114<br>Telephone (901) 774-6533<br>Fax (601) 774-6858 | Bobby Thomas |

Since the appointment of the Creditors' Committee, the Debtor, through its attorney, has advised the Creditors' Committee periodically concerning the administration of the chapter 11 case and has informed the Creditors' Committee with respect to certain aspects of its operations.

On November 4, 2008, the Debtor filed its Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("SOFA"). On June 30, 2009, the Debtor amended its Schedules. A copy of the Schedules, as amended, is attached hereto as Exhibit "B."

On November 4, 2008, the Company filed a number of First Day Motions, including its *Emergency Motion for a Preliminary and Final Order (I) Authorizing Post-Petition Financing on a Secured and Super Priority Basis Pursuant to 11 U.S.C. §§ 105, 361, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 507(b), (II) Granting Other Related Relief and (III) Scheduling a Final Hearing Pursuant to Rule 4001* (the "DIP Financing Motion"), in which the Company sought to obtain seeks interim and final approval to obtain post-petition financing from Kenneth A. May ("DIP Lender") in the form of a non-revolving Line of Credit in the original principal amount of up to Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "DIP Loan"). On November 7, 2008, the Court entered its Interim Order granting authority for the DIP Loan (Dkt. # 037) and on April 2, 2009, the Court entered it Final Order approving the DIP Financing Motion and granting authority for the Debtor to incur the DIP Loan (Dkt. # 116).

Thereafter, the Company filed its Motion for Authority to Sell Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Outside the Ordinary Course of Business and Assuming and Assigning Certain Unexpired Leases and Executory Contracts Pursuant to 11 U.S.C. §§ 105, 363 and 365 (the "Sale Motion") (Dkt. # 32). The Sale Motion was noticed to all creditors and parties in interest, and on December 10, 2008, the Court granted the Sale

- 16 -

Motion (the "Sale Order")(Dkt. # 070). The Sale Order authorized the sale of substantially all assets of the Company to the Buyer, Kenneth A. May or his designee. The Report of Sale (Dkt. # 076) reflected the December 11, 2008 closing at which the proceeds of $1,290,350.40 were distributed as follows:

1.     A promissory note in the amount of $750,000.00 to Stuart M. Irby in satisfaction of the Irby Secured Indebtedness;

2.     $440,350.38 to repay the DIP Loan to the Debtor; and

3.     $100,000.00 to the Debtor's bankruptcy estate.

The total consideration of $1,290,350.40 was fair and adequate consideration for the assets that were sold, particularly since the sale was not subject to a financing contingency and the sale had only minimum conditions precedent to closing. Pursuant to the Sale Order, the Debtor deposited the $100,000.00 of sales proceeds in its debtor-in-possession checking account where it remains to this day, pending disbursement pursuant to Orders issued by the Bankruptcy Court.

After closing, the Debtor has resolved various claims against the bankruptcy estate. More importantly, the Debtor has continued to pursue the recovery of the Insurance Proceeds related to the fire and tornado of its Southaven, Mississippi facility. RadioShack, Inc. / SCK, Inc. ("SCK") also asserts a claim to a portion of those funds. Although this claim has not been fully resolved at this time, the Debtor believes that the claim will be resolved shortly so that the insurance proceeds can be paid jointly to the Debtor and to SCK pending either a settlement approved by the Bankruptcy Court after notice and a hearing or after an adjudication by the Bankruptcy Court as to the Debtor's rights to these Insurance Proceeds.

On November 6, 2008, the Clerk of the Bankruptcy Court sent a notice to all creditors and parties in interest advising them of the date of the meeting of creditors and also the deadline by which proofs of claim had to be filed: **"Deadline to File a Proof of Claim.** Proof of claim must be *received* by the bankruptcy clerk's office by the following deadline: For all creditors (except a governmental unit): **2/3/09;** For a governmental unit: **5/5/09."** The Bar Date for any person or entity to file proofs of Claim based on prepetition Claims against the Debtor has now passed.

IV.    **THE PLAN OF REORGANIZATION**

    A.    **INTRODUCTION**

The Debtor believes that this chapter 11 Plan maximizes the distribution of assets to its creditors, and that creditors will receive as great as or a greater recovery from the estate of the Debtor than the recovery that they would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code or if the case were dismissed.

The Plan is filed simultaneously with this Disclosure Statement in the electronic version, but it is also being filed separately with the Court. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

    B.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used

throughout the Plan and the descriptions below. In general, an "allowed" Claim or "allowed" Equity Interest simply means that the Debtor agrees, or in the event of a dispute that the Bankruptcy Court determines, that the Claim or Equity Interest, and the amount thereof, is in fact a valid obligation of the Debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the Debtor or other party-in-interest objects.

Section 502(b) of the Bankruptcy Code, however, specifies certain Claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. For example, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any Claim or Equity Interest that either is not listed on the Debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive under the chapter 11 plan no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under Section 1124 of the

Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Under the Debtor's Plan, the Claims in Class 1 (Other Priority Claims) and Class 3 (General Unsecured Non-Priority Claims) are impaired, and therefore, the holders of such Claims are entitled to vote to accept or reject the Plan. There are no Class 2 creditors (Secured Claims). Although Class 4 (Equity Interests) is also impaired. Because members of Class 4 will not receive or retain any property under the Plan or on account of their Equity Interests, however, they are not entitled to vote since under the Bankruptcy Code they are deemed to have rejected the Plan.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtor into the following Classes:

| Class | Claims |
|-------|--------|
| 1 | Other Priority Claims |
| 2 | Secured Claims – None |
| 3 | General Unsecured Non-Priority Claims |
| 4 | Equity Interests |

1.     <u>Unclassified Claims - Administrative Expense Claims</u>.     Administrative Expense Claims are the actual and necessary costs and expenses of the Debtor's Bankruptcy Case that are allowed under and in accordance with Sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtor's estates, actual and necessary costs and expenses of operating the Debtor's businesses, indebtedness or obligations incurred or assumed by the Debtor in Possession during the Bankruptcy Case, compensation for professional services rendered and reimbursement of expenses incurred and any fees or charges assessed by the United States Trustee against the estates of the Debtor under Section 1930 of chapter 123 of title 28 of the Bankruptcy Code.

(a)     <u>United States Trustee Fees</u>. Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.  The amount of these fees is dependent on the amount

of moneys disbursed by the Debtor.  The Debtor estimates that these fees will be less than $10,000.00.

(b)    Professional    Compensation    and    Reimbursement    Claims. Professional compensation and reimbursement claims are all Claims of entities seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under Sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.  The timing of payment to such professionals for compensation for services rendered and reimbursement of expenses will be made as authorized and allowed by the Court. The Court will review and approve all requests for compensation and reimbursement.  The Debtor has incurred approximately $92,500.00 in attorneys' fees through June 30, 2009.  The Debtor will set aside a Professional Fees Fund of $125,000.00 from which the Professional Compensation and Reimbursement Claims can be paid.  In addition, the Debtor has also paid a $40,000 retainer to its outside accounting firm for post-petition fees and expenses, and the charges of that accounting firm are not expected to exceed the amount of its retainer.

Pursuant to the Plan, holders of Allowed professional compensation and reimbursement claims will be paid in full, in cash, in such amounts as are allowed by the Bankruptcy Court in accordance with the order allowing any such Administrative Expense Claim.

(c)    Priority Tax Claims.  A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.  Presently, the Debtor

anticipates having to pay the priority claim of the Tennessee Sate Tax Commission in the approximate principal amount of $12,250.00 as of the Petition Date, together with accrued interest on all of these claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive on the Effective Date, cash in an amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under nonbankruptcy law.

2.      Classified Claims.

(a)      Class 1 - Other Priority Claims.   Other Priority Claims include certain Claims that are granted priority in payment as specified in Section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary and other compensation obligations to employees of the Debtor up to a statutory cap of $10,000 per employee.   The Debtor estimates that on the Effective Date, the Allowed Amount of such Claim, which is held by Eric Eilertsen for unpaid salary and a car allowance for the month of July 2008 under 11 U.S.C. § 507(a)(4), is in the amount of $11,500.00.

Class 1 is impaired by the Plan since the sole claimant will be paid only 75% of the principal amount of its Allowed Claim.   Each holder of an Allowed Other Priority Claim is entitled to vote to accept or reject the Plan.

Although each holder of an Allowed Other Priority Claim is entitled to receive cash in an amount equal to 100% of such Allowed Other Priority Claim on the Effective Date, or as soon thereafter as is practicable, the holder of an

Allowed Other Priority Claim will be paid only 75% of the principal amount of its Allowed Claim.

(b)    Class 2 - Secured Claims.  There are no Secured Claims because the Debtor returned to all secured creditors the deposits or the merchandise which comprised the secured portion of their claims.  To the extent that any creditor is was listed as a secured creditor or asserts a secured claim, it must resort to its collateral first, and the balance will be deemed to be a Class 3 General Unsecured Claim.

Accordingly, Class 2 is unimpaired by the Plan and no votes will be allowed or counted for any Class 2 Claims.

(c)    Class 3 – General Unsecured Claims.  General Unsecured Claims include any Claim against the Debtor other than an Administrative Expense Claim, an Other Priority Claim, or a Secured Claim.  The Schedules listed General Unsecured Claims in the amount of $2,452,000, and to date, proofs of claims as General Unsecured Claims have been filed in the amount of approximately $5,255,963.48.

Class 3 is impaired by the Plan.  It is unknown the extent the holders of such Claims will receive any distribution under the Plan, since they will receive a distribution only from the balance of the $100,000.00 of the Sales Proceeds and from the collection of the Insurance Proceeds after the payment of all administrative and priority claims, as well as the Claims of Class 1, or from the recovery of Avoidance Actions, if any, in the event the Creditors' Committee files its Notice of Acceptance of Avoidance Causes of Action as set forth in

Section IV(I)(6) herein.  As a result, each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(d)     Class 4 - Equity Interests.  Equity Interests include Equity Interests in the Debtor as they existed on or immediately prior to the Effective Date. Class 4 is impaired by the Plan, but because such Interests will not receive any distribution under the Plan and will not receive or retain any property under the Plan or on account of such Equity Interest, such Equity Interests are deemed not to have accepted the Plan.  On the Effective Date of the Plan, all existing Equity Interests in the Debtor will be cancelled.

## C.     MEANS OF IMPLEMENTING THE PLAN

1.     Settlement of Claims.  Pursuant to Bankruptcy Rule 9019, the Plan, including the classification, distribution and other benefits provided thereunder, constitutes a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.

2.     Payment from Debtor-in-Possession Checking Account.  As stated previously, the proceeds from the sale of the Debtor's Assets were placed in the debtor-in-possession checking account.  Any disbursements of the sales proceeds can be made only pursuant to the order of the Bankruptcy Court. The payments required by this Plan will be made from funds in this account.

## D.     PLAN PROVISIONS GOVERNING DISTRIBUTION

1.     Distribution on Account of Allowed Claims.  Distributions in respect of Allowed Claims shall be made on the later of ten (10) days after the Effective Date of the Plan and the date a Claim becomes Allowed, except for the balance of Class 2 Claims,

which will be paid within ten (10) days after all professional fees and expenses have been paid. For purposes of treatment and Distribution under the Plan, all Allowed General Unsecured Claims held by a creditor will be aggregated and treated as a single Claim. Ernest K. Strahan III ("Strahan"), the Chief Financial Officer of the Debtor, will serve as the Disbursing Agent. At the written request of the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Claims will provide to the Disbursing Agent, as the case may be, a single address to which any Distributions shall be sent.

2.    Delivery of Distributions. Except as otherwise provided herein, all distributions under the Plan will be made by Disbursing Agent, who will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as necessary and proper to implement the provisions hereof.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, as applicable, unless the Debtor or Disbursing Agent have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. In the event that

any distribution to any holder is returned as undeliverable, the Disbursing Agent will use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution will be made to such holder without interest; provided that such distributions will be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property will be returned by the Disbursing Agent and will be available to pay claims according to the priorities established by this Plan, and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

3. <u>Manner of Payment</u>. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by a check or, at the option of the Disbursing Agent, by wire transfer.

### E. PROCEDURES FOR TREATING DISPUTED CLAIMS

1. <u>Objections</u>. Except insofar as a Claim is allowed under the Plan, the Debtor shall be entitled to object to Claims. The Bar Date has passed, and the Debtor must file its objection to any Claims on or before the date of the hearing on this Disclosure Statement.

2. <u>No Distributions Pending Allowance</u>. Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, at the Debtor's option, no payment or distribution provided in the Plan shall be made on account of such Administrative Expense Claim or Claim or any junior and subordinate

claim unless and until such Disputed Administrative Expense Claim or Claim is resolved and becomes Allowed.

       3.    <u>Estimation of Claims</u>.  The Debtor may request at any time that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether any of the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.

## F.     PROVISIONS GOVERNING EXECUTORY CONTRACTS AND UNEXPIRED LEASES

       1.    <u>Assumption or Rejection of Executory Contracts</u>.  The Bankruptcy Code empowers the Debtor to assume or reject their executory contracts and unexpired leases. All executory contracts and unexpired leases that existed between the Debtor and any person or entity will be deemed to be rejected by the Debtor as of the date of this Disclosure Statement, except for any executory contract or unexpired lease that has previously been assumed or rejected pursuant to an order of the Bankruptcy Court.

2.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.    Entry of the Order approving this Disclosure Statement will constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the foregoing section.

3.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.    Proofs of claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtor on or before the date first set for the hearing on the approval of the Disclosure Statement.    In the event that the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, will be forever barred and will not be enforceable against the Debtor.

## G.    TAX CONSEQUENCES

The tax consequences resulting from Confirmation of the Plan can vary greatly. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local and foreign tax statutes.    No specific tax consequence to any creditor is represented, implied, or warranted.    Each holder of a Claim or Equity Interest should seek professional tax advice, including the evaluation of recently enacted and pending legislation, because recent changes in taxation are apparently complex and lack authoritative interpretation.

**THE DEBTOR ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY**

**GIVEN HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISERS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO THEIR INDIVIDUAL SITUATION.**

## H.   CONDITIONS PRECEDENT TO EFFECTIVE DATE

1.    <u>Condition Precedent to Effectiveness</u>.  The Effective Date will not occur and the Plan will not become effective unless and until the Confirmation Order shall have been entered and shall have become a Final Order.

2.    <u>Waiver of Condition Precedent</u>.  The condition precedent of the Plan may be waived, in whole or in part, by the Debtor.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

3.    <u>Satisfaction of Condition Precedent</u>.  Any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action.  In the event that the condition precedent specified has not occurred or otherwise been waived, (i) the Confirmation Order will be vacated, (ii) the Debtor and all holders of Claims and interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtor's obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

## I.   EFFECT OF CONFIRMATION

1.   <u>Vesting of Assets</u>.  On the Effective Date, the property of the bankruptcy estate of the Debtor shall vest in the Disbursing Agent free and clear of all Claims, Liens, encumbrances, charges and other interests, subject, however, to the obligations as provided in the Plan.

2.   <u>Binding Effect</u>.  Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan and whether or not such holder is entitled to distribution under the Plan.

3.   <u>Discharge of Claims</u>.  The confirmation of the Plan does not discharge the Debtor from any existing debts and Claims asserted against the Debtor as provided by Section 1141(d)(3)(A) of the Bankruptcy Code.

4.   <u>Exculpation</u>.  Notwithstanding anything in the Plan to the contrary, as of the Effective Date, neither the Debtor, the Disbursing Agent, the Creditors' Committee, and their respective accountants and attorneys (but, in each case, solely in their capacities as such) will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Bankruptcy Case, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Bankruptcy Case, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing will not affect the liability of any person that otherwise

would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

The Plan does not provide for broad third-party releases, but rather, limited exculpation for acts during this chapter 11 case. The exculpation neither affects liability for prepetition actions nor absolves any parties from liability for gross negligence or willful misconduct. The Debtor believes the exculpation provision contained in the Plan is appropriate and reasonable.

5.    <u>Injunction or Stay</u>. Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against the Debtor or Debtor in Possession will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against any of the Disbursing Agent, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Disbursing Agent with respect to such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Disbursing Agent or against the property or interests in property of any Disbursing Agent with respect to such Claim, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Disbursing Agent or against the property or interests in property of any Disbursing Agent with respect to such Claim, and (v) pursuing any Claim released pursuant to the Plan.

6.    <u>Preservation of Avoidance Actions</u>.    As of the Effective Date, any avoidance actions pursuant to Sections 544, 547, 548 or 549 of the Bankruptcy Code will be preserved for prosecution by, and assigned to, the Creditors' Committee for the benefit

of Class 3 Creditors under the Plan, but only if a majority of the members of the Creditors' Committee affirmatively file with the Bankruptcy Court a Notice of Acceptance of Avoidance Causes of Action at least five (5) business days prior to the date first set for the Confirmation Hearing.

       7.    Headings; Descriptions.  The foregoing descriptions are for informational purposes only and are not an admission by, nor prejudice the rights of, the Debtor and/or the Disbursing Agent in all respects.  Moreover, the descriptions contained herein and in any schedule provided in connection with the Plan are not exclusive. The inclusion or exclusion of any actions herein or on any such schedule is in no way a waiver of any Claim or cause of action whatsoever and all such Claims or causes of action are reserved and preserved. As of the date hereof, no determination has been made as to whether to pursue any such potential claims or causes of action.

## J.    RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Bankruptcy Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, the following purposes:

       1.    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance of Claims and Administrative Expense Claims resulting therefrom, and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising our of or relating to the Bankruptcy Case;

       2.    To determine any and all adversary proceedings, applications and contested matters;

3.      To  hear  and  determine  all  applications  for  compensation  and reimbursement of expenses under Sections 330, 331, and 503(b) of the Bankruptcy Code;

4.      To hear and determine any timely objections to, or requests for estimation of, Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

5.      To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

6.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.      To issue such orders in aid of execution of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code;

8.      To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

9.      To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

10.     To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor prior to the Effective Date or by the Disbursing Agent after the Effective Date for an expedited determination of tax under Section 505(b) of the Bankruptcy Code);

11.    To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

12.    To enforce the automatic stay and to issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

13.    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

14.    To hear and determine any rights, Claims or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory; and

15.    To recover all assets of the Debtor and property of the Debtor's estates, wherever located.

**K.    MISCELLANEOUS PROVISIONS**

1.    <u>Tax Reporting Requirements</u>.  Each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

2.    <u>Modification of Plan</u>.  Amendments or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code and the Debtor have complied with Section 1125 of the

Bankruptcy Code.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided: (i) the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code; (ii) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code; and (iii) the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

3.      Revocation or Withdrawal of the Plan.  The Debtor reserves the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date.  If the Debtor revokes or withdraws the Plan in whole prior to the Confirmation Date, then the Plan will be deemed null and void. In such event, nothing in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor. The Debtor reserves the right to withdraw the Plan with respect to any Debtor and proceed with confirmation of the Plan with respect to any other Debtor. In such event, nothing in the Plan will constitute or be

deemed a waiver or release of any Claims against or Equity Interests in such Debtor withdrawn from the Plan or any other person or to prejudice in any manner the rights of the withdrawn Debtor or any person in any further proceedings involving such withdrawn Debtor.

4. Payment of United States Trustee's Fees. The Debtor's Plan, pursuant to 28 U.S.C. §1930(a)(6), provides payment to the United States Trustee of the appropriate sums required for all disbursements made by the Debtor during the Chapter 11 proceeding. In addition, the Plan provides that the Debtor will make payments to the United Sates Trustee of the appropriate sums required for all disbursements made by the Debtor pursuant to the terms of the proposed Plan, including the payment of post-confirmation quarterly fees required by Section 1129(a)(12) until such time as the case is converted, dismissed or closed by the Bankruptcy Court. Additionally, the Debtor shall submit to the United States Trustee post-confirmation monthly operating reports in the format prescribed by the United States Trustee until such time as this case is converted, dismissed or closed by the Bankruptcy Court.

5. Post-Confirmation Date Professional Fees and Expenses. Pursuant to Section 1129(a)(4) of the Bankruptcy Code, the Debtor's attorneys and accountant shall file applications for compensation with the Bankruptcy Court up to and through the Confirmation Date of the Plan, but may submit an estimated amount of professional fees for the Debtor's attorneys and accountant/Disbursing Agent to conclude this Chapter 11 case through consummation. Only after notice and a hearing and Court approval of the applications will any payments be made to these professionals.

6.    <u>Dissolution of the Creditors' Committee</u>.  Unless the Creditors' Committee gives timely written notice to the attorney for the Debtor of its intention to accept and prosecute any avoidance actions under Chapter 5 of the Bankruptcy Code as more particularly set forth in Section IV(I)(6) above, on the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Bankruptcy Case.

7.    <u>No Transfer Tax</u>.  Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer in anticipation of or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

8.    <u>Expedited Tax Determination</u>.  The Debtor and the Disbursing Agent are authorized under the Plan to request an expedited determination of taxes under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtor for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

9.    <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the

rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Mississippi without giving effect to its principles of conflict of laws.

## V.        LIQUIDATION ANALYSIS AND PLAN ALTERNATIVES

The Debtor believes that the Plan affords creditors and interest holders the greatest potential for maximum realization of its assets, and therefore is in the best interest of creditors and interest holders. The Debtor has considered alternatives to the Plan, such as conversion of the case to a chapter 7 liquidation or requesting that the case be dismissed, but the Debtor believes that these alternatives do not afford creditors as great a realization potential as does this Plan. The increased administrative costs and the delay inherent in a conversion to a chapter 7 weigh against that approach, while a dismissal of the case would cause creditors to lose certain rights they have in this chapter 11 case. As a result, the Plan is really the most viable means of liquidating and distributing the Debtor's assets in an orderly way in accordance with the priorities established by the Bankruptcy Code.

A liquidation analysis in this case is unnecessary because the Debtor is liquidating its assets and dissolving. Set forth below, however, is a summary of the approximate amounts of the remaining assets of the Debtor anticipated to be available for distribution after the anticipated payment is made to the Tennessee Plaintiffs, as well as the approximate amount of the liabilities of the Debtor.

        **ASSETS:**
        Cash (DIP Checking Account)      $165,000.00
        Insurance Proceeds               $ To be Determined
        Avoidance Claims                 $ unknown and uncertain
        Total Assets                     $To be Determined

**LIABILITIES:**

| | |
|---|---|
| Administrative Claims | $ 150,000.00 |
| Other Priority Claims | $     8,625.00 |
| Secured Claims | $          0.00 |
| Unsecured Claims | $3,500,000.00 |
| Total Liabilities | $3,650,000.00 |

## VI.       BANKRUPTCY LAW CONSIDERATIONS AFFECTING THE DEBTOR

A.       <u>Risk of Non-Confirmation of the Plan of Reorganization</u>.   Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.   Thus, there is some risk that this Plan will not be confirmed.

B.       <u>Non-Consensual Confirmation</u>.   As discussed above, in the event any impaired class of Claims or Equity Interests does not accept a plan, the Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.

C.       <u>Risk of Non-Occurrence or Delay of the Effective Date</u>.   Although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

## <u>CONCLUSION</u>

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR TO PROVIDE ADEQUATE INFORMATION TO THE CREDITORS AND EQUITY**

**SECURITY HOLDERS OF THIS ESTATE IN ACCORDANCE WITH 11 U.S.C. § 1125. IT IS BELIEVED THAT THIS DISCLOSURE STATEMENT PROVIDES INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WILL ALLOW CREDITORS AND EQUITY SECURITY HOLDERS IN EACH AFFECTED CLASS UNDER THE PROPOSED PLAN OF LIQUIDATION TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.   CREDITORS AND EQUITY SECURITY HOLDERS, HOWEVER, SHOULD REVIEW CAREFULLY ANY RELEVANT PLEADINGS AND SHOULD ANALYZE CAREFULLY THE PLAN OF LIQUIDATION ITSELF PRIOR TO MAKING ANY DECISION AS TO WHETHER TO VOTE FOR THE PROPOSED PLAN OF LIQUIDATION.**

The Debtor hopes and believes that the creditors have gained some understanding of the problems which faced the Debtor prior to the filing of this Chapter 11 case and of the causes which necessitated the filing of this bankruptcy case.   The Debtor believes that this Plan represents a plan which complies with all the provisions of Chapter 11 and will provide for the greatest recovery for all of the Debtor's creditors.

WHEREFORE, the Debtor requests the Bankruptcy Court to approve the Disclosure Statement pursuant to 11 U.S.C. § 1125.

This, the 30th day of June, 2009.

Respectfully submitted,
WAREHOUSE 86, LLC

By: *s/ Stephen W. Rosenblatt*
Stephen W. Rosenblatt
One of Its Attorneys

OF COUNSEL:

Stephen W. Rosenblatt; MB No. 5676
John A. Crawford, Jr.; MB No. 10346
BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
Post Office Box 22567
Jackson, MS 39225-2567
Telephone No.: (601) 948-5711
Facsimile:  (601) 985-4500

CERTIFICATE OF SERVICE

I, Stephen W. Rosenblatt., one of the attorneys for the Debtor, certify that I have this day

caused a true and correct copy of the Disclosure Statement to be delivered via the means directed

by the United States Bankruptcy Court CM/ECF System to the following person:

Ronald H. McAlpin, Esq.
Office of the United States Trustee
Suite 706, A. H. McCoy Federal Building
100 West Capitol Street
Jackson, MS 39269
Ronald.McAlpin@USDOJ.gov

THIS, the 30th day of June, 2009.

By: /s/ Stephen W. Rosenblatt
Stephen W. Rosenblatt (MB No. 5676)

Jackson 3601547v.1